**WESTCHESTER MEDIA COMPANY L.P., et al., Plaintiffs,**

v.

**PRL USA HOLDINGS, INC., et al., Defendants.**

No. Civ.A. H–97–3278.

United States District Court, S.D. Texas, Houston Division.

Aug. 4, 1999.

938

Paul J. Dobrowski, Gibbs & Bruns, Thomas C. Godbold, Fulbright & Jaworski, Houston, TX, for Westchester Media Co. and Navasota Holding Co.

Anthony F. Lo Cicero, Amster, Rothstein & Eberstein, New York City, Thomas H. Adolph, Baker Botts, Michael P Lennon, Jr., Houston, TX,Leslie G. Fagen, Carey R. Ramos, Jeremy Creelan, Mariann Meier Wang, Paul, Weiss, Rifkin, Wharton, and Garrison, New York City, for PRL USA Holdings Inc.

## MEMORANDUM ORDER, FINDINGS OF FACT, AND CONCLUSIONS OF LAW ON DEFENDANTS' MOTION FOR PERMANENT INJUNCTIVE RELIEF

MILLOY, United States Magistrate Judge.

On February 18, 1998, the parties consented to proceed before a United States

magistrate judge, under 28 U.S.C. § 636(c), "for the limited purpose of ruling on the motion for [a] preliminary injunction" that was filed, jointly, by Defendants PRL USA Holdings, Inc. and the Polo Ralph Lauren Corporation, d/b/a Delaware Polo Ralph Lauren Corporation (collectively "PRL" or "Defendants"). (Docket Entry # 19). An order granting limited injunctive relief was entered on July 2, 1998. Subsequently, the parties consented to proceed before this court for all purposes, including entry of final judgment. (Docket Entry # 104). The court entertained testimony on these claims and defenses in November 1998, and heard final arguments in January 1999. Since that date, the parties have supplemented the record with additional evidence in the form of deposition transcripts, copies of all publications issued to date, and memoranda on recent case decisions. Prior to ruling, the court has reviewed all of the briefs, letter memoranda, and exhibits submitted by the parties, including all of the transcripts/videos of depositions given by witnesses for each party.

At the heart of this matter is the contention that the 1997 "re-launch" of a magazine, under the name "POLO", by Plaintiffs Westchester Media Company, L.P. and Navasota Holding Company, L.L.C., ("Westchester" or "Plaintiffs"), will cause a likelihood of consumer confusion as to affiliation, sponsorship, or association with Defendants. In weighing these claims and defenses, the court is called upon to decide matters implicated under the first amendment to the constitution, the effect of an incontestable trademark registration, the contours of a new federal dilution statute, as well as the validity of expert opinions, including the procedures and results from competing market surveys. In making these findings, the court has scrutinized carefully each factor involved in the determination of a likelihood of confusion, the equitable and legal defenses raised, and all aspects of the relief ordered. Following that scrutiny, and based on credibility findings and the governing law, the court is

persuaded, by a preponderance of the evidence, that PRL has met its burden to show a likelihood of confusion on its trademark infringement claim and that injunctive relief should be ordered. The explicit findings required under Rule 52 of the Federal Rules of Civil Procedure, follow this memorandum and are incorporated for all purposes.

## BACKGROUND

On October 1, 1997, Westchester filed this declaratory judgment action against PRL, seeking a determination of its right to use "*POLO*" as the title for a magazine. In response to Plaintiffs' declaratory judgment action, PRL filed counterclaims alleging trademark infringement and dilution under the Lanham Act, codified as amended at 15 U.S.C. §§ 1114(1), 1125(a), and state law claims of unfair competition and injury to business reputation. The court has jurisdiction over the subject matter of these claims pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1338, and 28 U.S.C. § 636(c) and venue is proper in the Southern District of Texas under 28 U.S.C. § 1391. This case requires close decisions on questions of fact and law as the parties dispute the right of each to use the word "polo" in pursuing business goals. PRL, Counter–Plaintiff here, claims that Westchester Media, Counter–Defendant, has infringed its rights by use of that name and that it has diluted its distinctive mark in the process. Westchester responds that PRL's efforts to control the use of the word, by litigation, is an overreaching attempt to extend its current rights under the law. In July 1998, this court was presented with similar issues on PRL's request for a preliminary injunction, and limited injunctive relief was ordered. Since July 1998, Westchester has been required to distance itself from PRL, and its products, by publishing a disclaimer on the disputed magazine cover and in all of its advertising media. At the trial on the merits, and in the post trial briefs and arguments, the parties have elaborated on,

and expanded, the factual underpinnings for the competing claims and defenses.

As the springboard for its claims, PRL insists that, from its inception, Polo Ralph Lauren has initiated, and vigorously pursued, an advertising theme which it has deemed "aspirational". PRL contends that through this "aspirational" style of advertising, it has consistently evoked "lifestyle images" that resonate with elegance, luxury, and distinctively American imagery. PRL complains that Westchester, through its current publication, has imitated and usurped that "aspirational advertising" to further its own goals at the expense of PRL's distinctive trademark. PRL points to Westchester's actions in hiring new editorial staff and displacing the number of articles on equestrian sports with "an abundant mix of elegant fashion, romantic travel, witty observations, [and] world-class reporting" as proof of an intent to infringe on its rights. PRL insists that this wholesale change to the original magazine is a "Big Bang" creation and no mere Darwinian step in the evolution of the periodical. Westchester responds that, on the contrary, it is simply an attempt to broaden its appeal beyond the membership of the United States Polo Association ("USPA"), and that its expansion is not tied in any way to PRL's image. The evolution vs. revolution argument is clear; what is less clear is the impact of the disputed evidence on the determination of a likelihood of confusion. It is undeniable that polo players, team owners, and followers are likely to be affluent and just as likely to be interested in other leisure activities. Certainly, it is safe to assume that polo enthusiasts are also interested in fashion, travel, and "world-class reporting". Westchester is adamant that, as the official magazine for the only American polo association, it has every right to evoke the elegance and opulence that it reports is attendant to that sport. In contrasting its readership ("the real deal"), to the typical Ralph Lauren consumer, Westchester argues that PRL is attempting to use the trademark laws to trample its first amendment right to disseminate the editorial content of its choice. In addressing these arguments, the parties bring into sharp focus Justice Frankfurter's comments in *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942). In speaking to the purpose and import of trademarks in the market setting, Justice Frankfurter stated the following:

> The protection of trade-marks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trade-mark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same- to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trade-mark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can attain legal redress.

*Id.* at 205, 62 S.Ct. at 1024.

From the undisputed evidence, it is clear that since 1967, PRL, under its founder, Ralph Lauren, has built an image known to both national and international consumers, and it is one which encompasses diverse merchandise including fashions, accessories, home furnishings, fragrances, and other products. PRL contends that these diverse offerings are known immediately by the "Polo" name which has become famous and distinctive. (See Memorandum Order, Findings of Fact and Conclusions of Law on Defendants' Motion for a Preliminary Injunction ("July 1998 Memorandum Order"), p. 4).

Over the years, PRL has registered a number of trademarks with the United States Patent and Trademark Office ("PTO"). These registrations have been referred to as the "Polo Trademarks", and each is detailed in the record. (Defendants' Exhibit # 43, # 44, July 1998 Memorandum Order, p. 4). These trademark registrations are in full force and effect and a great number of them have become incontestable under the Lanham Act, codified as amended at 15 U.S.C. § 1065. PRL protects these marks through legal action when necessary. (July 1998 Memorandum Order, p. 4).

Westchester is in the business of publishing magazines and, until the summer of 1997, published only specialty magazines such as "Cowboys & Indians". Westchester's general partner is Navasota, whose sole shareholder is John B. Goodman ("Goodman"). Mr. Goodman is an avid polo player and has been a member of the USPA since 1989. John Goodman currently serves on two USPA committees, as well as on the board of directors of the Museum of Polo and Hall of Fame. Mr. Goodman is also on the board of directors of the Houston Polo Club and served as its president in both 1994 and 1995. Further, Goodman is captain of the Team Isla Carroll, which is reported to be the world's top ranked polo team, and the team that represented the United States in the international Westchester Cup tournament. (See July 1998 Memorandum Order, p. 4).

On May 30, 1997, Plaintiffs purchased the assets of POLO magazine, including its trademarks, from Fleet Street Publishing Company ("Fleet Street"), and its owner, Ami Shinitzky ("Shinitzky"). (July 1998 Memorandum Order, p. 4) Those registrations, granted to Fleet Street and Ami Shinitzky in 1992, are as follows: (1) Registration No. 1,691,432 for "POLO", a "magazine on the subject of equestrian sports and lifestyles"; (2) Registration No. 1,677,088 for a "horse and rider design" for "magazine publication services", the design which appears on the masthead of POLO magazine; and (3) Registration No. 1,710,894 for "POLO Life", a "magazine dealing with equestrian sports and lifestyles." (July 1998 Memorandum Order, p. 5).

When making its original application for registration with the PTO, Fleet Street sought protection for the "POLO" name on "the following services: equestrian magazines and periodicals". It must be noted that the PTO examining attorney refused the application, addressing, among other reasons, that the mark "merely describes the subject matter of the applicant's publication ... and that the Trademark Trial and Appeals Board and the courts have consistently held that marks which describe the subject matter of publications are usually descriptive under Section 2(e)(1)." (Plaintiffs' Exhibit # 114, Bates # 03997). The examining attorney also remarked that, should the publisher choose to pursue registration, several "informalities" must be rectified, but she allowed the company to respond with proof of "registerability". In so ruling, the examiner advised that, if it renewed its application, Fleet Street "may adopt the following identification of goods, if accurate: MAGAZINES ON THE SUBJECT OF EQUESTRIAN SPORTS AND LIFE STYLES". (Plaintiffs' Exhibit # 114, Bates # 03998). Fleet Street was also required to provide a "complete issue of the publication", rather than a reproduction of the cover only, so that "registerability" could be considered. (Id.) When the original application was filed, Fleet Street's attorney did submit issues of the magazine which were published in March and May of 1989. (id.)

In response to the PTO's refusal, Fleet Street filed an amendment to its application refuting the contention that the mark was descriptive and declaring, by way of affidavits, that it had achieved secondary meaning. (Plaintiffs' Exhibit # 114, Bates Number P. 04003–04006). Further, Fleet Street changed the identification of services to state that the mark was for a "magazine on the subject of equestrian

sports and life styles". (*id.*) Apparently, no additional proof of secondary meaning was supplied. The registration, under Section 2(f), was issued on June 3, 1992, following a second demand from the examining attorney for a complete issue of the magazine. (Plaintiffs' Exhibit #114, Bates Number P. 04015 & P. 004009).

From 1975, until it was sold in 1997, the Fleet Street publication was a special interest magazine said to be devoted to "serious enthusiasts" of the sport of polo. (July 1998 Memorandum Order, p. 6). On April 13, 1998, Westchester's newly acquired trademark, Registration No. 1,691,-432, for "*POLO*", a "magazine on the subject of equestrian sports and lifestyles", became incontestable under the Lanham Act, 15 U.S.C. § 1065. (July 1998 Memorandum Order, p. 6). Westchester's declaratory judgment action against PRL was identified, and the pertinent pleadings were provided to the PTO, before that status was conferred. PRL does not contest the validity of that registration, under 15 U.S.C. § 1063. In fact, Westchester notes, correctly, that there is no record that PRL ever objected to a magazine with that name, until the Fall of 1997, when Plaintiffs announced an intention to "relaunch" *POLO* magazine, and to expand that periodical's circulation and audience. It is uncontroverted that PRL made no challenge to the three trademark registrations which the PTO granted to Ami Shinitzky's company. To date, PRL owns no trademark on any magazines, although it did file an application to register a mark for "*Lauren*", a "general features magazine directed to lifestyles". (July 1998 Memorandum Order, p. 6). Although that application was filed in 1993, no magazine has been published under that, or any other name by PRL, or any Ralph Lauren entity.

After an exhaustive review of the law and careful examination of the evidence submitted in this matter, the conclusion is inescapable that a likelihood of confusion exists between PRL's products and the Westchester magazine which has been published since October 1997. In short, the court is convinced that, if the periodical which is now published by Westchester under the name "*Polo Players Edition*", was instead published under the name "Polo", this suit would not have arisen. The court finds that the editorial content, distributorship, advertising, layout, and reportage in *Polo Players Edition* is, in essence, the continuation of Ami Shinitzky's *Polo* Magazine. Based on that determination, the court finds that the "relaunch", under Westchester, with the new, glossy format and altered editorial and advertising direction, evidences an intent to trade on the reputation and goodwill established by PRL over the last 30 years. There can be no better proof of this intent than the fact that Westchester has retained the old thematic content and readership of the original Shinitzky publication, but has now retitled it, *Polo Players Edition.* Surely there is no need for two different magazines if, as claimed by Westchester, the current Polo is a mere continuation of the Fleet Street periodical with an updated look and a cash infusion.

With that finding, comes the harsh, but unavoidable, conclusion that permanent injunctive relief is the only remedy feasible. That the remedy is harsh is without doubt. That Westchester has expended large sums in pursuit of its new venture is obvious, and the disappointment to its new owner is inevitable. Nevertheless, dating from the summer of 1997, the company was on notice that use of the name Polo, for the re-vamped magazine, was problematic. Further, since the preliminary injunction was entered in July 1998, Westchester has not complied faithfully with this court's orders to distance itself from PRL, and that conduct, coupled with the discovery practices during the litigation, lends little credibility to its present assertions that a disclaimer is a sufficient remedy, and one that is not only reasonable, but required, as the least restrictive alternative under the law. For these reasons, the

court comes to the inescapably harsh, but inescapable, nonetheless, conclusion that permanent injunctive relief is required.

## DISCUSSION

### Old Polo Magazine vs. New Polo Magazine

The history of Ami Shinitzky's *POLO* magazine is critical to this dispute. Undeniably, Mr. Shinitzky founded a magazine devoted to the equestrian sport of polo and began publishing it in 1975. Mr. Shinitzky is a polo enthusiast, a well known promoter of the sport, and a member of the USPA. His magazine was endorsed, from the very outset, as the "official publication of the USPA". Westchester, in fact, refers to it, as the "Bible of the USPA". That endorsement and support continues today and Mr. Shinitzky is a member of the Editorial Board of the Westchester publication. (Plaintiffs' Exhibit # 8, # 8A; Defendants' Exhibit # 1). When he began the magazine in 1975, Mr. Shinitzky called his publication *POLO News*. In October of 1976, the title was changed to *POLO* Magazine. That periodical, eventually called simply "POLO", is deemed the "Old POLO Magazine" for these purposes. In 1989, Ami Shinitzky began a new venture, *POLO Life*, purportedly intended as an expansion of the previous publications, but with broader editorial scope and a greater emphasis on "lifestyles" than the earlier magazines. (July 1998 Memorandum Order, p. 5). It appears, however, that *POLO Life* was distributed only in 1989, 1990, and 1997. After its acquisition by Westchester, in 1997, Plaintiffs "relaunched" the Shinitzky magazine, still using the name "POLO", while contemporaneously publishing a separate magazine called *"Polo Players Edition"*. In this action, PRL complains that the "relaunched periodical is no longer a magazine that is devoted to equestrian sports, but is instead a magazine about 'fashion and lifestyle' ". The "re-launched" publication is referred to here as the "New POLO Magazine". The first issue of the New POLO Magazine was published in October of 1997. Westchester, by then keenly aware of PRL's objections to its publication, filed its declaratory judgment action the same month.

Without detailing each contested fact, the court concludes that PRL has spent millions of dollars cultivating its Polo image and in advertising its products and services. Products bearing the PRL marks have resulted in worldwide sales of approximately seven billion dollars. These products range from a wide array of men's and women's apparel to home furnishings, accessories, linens, paints, and fragrances. These sales are generated from retail stores located throughout the world. (11–16–98 A.M. Tr. at 49–51; Defendants' Exhibit # 142). Articles about PRL's products, and Ralph Lauren himself, have been written in magazines as diverse as *Time*, *Financial World*, *Town & Country*, and *Vanity Fair*. (Defendants' Exhibit # 37 A–I; 11–16–98 A.M. Tr. at 63). PRL advertises worldwide, and it is visible in all manner of media, including newspapers, trade publications and magazines. (July 1998 Memorandum Order, p. 7). It is undisputed that, in 1997 alone, PRL ran 952 pages of advertising in such widely-circulated magazines as *Elle*, *Vogue*, *Town and Country*, *GQ*, and *Cosmopolitan*. (July 1998 Memorandum Order, p. 7). It is likewise undisputed that in the same year, Fleet Street/Westchester publications, including the Old and New POLO Magazines, together, produced only 778 pages of copy. (July 1998 Memorandum Order, p. 7). From 1995 through August of 1997, Fleet Street/Westchester printed approximately 2,700 articles. Of that number, 97.8% concerned the sport of polo and "equestrian matters". Only 2.2% of those articles concerned travel, or other non-equestrian subjects. (July 1998 Memorandum Order, p. 7). The Old POLO Magazine was directed to fewer than 7,000 subscribers, most of whom were members of the USPA. Indeed, those belonging to the USPA received the magazine as a benefit of membership. (July 1998 Memorandum

Order, p. 7). Core advertisers in the Old POLO Magazine offered products primarily connected to the sale, care and maintenance of horses, and other equipment integral to the sport of polo. PRL asserts that in the twenty-year history of the magazine, only 407 fashion advertisements appeared. (July 1998 Memorandum Order, p. 7).

Mr. Shinitzky personally negotiated the sale of Fleet Street's *POLO* registrations to Westchester. In the course of those negotiations, he wrote a letter to Reid Slaughter, the first publisher of the New POLO Magazine. In the letter he stated that "Ralph Lauren's spectacular achievement with the name POLO has helped cement the unmistakable association of the name POLO with lifestyle. Your success with *Cowboys & Indians* obviously puts you in a position to fully realize that." (Letter from Shinitzky, dated April 15, 1997) ["Shinizky Letter"], (July 1998 Memorandum Order, p. 8, Defendants' Exhibit # 63). It is not surprising that Defendants point to this as evidence that the "re-launch" of the magazine is an effort to capitalize on the "untapped potential" of that "unmistakable association", and is an attempt to trade on PRL's good will. (Defendants' Exhibit # 64). But, as Westchester points out, repeatedly, and heatedly, it is also true that there is an obvious, and longstanding, association among John Goodman, polo, and the USPA. Westchester contends that the word "polo", and the sport itself, have long had "meanings, images, and connotations all their own." (July 1998 Memorandum Order, p. 8).

Before the New POLO Magazine was published, Westchester sent promotional materials to potential advertisers explaining the magazine's new direction: that is, Plaintiffs shared their hope to highlight "great stories and photography [as] the cornerstone of POLO, which is not about the sport, but rather about an adventurous approach to living life." (Letter from Rod Hunsaker ["Hunsaker Letter"], Defendants' Exhibit # 90). Unlike its predeces-

sor, the new magazine is not distributed solely to USPA members, but is to be "distributed on newsstands, at hotels, resorts and clubs." Further, in an introduction to consumers, Westchester chose to distribute promotional materials about the New POLO Magazine in the Neiman Marcus mail order catalog, known as "*The Book*". (Plaintiffs' Exhibit # 62; Defendants' Exhibit # 15; July 1998 Memorandum Order, p. 8–9). Westchester also chose to use fashion model Claudia Schiffer in the cover photograph of its inaugural issue. PRL reports that only the year before, Claudia Schiffer had been its featured model in an extensive magazine advertising campaign. (Defendants' Exhibit # 41).

Since that promotional mailout, Westchester has published eleven (11) editions of the magazine, from October 1997 to August 1999. In that time, the parties have each conducted a market survey to assist them in their claims and defenses, and Westchester has assembled some documentary evidence tracking its rate of success in marketing the new publication to advertisers and potential subscribers. The court has considered all of those matters in deciding these issues.

**PRL's Claim for Injunctive Relief**

PRL's claims for trademark infringement and unfair competition rest on the contention that a likelihood of confusion results from publication of the New POLO Magazine. PRL alleges that this confusion arises from an appearance that it has sponsored or otherwise approved Westchester's new periodical. In this circuit, the trademark infringement inquiry is distilled in two basic questions: whether the claimant has a protectable right in its mark, and, if so, whether there is infringement as determined by the likelihood of confusion. *See Security Center Ltd. v. First Nat. Sec. Centers*, 750 F.2d 1295, 1298 (5th Cir.1985). To prevail on a claim of dilution under state law, PRL must show that its marks are distinctive and that there is a likelihood that dilution will

result from Plaintiffs' use of those marks; to prevail under the new federal law, PRL must show that its marks are "famous" and that Westchester's use "causes dilution". *Exxon Corp. v. Oxxford Clothes, Inc.,* 109 F.3d 1070, 1081 (5th Cir.), *cert. denied,* 522 U.S. 915, 118 S.Ct. 299, 139 L.Ed.2d 231 (1997) (state law); *Pebble Beach Co. v. Tour 18 I, Ltd.,* 942 F.Supp. 1513, 1567 (S.D.Tex.1996), *aff'd as modified,* 155 F.3d 526 (1998) (state law); 15 U.S.C. § 1125(c)(1).

**The claim for infringement under 15 U.S.C. § 1125(a)**

■ To succeed on its infringement claim under the Lanham Act, PRL must generate findings, in its favor, on whether there is a likelihood of confusion if Plaintiffs are allowed to proceed with publication of the New POLO Magazine in its current format. The Fifth Circuit has held that whether there is a "likelihood of confusion" is a question of fact that is subject to review for clear error only. *Moore Business Forms, Inc. v. Ryu,* 960 F.2d 486, 489 (5th Cir.1992); *T.G.I. Friday's, Inc. v. International Restaurant Group, Inc.,* 569 F.2d 895, 899 (5th Cir. 1978). Further, likelihood of confusion has been deemed "synonymous with a probability of confusion, which is more than a mere possibility of confusion." *Elvis Presley Enterprises, Inc. v. Capece,* 141 F.3d 188, 193 (5th Cir.1998) (citing *Blue Bell Bio–Med. v. Cin–Bad, Inc. .,* 864 F.2d 1253, 1260 (5th Cir.1989)).

**Likelihood of Confusion**

■ "Once the determination has been made that a term is entitled to trademark protection, the pivotal inquiry becomes whether the allegedly infringing mark is likely to cause consumer confusion." *Boston Beer Co. Ltd. v. Slesar Bros. Brewing Co. Inc.,* 9 F.3d 175, 180 (1st Cir.1993). That inquiry is based, in turn, on the court's consideration of several non-exclusive factors which include the following: "(1) the type of mark allegedly infringed, (2) the similarity between the two marks,

(3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion." *Elvis Presley Enterprises,* 141 F.3d at 194 (citing *Conan Properties, Inc. v. Conans Pizza, Inc.,* 752 F.2d 145, 149 (5th Cir.1985)); *see also Blue Bell Bio–Med.,* 864 F.2d at 1260 (citations omitted). "No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these 'digits of confusion.'" *Elvis Presley Enterprises,* 141 F.3d at 194 (citing *Conan Properties, Inc.,* 752 F.2d at 150). The court is also "free to consider other relevant factors in determining whether a likelihood of confusion exists." *Elvis Presley Enterprises,* 141 F.3d at 194 (citing *Armco, Inc. v. Armco Burglar Alarm Co.,* 693 F.2d 1155, 1160–61 (5th Cir.1982)). Equally important is the Fifth Circuit's reminder that the issue of confusion must be examined in the context of the alleged infringing use of the marks, and that no one factor can be isolated to the exclusion of its impact on the others. *See Elvis Presley Enterprises,* 141 F.3d at 197–98, 200–01. The analysis here is also framed by the fact that Westchester has an incontestable registration for the mark POLO Magazine.

**(1) The type of mark allegedly infringed**

■ "The type of trademark refers to the strength of the mark." *Id.* at 201. In weighing the present dispute, the court must first consider whether PRL's marks are "strong" or "weak", as "the strength and distinctiveness of [a claimant's] mark is a vital consideration in determining the scope of protection it should be accorded." *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 259 (5th Cir.1980), *reh. denied,* 615 F.2d 252 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). In the Fifth Circuit, trademarks have been characterized as distinctive and

protectable if they serve as "a symbol of origin." *Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119–20 (5th Cir.1991), *aff'd*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615, (1992). Traditionally, trademarks are classified in the following categories: "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." · *Two Pesos Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992); *see also Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). The last three categories are considered "inherently distinctive" and, as such, require no additional showing in order to be protected "because their intrinsic nature serves to identify a particular source of a product." *Sunbeam Products., Inc. v. West Bend Co.*, 123 F.3d 246, 252 (5th Cir.1997), *cert. denied*, 523 U.S. 1118, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998). It is well accepted that arbitrary and fanciful marks "bear no relationship to the products or services to which they are applied". *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 791 (5th Cir.1983). On the other hand, a mark is deemed descriptive if it merely " 'identifies a characteristic or quality of an article or service,' such as its color, odor, function, dimensions, or ingredients". *Id.* at 790 (quoting from *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 115 (5th Cir.1979)). Descriptive marks therefore are protectable only when shown to have "acquire[d] a secondary meaning in the minds of the consuming public". *Id.* Secondary meaning must be proven by considerations which include (1) the length and manner of the use of the mark; (2) the volume of sales; (3) the amount and manner of advertising; (4) the nature of use of the mark or trade dress in newspapers and magazines; (5) consumer survey evidence; (6) direct consumer testimony; and (7) the defendant's intent in copying the mark. *See Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 541 (5th Cir.1998); *see also 2 J.* THOMAS MCCARTHY, MCCARTHY ON TRADE-MARKS AND UNFAIR COMPETITION § 15:30, at 15–47–48 (4th ed.1996). While each of

these indicia, alone, may not prove secondary meaning, in combination they may establish that consumers consider the mark to be an "indicator of source." *Pebble Beach*, 155 F.3d at 541 (citing *Zatarains Inc.*, 698 F.2d at 795). When considering the evidence on these factors, the court must focus on how it demonstrates, if it does, that the meaning of the mark has been altered in the minds of consumers. For instance, merely spending large sums of money on advertising is not sufficient to elevate a mark to one which has acquired secondary meaning. However, the pervasive influence of such advertisements may serve to emphasize " 'the source significance of the designation through prominent use of the [mark or trade dress]' and are therefore likely to alter the meaning of the mark or trade dress in the minds of consumers." *Pebble Beach*, 155 F.3d at 541 (quoting RESTATEMENT (THIRD) OF UN-FAIR COMPETITION § 13 cmt. c. at 110 (1995)).

In a recent decision, affirming the trial court findings on secondary meaning, the Fifth Circuit relied on the evidence of extensive advertising by the owner, the unsolicited publicity about the product's trade dress, and the defendant's intent in copying and using the disputed trade dress in its own advertising. In commenting on the importance of such evidence, the court remarked that:

> The Lanham Act does not require a party to "own" a word, symbol, or other identifying mark before it may be granted protection from infringement. Rather, all that is required is that a party "use" the mark in commerce to identify its services and distinguish them from the services of others.

*Pebble Beach*, 155 F.3d at 542 (citing 15 U.S.C. § 1127; *Boston Prof'l Hockey Ass'n. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1014 (5th Cir.1975)) (footnote omitted). The evidence that PRL has presented here on the extensive use of its marks, for more than two decades, the dollar amounts it has spent in maintaining

its place in the fashion merchandising and home furnishing market, the results of the surveys conducted in this litigation which indicate widespread association of its name in the marketplace, and Westchester's intent in replicating the Advertising motifs and targeting the PRL customer base, all serve to convince the court that PRL's marks have achieved secondary meaning.[1] (See Findings of Fact in Support of Permanent Injunctive Relief ("Final Findings") # 5, # 6, # 10, # 11, # 12, # 16, # 17, # 19; Defendants' Exhibit # 38).

Indeed, Westchester concedes that PRL has strong rights in its "POLO Trademarks", a family of marks which include such registrations as "Polo by Ralph Lauren" and "USA Polo Club", when they are used in connection with fashion merchandising and clothing. (July 1998 Memorandum Order, p. 12). Westchester contends, however, that while those particular marks are strong, the polo player symbol, and "polo" alone, are materially different marks, and therefore entitled to a different level of protection. Westchester insists that there is insufficient evidence to show that PRL's mark is strong when it uses "polo" by itself, without appending it to any other term or name. Westchester argues that "polo", standing alone, should receive only the most limited protection. (July 1998 Memorandum Order, p. 12). It is true, as Plaintiffs point out, that "Polo" is the surname of a famous historical figure, it is the name of the oldest team sport, at issue here, and it has become a common word for a type of apparel. (July 1998 Memorandum Order, p. 12). Plaintiffs argue that because "polo" is a word in

frequent usage, it is, therefore, not inherently distinctive or entitled to strong protection. (Id.) As Plaintiffs note, third-party usage of a common term may serve to limit the protection to which a party is entitled in the pursuit of its rights. Plaintiffs claim that the facts presented here are akin to those that the Fifth Circuit addressed in *Amstar Corp. v. Domino's Pizza, Inc.*, and so a similar result should ensue. In that case, the parties disputed each other's right to use *"domino"* for sugar products and home delivery pizza. Defendants there introduced evidence of seventy-two (72) third-party registrations for the mark *"domino"* that had been filed with the PTO. The Fifth Circuit agreed with the complaint that the trial court had too "readily dismissed" that evidence, and had given insufficient weight to the third-party registrations, but it still observed that the plaintiff's mark for its sugar and "related products" was distinctive and well known. *Id.* at 259–60. Noting that *domino* is a common English word, in long use as the name of a "game, a hooded costume, a type of mask, and a theory of political expansion", the court held that the third-party uses and registrations merely "limit[ed] the protection to be accorded plaintiff's mark outside the uses to which plaintiff has already put its mark." *Amstar*, 615 F.2d at 260 (citing *American Sugar Co. v. Texas Farm Products. Co.*, 159 U.S.P.Q. 679, 681 (T.T.A.B.1968); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225 (3d Cir.1978)).

Like the defendant in *Amstar*, Westchester has submitted proof of numerous

1. "As a result of their length of use, extensive advertising and volume of sales, the Polo trademarks have achieved a secondary meaning as denoting products emanating from, authorized by or sponsored by Polo." *Polo Fashions, Inc. v. Rabanne*, 661 F.Supp. 89, 93 (S.D.Fla.1986) (citation omitted); *see also Polo Fashions, Inc. v. Extra Special Products, Inc.*, 451 F.Supp. 555 (S.D.N.Y.1978). "An example of a designer who has met the requirement of secondary meaning is Ralph Lauren (or Polo by Ralph Lauren)." According to the New York district court, " 'Polo

Fashions, through its principal and designer, Ralph Lauren, has become a nationally, perhaps internationally, known creator of men's fashions, with its marks receiving commensurate public recognition.' " S. Priya Bharathi, *There is More than One Way to Skin a copycat: The Emergence of Trade Dress to Combat Design Piracy of Fashion Works*, 27 Texas Tech. L.Rev. 1167, 1695 n. 117 (1996) (quoting from *United States Polo Association., Inc. v. Polo Fashions, Inc.*, 1984 WL 1309, *3 (S.D.N.Y.1984)).

other PTO registrations for the word "polo" in connection with a variety of products and services. (Plaintiffs' Exhibit # 1A and # 1C). To emphasize this contention, Plaintiffs point to numerous third-party uses of "polo" in the names of businesses and products. (Plaintiffs' Exhibit # 1A; # 1C; # 1E; # 1F) (Plaintiffs' Exhibit # 96; # 147–157; # 171–174). Westchester has shown that "polo" was listed in eighty (80) non-PRL affiliated "active registrations" with the PTO. (Plaintiffs' Exhibit # 1A). Although the court agrees that there are numerous third-party uses, and many federal trademark registrations that also use the word polo, courts will not assume that the mere existence of third-party registrations is proof that they are in such extensive use as to be probative of a mark's weakness. 2 McCarthy, *supra,* § 11:89 at 11–151. Westchester has made no real showing that any of those marks are actually used, or that the other marks have resulted in consumer recognition in the market. Nor can it escape the fact that, in *Amstar,* the district court had a fifteen-year history of sales and service to compare when evaluating the strength of the marks at issue.

Again, even though Plaintiffs have tallied the number of reported third-party uses for the word "polo" in commerce, they have shown little proof that they are actually in use, or that any of them are relevant to the context in which Westchester and PRL use the word. In *Sun Banks of Florida, Inc. v. Sun Federal Sav. & Loan Ass'n,* 651 F.2d 311, 316 (5th Cir.1981), the court emphasized that third party use of a word is certainly relevant in determining the likelihood of confusion issue, but there it had evidence of "over 4400 businesses registered with the Florida Secretary of State had the word 'Sun' in their names." The court found, from that record, that a number of those businesses could be said to be in competition, in one form or another, with the plaintiff bank. *See id.* at 317 & n. 10. It seems reasonable to require Plaintiffs to demonstrate, at a minimum, that the cited third-party registrations are

being used in a way that generates consumer recognition, if they hope to rebut PRL's claim of a strong mark. *See, e.g., Smith Brothers Mfg. Co. v. Stone Mfg. Co.,* 476 F.2d 1004, 1005 (C.C.P.A.1973); *see also Pebble Beach Co. v. Tour 18 I, Ltd.,* 942 F.Supp. at 1543. The significance of third-party trademarks depends wholly upon their usage. *Scarves by Vera Inc. v. Todo Imports Ltd. Inc.,* 544 F.2d 1167, 1173–74 (2d Cir.1976); *Turner v. HMH Pub. Co.,* 380 F.2d 224, 228 n. 2 (5th Cir.), *cert. denied.,* 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601 (1967). More importantly, the court finds that although Westchester has shown proof that "polo" has been used in connection with lubricating oils and greases, one-hour dry cleaning services, real estate developments, and bicycles, these are distinguishable from Westchester's use on a magazine devoted to "Adventure, Elegance, [and] Sport". (Plaintiffs' Exhibit # 151, # 154, # 148).

Westchester also disputes the strength of PRL's marks through its contention that Defendant's products are rarely identified by "Polo", alone, and so the proof of that precise usage bears on its protectability. In the abstract, Plaintiffs are correct; but in the context of PRL's highly visible marketing strategies for a diverse array of products, it is not persuasive. As early as 1978, in *Polo Fashions, Inc. v. Extra Special Products., Inc.,* one trial court characterized PRL's marks in the following manner:

> it is clear that "polo" is generic to polo shirts and coats, descriptive as to other shirts and coats and fanciful as it is applied to other articles of wearing apparel.
>
> ... To the extent that the word is descriptive, distinctions must be drawn as to the use to which defendants have put the word. If a competitor uses a descriptive word in its trademark sense "as a symbol to attract public attention" and accomplishes its purpose by adopting the trademark holder's distinctive

typestyle or emphasis upon the descriptive word, such use can be enjoined as trademark infringement or unfair competition.

451 F.Supp. 555, 559 (S.D.N.Y.1978) (citations and internal quotation omitted). There, the trial court also noted that "the use of POLO on ties is a fanciful one," and that it is even more apparent "that the use of Polo in a trademark sense on non-apparel items unrelated to the sport, such as home furnishings, is a fanciful and not a descriptive use". *See United States Polo Association, Inc. v. Polo Fashions, Inc.*, 1984 WL 1309 *3 (S.D.N.Y. Dec.6, 1984) (No. 84–Civ 1142(LBS)). As noted earlier, fanciful marks are inherently strong and entitled to a greater level of protection. *See Sunbeam Products., Inc. v. West Bend Co.*, 123 F.3d at 252. Since the era of that ruling, the Polo Trademarks have been promoted even more extensively and its market activities have increased worldwide.

This court finds that PRL has established trademarks in the fashion industry that are both famous and distinctive when associated with numerous and diverse items of men's and women's apparel, fashion accessories, fragrance, and home furnishings. (July 1998 Memorandum Order, p. 11). Used in connection with fashion and fashion accessories, these marks are strong.[2] (July 1998 Memorandum Order, p. 11). That PRL has established a strong mark in the realm of furnishings and fashion merchandising is likewise unquestionable. (July 1998 Memorandum Order, p. 12). Defendant's marks are, therefore, afforded great protection in that use. The question now posed is what level of protection, if any, is the mark entitled to in other fields, particularly in those which may be

seen as a "natural area of expansion." *Elvis Presley Enterprises*, 141 F.3d at 203; *Union Nat. Bank of Texas, Laredo, Tex. v. Union Nat. Bank of Texas, Austin, Tex.*, 909 F.2d 839, 842 n. 9 (5th Cir.1990). While all of the factors that Westchester cites are relevant to the limits of the protection to which PRL is entitled in its use of the word, it is also true that a mark's owner has a right to protection in areas of expansion which are logical to its interests.

Again, the type of mark at issue is only the first step in assessing the strength of the mark for purposes of likelihood of confusion. At times, Plaintiffs appear to argue that, because they have an incontestable registration for "Polo", as the name for an equestrian and lifestyle magazine, there need be no further inquiry into the traditional likelihood of confusion factors. *See Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 92 (4th Cir.1997), *cert. denied*, 523 U.S. 1095, 118 S.Ct. 1561, 140 L.Ed.2d 793 (1998) (the court is " 'free to address whether Plaintiffs' incontestable trademark is descriptive or suggestive in determining whether the likelihood of consumer confusion exists in this case.' ") (quoting *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 935 (4th Cir.1995)). Even though Westchester relies on its incontestable registration to defeat PRL's claims here, it has not presented any persuasive evidence that its mark even approaches the strength of the PRL marks. Outside the limited readership of the USPA, there was no showing that its use of "Polo" in any way identified it, or Fleet Street, as the "source" of the periodical. On the other hand, PRL has shown that its presence is pervasive in the world of magazines, lifestyle and otherwise. Moreover,

---

2. Courts around the country have made similar findings in the context of fashion merchandising. *See, e.g., Gucci America., Inc. v. Action Activewear, Inc.*, 759 F.Supp. 1060 (S.D.N.Y.1991); *Polo Fashions, Inc. v. Fernandez*, 655 F.Supp. 664 (D.P.R.1987); *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145 (4th Cir.1987); *Polo Fashions, Inc. v. Ra-*

*banne*, 661 F.Supp. 89 (S.D.Fla.1986); *Polo Fashions, Inc. v. The Gordon Group*, 627 F.Supp. 878 (M.D.N.C.1985); *Polo Fashions, Inc. v. Magic Trimmings, Inc.*, 603 F.Supp. 13 (S.D.Fla.1984); *Polo Fashions, Inc. v. Extra Special Products., Inc.*, 451 F.Supp. 555 (S.D.N.Y.1978).

when used in connection with any products other than the attire worn while playing equestrian sports, the Polo mark is, at a minimum arbitrary, if not fanciful, for use on any other consumer goods. The court finds, therefore, that, on balance, the strength of the mark analysis weighs in favor of PRL, and this "digit of confusion" benefits Defendants.

### (2) Similarity between the products and services

 Ralph Lauren does not, at present, publish any magazine, much less one devoted to lifestyles, travel, or fashion. Plaintiffs are therefore correct when they argue that the court must consider that Westchester and PRL are in different businesses. Plaintiffs are incorrect, however, when they conclude that because the products are non-competing, confusion cannot arise. True, Westchester publishes a magazine, and magazines are not products which are directly related to clothing, eyewear, home furnishings, or the other items for which PRL has previously obtained trademark protection. That, however, is not dispositive of the competing issues. The law in this circuit is quite clear that there may be a finding of trademark infringement even where the products are entirely different. *See, e.g., Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha,* 754 F.2d 591, 598 (5th Cir.), *reh. denied,* 761 F.2d 695 (1985); *Conan Properties., Inc.,* 752 F.2d at 149–50. "When products or services are non-competing, the confusion at issue is one of sponsorship, affiliation, or connection." *Elvis Presley Enterprises,* 141 F.3d at 202 (citing *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 388 (5th Cir.1977)); 3 McCarthy, §§ 24:3, 24:6 at 24–8–9, 24–13–16. "This is undoubtedly so, for confusion, not competition, is the touchstone of trademark infringement." *Mutual of Omaha Ins. Co. v. Novak,* 836 F.2d 397, 399 (8th Cir.1987) (citing *SquirtCo v. Seven–Up Co.,* 628 F.2d 1086, 1091 (8th Cir.1980)).

Because the likelihood of confusion is a question of fact, the Fifth Circuit has repeatedly rejected arguments that "infringement occurs only when the alleged infringer uses the mark on the same category of product with respect to which the trademark owner obtained the mark." *Kentucky Fried Chicken Corp.,* 549 F.2d at 388; *see also Professional Golfers Ass'n. of Amer. v. Bankers Life & Cas. Co.,* 514 F.2d 665, 669 (5th Cir.1975). Indeed, this is an area in which courts must be especially vigilant because the true issue is whether the complained of use is likely to confuse purchasers as to the user's affiliation or endorsement. *See Fuji Photo Film Co. Inc.,* 754 F.2d at 596 (citing *Kentucky Fried Chicken,* 549 F.2d at 388). This is particularly so when the products are dissimilar, but are used in an area in which the owner of a mark is likely to expand, or to "bridge the gap". As PRL notes, the Fifth Circuit emphasized that "[t]he danger of affiliation or sponsorship confusion increases when the junior user's services are in a market that is one into which the senior user would naturally expand." *Elvis Presley Enterprises, Inc.,* 141 F.3d at 202 (citing Restatement, *supra,* § 21(e) & cmt. j). In *Elvis Presley Enterprises,* the Fifth Circuit found that the parties' products and services did not compete directly, but still held, in the context of those circumstances, that the plaintiff faced irreparable harm from the illusion of affiliation or sponsorship. *See* 141 F.3d at 202, 207. There, the court concluded that a restaurant and bar with live music would be a "natural area of expansion" for the plaintiff. *Id.* at 203. The Fifth Circuit reasoned that, " '[i]f consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely.' " *Id.* at 202. (quoting Restatement, *supra,* § 21, cmt j). It is significant that the analysis in *Elvis Presley Enterprises* was without regard to whether Elvis Presley Enterprises actually

intended to expand into the restaurant market. Instead, the Fifth Circuit found that the "proper focus is on (1) whether the products and services of [the Plaintiff] and the Defendants are similar enough to cause confusion as to source or affiliation or (2) whether the Defendant's bar is in a market into which [the Plaintiff] would naturally be perceived to expand." *Id.*

Inquiry into a natural area of expansion is even more pertinent here because Ralph Lauren has, apparently, investigated publishing a magazine of his own. (Plaintiffs' Exhibit # 109). *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1227 (2d Cir.1987); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 874 (2d Cir. 1986) (If the senior user can show such an intention, it helps to establish a future likelihood of confusion as to source.) The inquiry, therefore, becomes whether PRL's products and services are "similar enough" to Westchester's to cause confusion as to source or affiliation, or whether Westchester's market is one into which PRL "would naturally be perceived to expand." *Elvis Presley Enterprises,* 141 F.3d at 202. Westchester argues that the fact that PRL has been "considering" publishing a magazine for years, without doing so, "suggests that the connection between clothing sales and magazine publishing is more tenuous than PRL would have the court believe". (See Plaintiff's Exhibit # 180), ("It's been harder to sell the magazine on the strength of the Lauren name, and Ralph's vision, than we realized. Ad prospects 'get' Polo and Lauren fashion, but they don't easily see how Ralph can translate his success as a designer into a distinctive magazine"; " 'Is there really a need for a magazine named Lauren?' is a common question.' "); *see also* 11/18/98 A.M. Tr. 91:7 – 94:2 (Slaughter) ("As a publisher and understanding the publishing industry, [PRL's use of 'polo'] has absolutely nothing to do with our ability to publish a successful magazine."). But whether PRL will succeed in marketing a magazine is not entirely on point. Indeed, it has been some time since "need" motivated product development. It seems clear that if the consuming public believes, albeit erroneously, that there is an association between PRL and the New POLO Magazine, the requisite likelihood of confusion is present and the "zone of expansion" argument gains currency.

It is also critical to note that, just as in the case of the Elvis Presley Enterprises' marks, PRL has established pervasive marks across "a spectrum of products". Rather than defeating a claim of a likelihood of confusion, as Westchester argues, the fact that PRL has licenses for so many products, and "is such a strong presence" in fashion marketing, may achieve the opposite result. "The pervasiveness of [the] marks across the spectrum of products . . . support a likelihood of confusion." *Elvis Presley Enterprises,* 141 F.3d at 203 (citing *Armco Inc. v. Armco Burglar Alarm Co.,* 693 F.2d at 1161) ("Diversification makes it more likely that a potential customer would associate the nondiversified company's services with the diversified company, even though the two companies do not actually compete."). Put bluntly, in today's merchandising world, is a magazine published by a clothing designer any less likely than china and dinnerware produced by another designer (Gianni Versace)? Or a magazine and television show devoted to home decorating and crafts, developed by a housekeeper extraordinaire (Martha Stewart)? Are rock concerts sponsored by yet another designer (Tommy Hilfiger), or Broadway musicals produced by Walt Disney's old company any more likely "zones of expansion" than a "lifestyle magazine" published by Oprah Winfrey or even Ralph Lauren?

It appears that the New POLO Magazine, with its emphasis on fashion, elegance, and an "affluent lifestyle" is meant to appeal to the same markets in which PRL has acquired a widespread identity. The court agrees with PRL that "in the consumer's mind, the link between PRL's

Polo Trademarks and the pages of fashion magazines" may be connected. (Defendant's Exhibit # 121). Although, at present, PRL does not publish a "lifestyle magazine", all of the attendant circumstances, as well as the context, in which these non-competing products greet purchasers, indicate that there is a likelihood that consumers will be confused about PRL's association with Plaintiffs' magazine. The court finds that the publication of a lifestyle and fashion magazine, in fact, could be perceived as a "natural area of expansion" for PRL. *Elvis Presley Enterprises*, 141 F.3d at 202.

Findings on this digit of confusion weigh in favor of PRL.

### (3) Similarity of the mark

■ The parties agree that this factor overlaps with a consideration of the similarity of the products. Westchester contends that no similarity factor favors PRL because both parties are using a common word and both are spelling it in the only way possible. Westchester insists that PRL most often uses the word in connection with another qualifier, such as, "Lauren" or with "Ralph Lauren", or with "USA", "Jean", "Sport", or the like, and so these qualified uses necessarily refute any likelihood of confusion because PRL does not, typically, use the word in isolation. To some extent, however, Westchester's argument misses the point in this particular dispute. (Docket Entry # 37, p. 14). As McCARTHY points out,

> [t]he degree of similarity of the marks needed to prove likely confusion will vary with the difference in the goods and services of the parties. Where the goods and services are directly competitive, the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products. Thus, the greater the similarity in the marks, the lesser the similarity required in the goods or services of the parties to support a finding of likely confusion. If the marks are very similar, it is only

necessary that there be a viable relationship between the goods or services in order to support a holding of likelihood of confusion.

3 McCARTHY, *supra*, § 23:20 at 23–51 (footnotes and internal quotations omitted). More importantly, the Fifth Circuit has cautioned that a mark must be considered in the context of its use and not in isolation. Relying on the RESTATEMENT, the court remarked, in *Elvis Presley Enterprises*, that

> [e]ven if prospective purchasers recognize that the two designations are distinct, confusion may result if purchasers are likely to assume that the similarities in the designations indicate a connection between the two users. The relevant inquiry is whether, under the circumstances of the use, "the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated."

141 F.3d at 201 (quoting RESTATEMENT, *supra*, § 21 cmt. c).

Equally important in weighing this factor, is the earlier observation by the Fifth Circuit in *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, that "[t]he similarity of design is determined by considering the overall impression created by the mark as a whole rather than simply comparing individual features of the marks." 628 F.2d 500, 504–05 (5th Cir. 1980). This has been characterized as " 'really nothing more than a subjective eyeball test' ". *Id.* (quoting 2 J. McCARTHY, McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 237:7 (1973)). In fact, it is well settled that "similarity is not limited to the eye or ear." The mental impact of a similarity in meaning may be so pervasive as to outweigh any visual or phonetic differences. That is, the "psychological imagery evoked by the respective marks" may overpower the corresponding dissimilarities in appearance and sound. *Vornado, Inc. v. Breuer Elec. Mf'g Co.*, 55 C.C.P.A. 858, 390 F.2d 724, 728 (1968) (Smith, J., dissenting). "It is not realistic to decide

likelihood of confusion by comparing the two marks naked and divorced from surrounding trade dress, since this is not the way the buyers view the goods in the market." 3 McCARTHY, *supra*, § 23:60 at 23–137. As the Fifth Circuit has observed, "trademarks cannot be isolated from the labels on which they appear." *Sun–Maid Raisin Growers of Cal. v. Sunaid Food Products, Inc.*, 356 F.2d 467, 469 (5th Cir. 1966). It was made clear in *Elvis Presley Enterprises*, that the meaning that is conveyed by use of a mark depends on the context in which it is used. Referring to the valuable, but difficult to articulate, attribute of a mark, the court emphasized Justice Frankfurter's assessment:

> The Supreme Court has said that "[t]he protection of trade-mark's is the law's recognition of the psychological function symbols." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942). To understand a symbol's psychological function, one must consider it in the context in which it is used and not in a vacuum. *See American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 11 & n. 7 (5th Cir.1974) ("[W]ords are chameleons, which reflect the color of their environment."); 2 JEROME GILSON, TRADEMARK PROTECTION AND PRACTICE § 5.09[1], at 5–137 n. 1 (Jeffrey M. Samuels ed., 1997) (noting that advertising is used by the holders of marks to "establish[ ] a sufficient aura of desirability to induce the public to purchase their products and services").

*Elvis Presley Enterprises*, 141 F.3d at 197 (alterations in original).

The court finds that, given the context of its use on the cover of a magazine devoted to "adventure" and "elegance", the similarity of the image created by the New POLO Magazine does suggest an identification with PRL's products. In that regard, the use of the word on a glossy, high production value magazine, which depicts well-groomed, well-dressed, well-fed, and, to date, attractive Caucasian males and females, appears quite similar to the PRL mark which has been reproduced, in similar settings, in thousands of pages of magazine ads. Further, "[w]hile an abstract marketing theme alone may not be the subject of exclusive rights, when defendant uses a similar mark in the context of a similar marketing theme, confusion is made all the more likely." 3 McCARTHY, *supra*, § 23:52 at 23–116 (citing *B.D. Communications, Inc. v. Dial Media, Inc.*, 429 F.Supp. 1011 (S.D.N.Y.1977); *General Foods Corp. v. Borden Inc.*, 191 U.S.P.Q. 674 (N.D.Ill.1976)). In weighing trademark disputes, and the evidence on the issue of a likelihood of confusion, the court

> must strive to place itself in the shoes of a prospective purchaser. In this role, the court does not act as an enlightened educator of the public but takes into account the mythical ordinary prospective purchaser's capacity to discriminate as well as his propensity for carelessness. Accordingly, an overly analytical approach with close attention to specific differences is less important than the overall impression of general similarity.

*E.I. DuPont de Nemours & Co. v. Yoshida Intern., Inc.*, 393 F.Supp. 502, 510 (E.D.N.Y.1975). " 'Legal surgery, in which trademarks have parts enhanced or discarded, is of little aid in determining the effect of design marks on purchasers who merely recollect. The scalpel is employed by lawyers, not purchasers.' " 3 McCARTHY, *supra*, § 23:58, at 23–130 (quoting *Grandpa Pidgeon's of Missouri, Inc. v. Borgsmiller*, 477 F.2d 586 (C.C.P.A.1973)). The New POLO Magazine, through its cover photographs and layouts, appears to, as PRL argues, link a promise of "sophistication and attempt[s] to serve the same consumers under the Polo name". (Docket Entry # 20, p. 15). Westchester's use of its POLO mark on the New POLO Magazine creates a likelihood that consumers will assume that it is sponsored or produced by Polo Ralph Lauren.

Accordingly, the court finds in favor of PRL on this digit of confusion.

**(4) Identity of advertising media used**

The court finds that the Old POLO Magazine was, without doubt, a periodical devoted to "the sport of polo" and it was distributed primarily to polo players, most of whom were members of the USPA. In that context, the POLO mark was clearly used in connection with the equestrian game. When Plaintiffs chose to revamp the magazine, it is reasonable to conclude that they changed the context in which the mark is used. By changing the context, and accenting features devoted to "adventure" and "elegance", Plaintiffs have changed the meaning that the mark conveys. The new meaning, as PRL maintains, appears to have more to do with "elegant lifestyles" than with the sport. The New POLO Magazine's advertisers are "fashion oriented" to an extent that was not present in the previous publications. The New POLO Magazine's original promotional and marketing materials touted its fashion and lifestyle content and de-emphasized the sport that is its reported inspiration. (July 1998 Memorandum Order, p. 19). Further, "[i]n determining the meaning and connotation which the trademark projects, it is proper to look to the context of use, such as material on labels, packaging, advertising and the like." 3 McCarthy, *supra*, § 23:26 at 23–61.

The court concludes, from all of the evidence presented, that Plaintiffs' target audience is no longer USPA members, but apparently "high-end retail" customers. Neiman Marcus, an important PRL retailer, was selected, in particular, for Westchester's promotional distribution. The court has compared the promotional literature distributed by Westchester in the Neiman Marcus catalog, and finds the content and the layout to be very close to PRL print ad campaigns. (*See* July 1998 Memorandum Order, p. 19; Defendants' Exhibit # 4A–B; # 4C–D). At trial,

Westchester was vehement in denying, not only an intent to link the magazine to Nieman Marcus in an attempt to exploit PRL's marks, but also in its assertions that the marketing ploy was a "dismal" failure, never to be repeated. While the latter declarations are easily accepted as true as to that particular pitch, they do little to allay concern that the magazine is interested in, and in order to survive, will continue to pursue similar strategies in the future that are aimed at PRL's customer base. As noted earlier, the premier issue of the magazine had a well-recognized fashion model on its cover, rather than any sports figure. (Defendants' Exhibit # 1, October 1997 issue). In fact, in the eleven (11) issues that have been published, the cover photographs have displayed models, (Schiffer, Seymour, and Gannon), soon to be models (Azzarro), or celebrities (Prince Charles, Tommy Lee Jones, George Plimpton), on nearly every issue. For those editions which depict players rather than fashion models/celebrities on the cover, it can hardly be disputed that, to date, good looks are a hallmark of each man featured. The court agrees with PRL that Westchester's "exploitation of the same channels of commerce" will result in targeting the same customers that it seeks. The court concludes that Westchester, in choosing to target the Neiman Marcus cardholders, and like audiences, was also targeting PRL consumers.

This digit weighs in PRL's favor on its showing of a likelihood of confusion.

**(5) Identity of retail outlets and purchasers**

Here, there is no firm evidence of a strict identity of retail outlets and purchasers because Plaintiffs intend to sell the magazine at airport counters, bookstalls, and in general retail locations. *See Lyons Partnership v. Giannoulas*, 14 F.Supp.2d 947, 953 (N.D.Tex.1998), *aff'd*, 179 F.3d 384 (5th Cir.1999) (No. 98–11003). However, from the context of the targeted audience and the advertising media selected,

the court finds that, in this instance, there is a likelihood that PRL's products and services will be associated, in error, with the New POLO Magazine. PRL has made uncontroverted assertions that it has spent millions of dollars in the last three decades to promote its products, and to expand the profile of fashion and "elegant lifestyles", through its consistent presence in publications devoted to those markets. (July 1998 Memorandum Order, p. 20). It is also true that a survey Westchester commissioned, in early 1998, shows that subscribers to the New POLO Magazine are generally affluent and well-educated. (Plaintiffs' Exhibit # 124; 11/18/98 P.M. Tr. 80–81; 11/19/98 P.M. Tr. 31). That survey revealed that the average subscriber to the New POLO Magazine lives in a household with a net worth of $1.4 million, and a mean net worth of $3 million; an income of $195,000, with a mean income of $435,000; a total investment portfolio value of $649,000, with a mean value of $1.829,000; and a home with a market value of $363,000, and a mean value of $606,000. Further, 92.7 percent of the New POLO Magazine subscribers have attended college. (11/18/98 P.M. Tr. 77; Plaintiffs' Exhibit # 124; 11/18/98 P.M. Tr. 79, 80).

PRL's representations about its presence in fashion media and retail outlets, nationally as well as internationally, are undisputed. (July 1998 Memorandum Order, p. 20). But common sense recognizes that neither it, nor Westchester, can hope to succeed by targeting only the wealthiest customers. Through its advertising, layouts, and content, as described earlier, Westchester has created the opportunity to capitalize on the public's familiarity with PRL's profile in the retail market. In that regard, the court cannot ignore Westchester's decisions to appeal directly to Neiman Marcus cardholders in the distribution of promotional materials, in October of 1997, and to use fashion models Claudia Schiffer and Stephanie Seymour on magazine covers.

Finally, the court has reviewed all publications submitted by Westchester in support of its contention that there is no intent to trade on PRL's good will. (Plaintiffs' Exhibit # 160, and all supplements; Defendants' Exhibit # 1). From that review, the court concludes that there is a concerted effort to replace the audience of the Old POLO Magazine, and to appeal to readers who have no special affinity to, or interest in, equestrian sports. A comparison of the promotional materials sent to Nieman Marcus cardholders with PRL's previous advertising compels a finding in PRL's favor on this digit of confusion. (July 1998 Memorandum Order, p. 20; Plaintiffs' Exhibit # 62; Defendants' Exhibits # 4A–B; # 4C–D; # 39).

### (6) Intent

■ Although no one factor is dispositive, it has been held, repeatedly, that the defendant's intent is a "critical factor" in determining whether there is a likelihood of confusion. *Sunbeam Products., Inc. v. West Bend Co., 123 F.3d at 258, (citing Chevron Chemical. Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 703–04 (5th Cir.1981), *cert. denied,* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982)). The court agrees with Plaintiffs that there is no reason to assume, or conclude, that the mark was adopted by John Goodman with the sole intent to derive a benefit from PRL. However, Plaintiffs' subsequent actions, including the decision to publish a separate periodical, one much more heavily devoted to lifestyle, travel, and other activities unrelated to the sport championed by the USPA, is persuasive evidence of an intent to trade on PRL's goodwill and reputation in the Polo trademarks, after the acquisition. The "revamping" of the Old Polo Magazine in format, content, and staff is readily apparent, and was, in fact, trumpeted by the new publisher. (July 1998 Memorandum Order, p. 21; Defendants' Exhibit # 90, "Hunsaker Letter", Defendants' Exhibit # 77, "Rizzo Letter"). Again, as there is a

logical connection between John Goodman and the sport of polo, the court makes no finding as to Westchester's good faith in the initial acquisition of the Fleet Street mark, and that is not dispositive to a finding of likelihood of confusion. *See Elvis Presley Enterprises*, 141 F.3d at 203 (citing *Fuji Photo Film Co.*, 754 F.2d at 597; RESTATEMENT, *supra*, § 22 cmt. b; 3 McCARTHY, *supra*, § 23:107 at 23–207–08). Clearly, Mr. Goodman has a long recognized affiliation with the sport. But for the reasons stated below, the court concludes that there is sufficient evidence to show that Westchester harbors a current intent to align its new magazine, the one emphasizing lifestyle and fashion, as opposed to *Polo Players Edition*, with PRL's mark and reputation. Westchester itself must see a distinction between a magazine devoted to an equestrian sport, and a magazine that heralds lifestyle images. The court has been presented with no other credible reason for the decision to publish *Polo Players Edition* separately from the "re-launch" of the New POLO Magazine.

The results of the court's own review of the previous editions of POLO Magazine (those from January 1975 through August 1997) were detailed in the memorandum order issued on July 2, 1998. That recitation is adopted here for all purposes, but will not be repeated in its entirety. (*See* July 1998 Memorandum Order, pp. 21–23). Suffice it to note that this court is convinced that, from 1975 to the summer of 1997, Fleet Street Publishing, and Ami Shinitzky, were content to sell a magazine which was clearly aimed at polo players and aficionados. As recited in the earlier memorandum, in an editorial celebrating its 20th year of publication, Mr. Shinitzky touted its adherence to reportage on "our sport". (May/June 1995, Polo, p. 83). Included in that particular issue was a retrospective column, recapping the magazine's

history, and recalling all of the different logos utilized by Fleet Street during that 20–year span. The article also commented on the fact that the magazine had changed its name three times in the first five years of publication. (May/June 1995 *Polo*, p. 120). That anniversary issue is unequivocal evidence that, although the Old Polo Magazine had undergone continual alterations in its look, there was no deviation from its emphasis on the sport or its service to members of the USPA. (*See* May/June 1995 issue of *Polo*, p. 9, 98).

Since the ruling on the preliminary injunction, Westchester has published six (6) new editions. The August 1998 edition of the New POLO Magazine, showing a cover photograph of Holly Gannon, model and wife of a polo team owner in a sailboat, featured the following stories: "King of Haute Couture", an article about Bernard Arnault, director of Louis Vuitton, Moet & Chandon & Hennessey, the French luxury goods maker ("The French Revolutionary"). That article is accompanied by photographs taken by Dan Lecca, who is described as a highly regarded photographer noted for his work at fashion shows to "snap Christian Dior, Givenchy, Christian LeCroix, and the Louis Vuitton collections". (Plaintiffs' Exhibit # 160, August 1998, p. 54). Of the ten pages of photographs that accompany the article, eight depict designer clothing or runway scenes; the other two pages show perfumes, purses, champagne, and other products manufactured by LVMH ("the Arnault empire"). The Blue Book section in the August 1998 issue is devoted to a tribute to Texas' own Cecil Smith. The article describes him as a "legend in his time", and notes that "Smith came to polo when the game was at its zenith". (Plaintiff's Exhibit # 160, August 1998, p. 124, 127). The next publication, the October 1998 issue, features the actor Tommy Lee Jones on the cover.[3]

---

**3.** The cover photograph of Tommy Lee Jones (wearing a khaki shirt, a cowboy hat and holding a dog) has been the subject of some argument between the parties. PRL contends

that this particular portrayal of Mr. Jones is a clear attempt to imitate a well known Ralph Lauren pose. Westchester labels that contention as preposterous. In the court's view,

Articles in that issue include one on "Special Forces Training in Costa Rica", which asks readers to "Tackle Adrenalin–Pumping Adventure in Costa Rica With The Green Berets". (Plaintiffs' Exhibit # 160, October 1998, p. 68). An editorial about the PRL litigation is also referenced on the cover under the title, "Polo Speaks Out". The "Blue Book" section of the October 1998 edition of the magazine, is a nine-page spread, in which each page contains photos of a polo game or horses and riders.

In the November/December 1998 edition, the one with the cover photograph of Adolfo Cambiaso, the feature articles are titled "Adolfo Cambiaso, Polo's Sexy Superstar"; "Eveningwear's Sensual Side"; and "Rough Trade: Colombia's Emerald Wars". (Plaintiffs' Exhibit # 160, November/December 1998). A trailer at the top of the magazine touts articles on "South American Odyssey: Cool Resort—Hot Sports—Wild Ride". In the center of the magazine is a fashion article called "Unbridled Passion, This Winter's Evening Attire is Intense and Sophisticated With Deeply Romantic Overtones". Accompanying that article are eight pages of photographs, featuring men and women in various stages of evening dress. (Plaintiffs' Exhibit # 160, November/December 1998, p. 56). Most of the photographs do include horses, or at least playing grounds in the background. In fact, one of the males captured in the evening wear photos is identified as a polo player. The Blue Book section in that month's edition is a six-page article, including black and white photographs, about Winston Churchill.

The January/February 1999 issue of Polo Magazine features George Plimpton on the cover, in a photograph which places him against the head and neck of a horse. It is noteworthy that this is the first Westchester publication in which a horse is prominent in the cover design. (Plaintiffs' Exhibit # 160, January/February 1999). Articles in that issue include ones titled "High Goal Season Sizzles in West Palm Beach"; "Plimpton on Polo"; and "The Great Cigar Debate". A trailer at the top of the magazine highlights an article on Carey Packer, "The Richest Man You've Never Heard Of". (*Id.* at 64). The Blue Book section in that edition consists of thirteen pages, with no one topic or person profiled, but which does include pictures, or drawings, of horses/players on every page. (p. 90).

The cover of the April 1999 edition of the magazine is an eye-catching photograph of palm trees against a blue sky. (Plaintiffs' Exhibit # 160, April 1999). The feature article that month is "The Relaxed Pace and Pleasures of Palm Springs", and it addresses the polo season in that city. Included in that edition, as well, are articles on "Luxury in the Himalayas", and "Paris Review: From the Runways to the Hideaways". The Blue Book section is seven-pages, including black and white photographs, devoted to deceased player Porfirio Rubirosa ("The Naughty, Naughty Boy") (*id.* at 98).

The June 1999 issue has, as its cover photograph, a picture of the Argentine polo team.[4] (Plaintiffs' Exhibit # 160, June 1999). Each player on the Argentine polo team is shown casually dressed in a shirt and polo slacks. The trailer across the cover of the magazine directs readers to articles on "Scottish Isles"; "The New Romantics"; and "Versailles Bacchanal".

---

either position is reasonable. From a New Yorker's perspective, perhaps Tommy Lee Jones in that setting, clothing, and pose is reasonably reminiscent of the Ralph Lauren ad. However, to a native, or near-native, Texan, Westchester's assertion that Tommy Lee Jones is not, and would not, be mimicking a fashion designer in such a pose is equally credible.

4. The court was notified at the time of publication that the disclaimer type size was so reduced as to be ineffective on that edition. (April 26, 1999, letter from Tom Godbold). The court accepts Westchester's assertion that the omission was inadvertent and that it was remedied immediately by use of a "sticker".

The last title refers to an article about a scheduled gala at Versailles, and the subtitle invites the reader to "think Fellini meets Marie Antoinette". (*Id.* at 22). The "The New Romantics" article is a fashion piece accenting wedding attire. (*Id.* at 56). The Blue Book section in the June 1999 publication is a seven-page article about Lord Mountbatten, and he appears in each of the photos. (*Id.* at 90).

The August 1999 issue of the New POLO Magazine features a black and white cover photograph of "Jemma Kidd on Brick Lane". (Plaintiffs' Exhibit # 160, August 1999). This issue appears to be devoted to "the New London", but other articles include ones on journeys through "New Zealand's Wild, Uncharted Waters, Hidden Caves, and Rainforests" ("Land of the Lost"); a two-page color photograph on human towers in Tarragona, Spain ("It Takes a Village"); an article on movie producer Darryl Zanuck, addressing his interest in polo ("Gods and Monsters"). (*Id.*) Feature articles on London include descriptions of the restaurants, pubs, bars, and shops to visit, along with an agenda of polo matches scheduled for the summer season in Great Britain. The article, "Cool Britannia, the New Scenes of the Young, the Beautiful, and the Incredibly Hip", is a fashion spread, which includes 12 pages of color photos showing models wearing clothing designed by Dolce & Gabbana, Shanhai Tang, Etro, Escada, and Vivenne Westwood ("Wild in the Streets"). (Plaintiffs' Exhibit # 160, August 1999, pp. 50–59).

After considering all publications submitted to date, the court finds that with the October/November 1997 edition of the New POLO Magazine, Westchester has taken a decidedly different editorial direction from Fleet Street Publishing. A casual glance at issues of the New POLO Magazine shows that it is no longer devoted to the sport in the manner of the Fleet Street publication. The advertising, layout, letters to the editor, and feature articles are quite different from those that were published in the Old POLO Magazine, or those now being published in *Polo Players Edition.* The court is still persuaded that there is no better proof of this change in emphasis than the letter from Rod Hunsaker, Plaintiffs' Director of National Accounts, which accompanied a request to PRL, and others, to advertise in the new publication. (July 1998 Memorandum Order, p. 24). Hunsaker stated that "great stories and photography are the cornerstone of POLO, which is not about the sport, but rather about an adventurous approach to living life—a celebration of history's rich lessons and today's unique opportunities." (July 1998 Memorandum Order, p. 24; "Hunsaker Letter"). This announcement was followed shortly by the promotional inserts which were sent to the Neiman Marcus customers. (July 1998 Memorandum Order, p. 24). When these materials are compared to previous PRL advertising campaigns, the conclusion is unavoidable that Westchester hoped to align itself with Ralph Lauren's image and reputation with the resultant "trade" on PRL's good will. (July 1998 Memorandum Order, p. 24).

Westchester has made many attempts to deflect the impact of Mr. Hunsaker's letter and to distance itself from him and his marketing approach. Westchester points out that Mr. Hunsaker is no longer employed by the magazine and argues implicitly that, to the extent one chooses to believe that his remarks were unauthorized, Plaintiffs should not bear the consequences of his erroneous sales approach. In that regard, John Goodman testified that he was not aware of Rod Hunsaker's letter and would have halted it immediately had he known. But the weight of the evidence contradicts Mr. Goodman's testimony that he "did not have that much contact with Rod," and that he entirely rejected Mr. Hunsaker's efforts to sell the New POLO as a general lifestyle magazine. (11/17/98 P.M. Tr. at 18.) Indeed, long after Rod Hunsaker first mailed the "not about the sport" letters, in early Sep-

tember, and after the first issue of the New POLO Magazine was published in October 1997, Mr. Hunsaker wrote, on November 5, 1997 that he:

had a talk yesterday with John [Goodman]. He reassured me that my territory in New York and by category [sic] was safe, and that I would not, under any circumstances, lose the freedom to aggressively sell into those markets.

(Defendants' Exhibit # 144). Mr. Hunsaker remained on staff until April 1998, months after he had sent those letters, and after he had informed Mr. Goodman and Jim Lonergan, the current publisher, that potential advertisers had expressed concern about the name of the magazine because of its perceived affiliation with Polo Ralph Lauren. (Hunsaker Depo. at 43), (11/17/98 P.M. Tr. at 17–18 (Goodman)). In addition, Mr. Hunsaker testified that he had "five or six" hours of discussions with Reid Slaughter, to gain an understanding of the new venture, before he accepted the position with Westchester. After he was hired, Mr. Hunsaker reported that he attended several meetings in Dallas, one with John Goodman present, to discuss the content of the magazine. (Hunsaker Depo. at 19–20; 74; 80–84, Hunsaker Depo. at 94:21–95:23.)

Further, Mr. Goodman's trial testimony reveals the fragile foundation for Westchester's insistence that the New POLO Magazine is dedicated to the sport of polo and "equestrian lifestyles." After he was shown a series of articles that appeared in the new publication, ones featuring topics such as "Rudyard Kipling's House" (Defendants' Exhibit # 1, August 1998 issue, at 88), and survival training in Costa Rica (Defendants' Exhibit · # 1, October 1998 issue, at 68), Mr. Goodman testified that those subjects concerned "equestrian lifestyles" simply because those destinations could be reached from a polo field, in a matter of hours, by airplane. (11/17/98 A.M. Tr. at 128–29). Mr. Goodman also testified that he believed that the New POLO Magazine might legitimately report on almost any activity as an "equestrian lifestyle", merely because a polo player was involved in that pastime in some way. (11/17/98 A.M. Tr. at 131–38).

Westchester's principals, current and former, have also made contradictory sworn statements on the matter of the magazine's goals. John Goodman testified that "it is Polo's policy to devote at least twenty-five (25%) percent of each issue of Polo to the game itself." (Declaration of John Goodman submitted in Response to PRL's Preliminary Injunction Motion ¶ 7.) At trial, Mr. Goodman testified that he communicated this policy to the magazine staff. (11/17/98 P.M. Tr. at 21–22.) Yet the staff members questioned on this point either have no recollection of it, or remember it differently. Remarkably, James Lonergan, the magazine's current publisher, testified that he was informed of this policy only one day before his deposition. That deposition took place eight months after Mr. Goodman submitted the declaration in which the "25% polo policy" was advanced, and ten months after Mr. Lonergan assumed his position as publisher, replacing Reid Slaughter. (Lonergan Depo. at 116;11–16.) It also appears that the "25% polo policy" has not been transmitted to Westchester's new regional advertising sales staff. Not one of those individuals was aware of the "25% policy" which Mr. Goodman spoke about in his pre-trial declaration and deposition testimony. (Fields Depo. at 62:13–18; Caris Depo. at 23:11–14; Anguiano Depo. at 19:2–6.) In fact, Steve Connatser[5] recalls discussions involving a "beginning percentage" of 15%, while Rod Hunsaker recalls

5. Steve Connatser, who is no longer affiliated with the magazine, was the original editorial designer. His wife, Judy Connatser, is employed by Neiman Marcus and, it was she who established contact for the promotional tie-in to "The Book". Mr. Connatser was also a highly visible spokesperson for Westchester when the magazine was "re-launched" in the summer of 1997. He made an appearance on the daily talk show, *Good Morning America*, to promote the magazine. (Defendants' Exhibit # 45A).

that a figure of "approximately 30%" was "thrown around." (Connatser Depo. at 83:24–84:14; Hunsaker Depo. at 106:6–10.)

In arguing that Plaintiffs' intent to infringe is clear, PRL has also cited market research surveys commissioned by Westchester. (July 1998 Memorandum Order, pp. 25–26; Defendants' Exhibits # 104; # 114–117, # 107). That survey is directed to readers of the New POLO Magazine, and it asks more than "60 questions, none of which relates to the sport of polo." (July 1998 Memorandum Order, p. 26). PRL notes that readers were asked to name the leisure activities in which they had participated in the last year and were offered a list to choose from. Not one of the activities listed relates to the sport of polo. (Defendants' Exhibit # 107). The court notes from its own review of the March/April 1998 issue of the New POLO Magazine, that it also includes a questionnaire that readers are asked to complete. That questionnaire asks readers/potential subscribers to answer various questions about their leisure activities and interests. Again, not one inquiry refers to the sport of polo. (Plaintiffs' Exhibit # 160, March/April 1998 issue, p. 123). Indeed, the June 1999 issue of the magazine provides a list of "our advertisers", and offers readers the opportunity to contact these merchandisers directly. Of the forty-eight retailers listed, only four, arguably, could be tied to any sport at all, and only two of those have any likely connection to equestrian sports ("Chukker Collection", "Lodden Stalls"). (Plaintiffs' Exhibit # 160, June 1999, p. 97). Westchester's attempt to explain away the need to familiarize its readers with the sport, by inquiries about their participation in polo itself, is simply not convincing. (11/19/98 P.M. Tr. (Lonergan) pp. 29–31, 74; 11/19/98 P.M. Tr. (Tubridy) p. 89–91). It seems clear that if, in fact, a magazine is directed to "the subject of equestrian sports and lifestyles", some measure of attention to equestrian activities should be of interest in a readers' survey.

Further on the matter of Westchester's intent, the parties dispute the significance of evidence which points to Ami Shinitzky's desire to sell a "naked trademark". Mr. Shinitzky considered selling his magazine as early as 1994, and, ultimately, he sold all of POLO Magazine's assets, including its trademarks, to Westchester on May 30, 1997. (11/17/98 P.M. Tr. 121, 131, 142–43 (Shinitzky); Plaintiffs' Exhibit # 3A; Defendants' Exhibit # 67 at 4). The evidence at trial established that Mr. Shinitzky believed that the name "Polo" had great value specifically because of Polo Ralph Lauren's success with the Polo Trademarks. Because of "Ralph Lauren's well-known connection to, and financial success" with the name "Polo," Mr. Shinitzky believed he and Ralph Lauren "could ... share a common interest in ways that would be beneficial to both entities." (Plaintiffs' Exhibit # 28; 11/17/98 P.M. Tr. at 105.) It is not disputed that when Mr. Shinitzky first decided to sell the Old POLO Magazine in 1994, he approached Ralph Lauren, a person never known for playing the sport, but whom Mr. Shinitzky credited with linking the name "Polo" to fashion and lifestyle, in an effort to sell his company's trademark. (11/17/98 P.M. Tr. at 144.) In November 1994, Mr. Shinitzky sent Mr. Lauren a letter which stated that "whereas the publication's destination is most likely the hands of another polo player, the trademark name and related logos might be of interest to you." (Plaintiffs' Exhibit # 28; Plaintiffs' Exhibit # 11).

The conclusion is inescapable that, for Mr. Shinitzky, in making that offer, the most important, and profitable, asset that he owned was the magazine's name, and that this was an effort to sell the trademark, divorced from the product with which it was associated. (11/17/98 P.M. Tr. at 158.) Indeed, at trial, Mr. Shinitzky testified that he was offering to sell Mr. Lauren the name, separate from the ongoing concern of the equestrian magazine itself, because of the successful business Ralph Lauren had built under the name

"Polo", and with the understanding that Mr. Lauren might not even use the mark, but might simply keep "it in a safe" so that "anytime in the future he can make sure of it", and so that "it wouldn't be anybody else's." (11/17/98 P.M. Tr. at 145–47.) As he wrote to Mr. Lauren:

> While I read in the trade press that your magazine project is on hold, it seems to me that whether now, or for the future, owning the rights for name *Polo* in these additional classes would be a prudent and auspicious move.

(Plaintiffs' Exhibit # 28).

When he received no reply from Ralph Lauren, Mr. Shinitzky looked elsewhere for a buyer. He testified that he knew that Reid Slaughter was the publisher of *Cowboys & Indians,* and that Mr. Slaughter had changed that magazine from a special interest publication into an affluent "lifestyle" periodical. (11/17/98 P.M. Tr. at 149–50 (Shinitzky); 11/18/98 P.M. Tr. at 3 (Slaughter); Defendants' Exhibit # 11A–C, Defendants' Exhibit # 9A–C). Mr. Shinitzky confirmed that, in negotiating the sale of the trademark, he stressed to Mr. Slaughter the value of the name "Polo", and its association with Ralph Lauren, whom he described as well-known for promoting affluent lifestyle imagery. On April 15, 1997, Mr. Shinitzky wrote to Reid Slaughter, and pointed out that:

> Clearly, the real value of the magazine is as the finest and most enduring name in polo-related publications the world over, and in the magazine's yet untapped potential. Moreover, Ralph Lauren's spectacular achievement with the name polo has helped cement the unmistakable association of the name polo with lifestyle.

(Defendants' Exhibit # 64).

At trial, Mr. Shinitzky explained that, in trying to sell his marks to Mr. Slaughter, he emphasized Ralph Lauren's success with the name "Polo," because he was "trying to put forward [his] best case for why this property was desirable." (11/17/98 P.M. Tr. at 125). He admitted that Polo Ralph Lauren's success was key to his sales effort:

> Q: You thought it was important in your sales pitch for him to know and think about Ralph Lauren's spectacular achievement with the name Polo, true?
>
> A: Yes, because as I said, I believed that that potential, which we have tried to exploit and explore all these years could benefit from even greater commitment than we were able to offer it.

(11/17/98 P.M. Tr. at 156)

Mr. Shinitzky's hope to capitalize on the reputation and goodwill of PRL's Polo Trademarks, and so to increase the value of the mark, is underscored by the very different approach he took when the prospective buyer was likely to continue the publication as an equestrian magazine, rather than transform it into a lifestyle periodical. When negotiating with his then-publisher, Peter Rizzo, a well-known polo player, and his partner, Bill Matheson, Mr. Shinitzky offered to sell the magazine for $350,000. When he offered his business to Mr. Slaughter, however, the price was $500,000. Further, when negotiating with Mr. Matheson, it is striking that Mr. Shinitzky omitted any reference to the value of the name "Polo" or to Ralph Lauren's successful use of that name as a selling point. (Defendants' Exhibit # 64, Defendants' Exhibit # 65.) The court concludes from Mr. Shinitzky's conduct that he understood that Polo Ralph Lauren's goodwill in the POLO name was worth much more to a lifestyle magazine publisher, someone like Reid Slaughter, than it was worth to a polo enthusiast alone.

Mr. Shinitzky learned later that Mr. Slaughter was acting as an agent for John Goodman, the eventual owner of Westchester. (11/17/98 P.M. Tr. at 126 (Shinitzky); 11/17/98 A.M. Tr. at 96 (Goodman); 11/18/98 P.M. Tr. at 10 (Slaughter)). The court concludes that Messrs. Shinitzky, Slaughter and Goodman discussed and considered the connection between Polo

Ralph Lauren's success with the name "Polo" and the potential for success of a "revamped" lifestyle magazine named "Polo". Ami Shinitzky and Reid Slaughter discussed Mr. Shinitzky's suggestion, in his April 15, 1997, letter that Mr. Slaughter was "in a position to fully realize" the potential of "Ralph Lauren's spectacular achievement with the name polo." (Defendants' Exhibit # 64; 11/17/98 P.M. Tr. at 160–61 (Shinitzky); 11/18/98 P.M. Tr. at 14–16 (Slaughter)). Mr. Slaughter, on behalf of Mr. Goodman, increased his original bid of $250,000 for the magazine as a result of these discussions. Mr. Goodman paid the final negotiated price, $400,000, for a magazine which only the year before had suffered a net loss of $1400. (11/18/98 P.M. Tr. at 18:19–24 (Slaughter); (Defendants' Exhibit # 67 at 4.))

Mr. Goodman admitted that the name and trademark that belonged to the Old POLO Magazine was important to him, and that "a lot" of the $400,000 that he agreed to pay for the magazine was specifically for the "Polo" name. (11/17/98 A.M. Tr. 102–105; Plaintiffs' Exhibit # 33). As articulated, in part, by Mr. Goodman, Westchester professes that its purchase of the Old POLO Magazine for that sum was based on the assets and goodwill that came with Mr. Shinitzky's magazine, including the magazine's subscriber and advertiser lists, its relationship with the USPA; its archives; and its history in general. (11/17/98 A.M. Tr. at 88, 101.) Yet, immediately following the purchase from Ami Shinitzky, Westchester began to design a very different product from its predecessor, a magazine that, as Mr. Goodman himself testified at trial, had a new design, new columns, features and articles, including wide coverage of fashion, new staff, new offices, new advertisers and new distribution methods. (11/17/98 A.M. Tr. at 113–17.) The original publication was transformed from the polo-enthusiast journal which Mr. Shinitzky had published for 22 years, and the name Polo was placed on an entirely new creation, a fashion and lifestyle magazine. A magazine that was

"not about the sport" of polo, that mimicked the imagery of Polo Ralph Lauren's advertisements, and was aimed, at least initially, at customers of one of PRL's most important retailers, Neiman Marcus. (Defendants' Exhibit # 90). Both Mr. Goodman and Mr. Slaughter confirmed that when they purchased the magazine from Ami Shinitzky they planned to take an old trade journal which was "90% about the sport of polo itself", and create a magazine to compete with the likes of *Town & Country* and *Cigar Aficionado*. They hoped to develop a product which would bring in more revenue, more advertisers and readers, and have a broader distribution and circulation. (11/18/98 P.M. Tr. at 3–5 (Slaughter); 11/17/98 A.M. Tr. at 90, 119–20 (Goodman).) Although, as noted, Mr. Goodman denied participating in any discussions of PRL's marks, Mr. Slaughter contradicted that testimony and conceded that he and John Goodman did discuss the effect that Ralph Lauren's use of the "Polo" name would have on the proposed magazine. (11/18/98 P.M. Tr. at 20–22.) In fact, Mr. Slaughter testified that, not only was he well aware of Ralph Lauren's wide use of the name "Polo", and its connection to the name of the magazine that he was negotiating to purchase, but he also thought, and discussed with John Goodman, that such a connection could prove "interesting" in terms of obtaining advertisers. (11/18/98 P.M. Tr. at 23–25.)

It has never been disputed that Mr. Slaughter was acting as John Goodman's agent, or that his conduct is not to be imputed to Westchester. On the other hand, Westchester contends that it is not bound by Ami Shinitzky's or Fleet Street's conduct and that is true. But while the court agrees that Ami Shinitzky's acts cannot provide the basis for an infringement finding against Westchester, it also true that Mr. Shinitzky's discussions with Reid Slaughter, and the circumstances surrounding his attempts to capitalize on Polo Ralph Lauren's good will and reputation, certainly color the conduct of the West-

chester staff in the start-up of the New POLO Magazine. The court does credit, however, Mr. Goodman's testimony about his passion for the sport and his own desire to popularize it; he has stated on a number of occasions that his goal is to expand the magazine's readership, promote the sport of polo, and introduce more people to the sport. (11/17/98 A.M. Tr. # 90–94; 100– 101; 118– 119; 121; 139). That does not, however, immunize Westchester, or its agents, in their conduct in the revamping of the Old POLO Magazine, and taking actions to trade on the goodwill and reputation that PRL has built in the POLO name.

It is true, as well, as Westchester points out, that when Ami Shinitzky owned the magazine, he toyed with the notion of a "two-tier" publication. Westchester argues that revamping the magazine is not the "big bang" creation that PRL claims, but is instead an evolution of Shinitzky's long-term goals. In support of that position, Westchester cites a memo from a business meeting that Mr. Shinitzky held with the Fleet Street staff in which the idea of publishing two different magazines was discussed. (Plaintiffs' Exhibit # 30). One of these periodicals was intended to be statistically intense, akin to the present *Polo Player's Edition,* and the other was to be devoted to the polo milieu, with features on the parties, the personalities, the exotic venues, and the like, in a manner similar to the New POLO Magazine. Relying on this evidence, Westchester contends that there was an intention, all along, to develop two different magazines, and that no bad intent can be imputed to Westchester for implementing that plan. But, just as Westchester cannot be bound by Mr. Shinitzky's intent and conduct in trying to sell the naked trademark, nor can it evade liability by adopting Ami Shinitzky's business goals for the Old Polo Magazine. The court concludes that merely because Mr. Shinitzky had expressed a desire to develop two different magazines, Westchester does not benefit from that intention any more than it can be bound by

Mr. Shinitzky's attempt to sell the trademark alone, divorced from the magazine's assets and liabilities.

Indeed, when pressed, even Mr. Shinitzky concedes that the New POLO Magazine contains more lifestyle content and "is somewhat different" from the magazine that he published. (11/17/98 P.M. Tr. at 169.) The New POLO Magazine is now a nationwide magazine with lots of fashion and lifestyle articles which features ads and columns targeting readers who have little, if anything, to do with the equestrian sport of polo. (See Defendants' Exhibit # 1 (October 1997 to November 1998 issues of New POLO Magazine)). The court concludes that, in line with the new magazine's tagline, **Adventure • Elegance • Sport,** its overall design and packaging touts the fashion, elegance and lifestyle images that were promoted by, and now associated with Polo Ralph Lauren.

Further, an examination of the magazines themselves reveals the difference, in most aspects, between the Old POLO Magazine published by Ami Shinitzky and the New POLO Magazine published by Westchester. The magazine's new direction was outlined in the first editor's column, written in September 1997, by Peter Rizzo ("Rizzo"). Mr. Rizzo, the editor of the Old POLO Magazine and now publisher of *Polo Players Edition,* explained the following in the inaugural edition:

> What about you polo purists who care more about pony care, hitting the ball like Mike Azzaro, and building the better mallet? For you (and me) there will be *"Players Edition"* which will be much the same as the Old POLO Magazine of recent years. A quick look at the mast head and table of contents will confirm that much of the editorial content and format has carried over. Our mission remains to chronicle the sport, providing the avid polo player an inside look at all the action and drama on the field, as well as an insider view behind the scenes.

(September 1997 issue of *Polo Players Edition*, p. 10).

Above all, it must be remembered that "[p]roof of an intent to confuse the public is not necessary to a finding of likelihood of confusion." *Elvis Presley Enterprises*, 141 F.3d at 203 (citing *Fuji Photo Film Co.*, 754 F.2d at 597). More important to the issues here, is the Fifth Circuit's comment that "an innocent intent in adopting a mark does not immunize an intent to confuse in the actual use of the mark." *Id.* (citing RESTATEMENT, *supra*, § 22 cmt. c) (stating that "[e]ven if an actor believes in good faith that the copying of another's designation is justified, an inference that confusion is likely may arise from other circumstances that suggest an intent to confuse, such as a failure to take reasonable steps to minimize the risk of confusion."). In the *Elvis Presley Enterprises* case, the Fifth Circuit addressed specific circumstances which it found to increase the risk of confusion and which, therefore, were deemed "more than 'just a failure to take reasonable steps to minimize the risk of confusion.'" *Id.* (quoting RESTATEMENT, *supra*, § 22 cmt. c). PRL argues here that Westchester's marketing, through Neiman Marcus, and its promotional approach to potential advertisers and readers, are just such circumstances in this case.

In sum, the court finds evidence that Westchester intends to target PRL consumers and customers in its advertising, layouts, and in some aspects of the contents of its "re-launched" magazine. This digit of confusion weighs in favor of PRL on the issue of likelihood of confusion.

### (7) Actual confusion

■ A plaintiff hoping to establish that a likelihood of confusion exists in an infringement action, may utilize the following methods of proof: "(1) survey evidence, (2) evidence of actual confusion, or (3) arguments based on a clear inference arising from a comparison of the conflicting marks and the context of their use." 3

McCARTHY, *supra*, § 23:2, at 23:10 (footnotes omitted). It is further well settled that "[e]vidence of actual confusion is not necessary to a finding of a likelihood of confusion, but 'it is nevertheless the best evidence of a likelihood of confusion.'" *Elvis Presley Enterprises*, 141 F.3d at 203–04 (citing *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d at 263). On this "digit", each party commissioned a survey and presented evidence of the results through expert witnesses. While the surveys conducted by PRL's expert, Walter McCullough, and Westchester's expert, Dr. Sandra Cogan, both reportedly employed the control/test methodology, their results were based on wholly different implementations of that method. The witnesses employed different stimuli, which were presented to the respondents in differing manners, while asking markedly different questions of them. In support of the contention that this "digit" weighs in its favor, PRL invites the court to find, not only that there is a likelihood of confusion as proven by the survey taken by its expert witness, but also that actual confusion has occurred as reflected in the anecdotal evidence provided.

For the trial on the merits, PRL again commissioned Walter McCullough, and the Monroe Mendelsohn Research group to conduct another survey (the "MMR Survey") to determine the percentage of consumers, if any, who are likely to believe that the New POLO Magazine is published by, sponsored by, authorized by, or affiliated with PRL. The trial survey respondents were again divided into two groups, one a test group, and one a control group. Interviewers showed the test group, 192 people, a copy of the August 1998 issue of the New POLO Magazine, and the control group, 200 people, was shown a copy of the July 1998 issue of *Polo Players' Edition*. For the reasons detailed, the court accepts the latter periodical as the continuation of the Old POLO Magazine. Persons who had been interviewed in the last three months, and those who were employed at

marketing research companies, advertising agencies, or publishing houses were excluded from the survey group. Those employed in the clothing, jewelry, cosmetic, fragrance, or other retail businesses were not excluded. Further, for this survey, respondents were limited to those with incomes exceeding $50,000.00, and who professed to read magazines on a regular basis. The court finds that this "universe" is almost identical to the universe of survey respondents that Westchester suggested as the appropriate one in previous pleadings and arguments.

In response to several open-ended, and probing questions, Mr. McCullough found that 53% of the test group believed that PRL had authorized, approved, or produced the New POLO Magazine, as compared with only 22% of the control group, who believed that PRL had authorized, approved, or produced *Polo Players' Edition*. These totals represent the net sum of respondents who answered at least one of the four primary questions in a way which indicated confusion. Although Mr. McCullough noted that 53% of the respondents in the test group were confused about whether PRL had produced or authorized the New POLO Magazine, he tempered this finding by subtracting the "confusion" rate he found in the control group from that figure. (11/17/98 A.M. Tr. at 27–31.) In short, Mr. McCullough's second survey found an incremental rate of confusion of 31% for the New POLO Magazine, and that is the figure upon which PRL relies. (11/17/98 A.M. Tr. at 2–8; 12; 18–25; 27–31.)

In addition, Mr. McCullough documented that these rates of confusion were even more striking among those respondents who were familiar with publications which are said to compete directly with the New POLO Magazine. A list of those magazines, including *Town & Country,* were identified in a subscriber study that Westchester commissioned. (Defendants' Exhibit # 107; 11/17/98 A.M. Tr. at 25–26.) Among this group of readers, a higher level of incremental confusion, 34%, was present. Indeed, among those survey respondents who reported income of more than $70,000 per year, a 40% incremental confusion level was found. The court accepts Westchester's assertion that it is that particular audience which it hopes to attract to its New POLO Magazine. (11/17/98 A.M. Tr. at 32–34; Defendants' Exhibit # 83 at 2; Plaintiff's Proposed Findings of Fact and Conclusions of Law, February 11, 1998 at 36 ¶ 1.) Further, and especially persuasive, is the number of respondents who volunteered the words/name "Ralph Lauren", specifically, as the source or sponsor of the New POLO Magazine. Mr. McCullough found that incremental level of response to be 19% of those surveyed. (11/17/98 A.M. Tr. at 30.)

The court has also considered evidence from Westchester's expert witness, Dr. Sandra Cogan, who conducted a survey in five different shopping malls in September 1998, interviewing approximately 200 adult men and women, 18 years of age and older. Although Dr. Cogan's respondents were also screened to eliminate those who worked in the shopping mall or for an advertising agency and the like, her screening did not elicit information on magazine readership or income levels, and so her survey universe was comprised of the general adult population, without regard to "affluence" or reading habits. (Plaintiffs' Exhibit # 119; 11/19/98 A.M. Tr. at 41). It has not escaped notice that this very universe was used by Mr. McCullough in the previous survey which he presented at the preliminary injunction hearing. That universe was vehemently criticized by Westchester, and its then expert witnesses, Dr. Edward Blair and Mr. Gabriel Gelb. (See, Plaintiff's Proposed Findings of Fact and Conclusions of Law, February 11, 1998 at 35–41.) The court agrees with PRL in its argument that Dr. Cogan's selection of this same universe, whether scientifically acceptable or not, casts severe doubt on the credibility of Westchester's own survey evidence.

The court also concludes that, although Dr. Cogan presented her study in the framework of the test/control methodology, the presentation of stimuli to the survey respondents was suspect in several aspects. Dr. Cogan's survey asked the respondents to view an "array" of various goods in two different displays. "Display A" contained nine different authentic PRL products with Ralph Lauren's name identified somewhere on each item. All respondents were asked to view Display A. After doing so, the test group viewed Display B and the control group viewed Display C. Each group was then asked a series of questions. Display B contained various unrelated products including lock sets, grass seed, motor oil, and a genuine PRL cap, bearing the "Polo" mark. Also included in Display B were three issues of the New Polo Magazine. Display C presented respondents with the very same items that were arranged in Display B, but with one exception. In Display C, respondents were shown three issues of the Old Polo Magazine rather than issues of the Westchester publication. In spite of Dr. Cogan's recitation that it is desirable, in an array survey, to replicate actual market conditions, she admitted that the product displays that she used were quite different from the actual marketplace. (11/19/98 A.M. Tr. at 58.) In fact, the "products" were created in the following manner:

The motor oil container which bore a POLO label was actually crafted by Dr. Cogan from different sources. The labels were obtained from Westchester's lawyers, and then Dr. Cogan attached them to generic containers, in order to create an artificial product;

The KwikSet lock did not, in fact, bear a POLO trademark, but was displayed next to a brochure which did carry that mark. Dr. Cogan obtained the brochure after calling the manufacturer and receiving it in the mail;

The Polo grass seed was purchased in yet a different store and the brochure that was displayed beside it was, again, obtained by Dr. Cogan, not in the marketplace, but directly from the manufacturer, at her request;

The tools sold by the "Custom Products Division of Polo" did not bear the POLO Trademark and, in fact, Dr. Cogan never saw that trademark on those goods;

The Polo mints were supplied by the lawyers;

Dr. Cogan purchased the Polo Ralph Lauren hat in a retail store.

(11/19/98 A.M. Tr. at 53–56.) (Plaintiffs' Exhibit # 119–121).

After being directed to this array of goods, Dr. Cogan's respondents were first asked "Do you think any of these is put out or made by the same company which puts out the products you saw in the first display, or do you think they are put out by different companies than the company that puts out the products in the first display." Respondents who answered "yes", or "not sure", were then asked, "Which of these is that," followed by the inquiry "Do you think there are any others?" For each product that a respondent identified, the following question was then posed: "What is it about this one that makes you think it is put out or made by the same company which puts out the products you saw in the first display?"

Without regard to the awkward phrasing of these questions, the last one, in particular, seems to suggest that there was only one correct answer. That suggestion is especially strong because the question was posed while the respondent had before him/her, in Display B or C, only one genuine PRL product. Further, the use of a Polo Ralph Lauren hat, in Displays B and C, is particularly problematic because not only was it the only clothing product, like those in Display A, and the only product with Ralph Lauren's name visible, in a manner identical to those products in Display A, but it was also the only genuine PRL product. In fact, Dr. Cogan admitted that she did not know what effect resulted from having a genuine PRL product in Display B. She testified further that

the results may have been different if no genuine PRL products had been included in that display. (11/19/98 A.M. Tr. at 59.) The court also has reservations about whether this multi-product exposure and questioning procedure insured that the respondents knew that all of the products set out in Display A were from the same company. The respondents were not asked any questions about this. Likewise, there was no means of assuring that the respondents actually looked at the magazines, set out in Displays B and C, much less examined them.

Because of the many concerns raised by Dr. Cogan's survey procedure, this court credits instead the findings in Mr. McCullough's survey evidence, which show a confusion rate of 31%.[6] Survey evidence documenting "confusion levels" as low as 15% to 17% has been deemed "strong evidence" of a likelihood of confusion. *See Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d at 507; *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir.1979) (15% to 20%). It must be remembered, as well, that the confusion that is remedied by trademark and unfair competition law is that confusion related to source, as well as to affiliation, connection or sponsorship. *See Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1121 (6th Cir.1996) (In the case of two golf courses both named Champions, the issue is not whether golfers are confused about which course they are playing on, but rather, whether there is confusion about an affiliation: "The relevant question is whether a golfer, albeit sophisticated, would likely be confused about affiliation between the two clubs.")

The court also concludes that, contrary to Westchester's contentions, Mr. McCul-

lough's use of *Polo Players' Edition* as a control was an acceptable means to determine if there was inherent confusion in the market. In a survey which tests the likelihood of confusion, a control is used "to determine the noise—the inherent confusion in the market which exists independently of and thus is not caused by confusion between the products being tested." *Reed–Union Corp. v. Turtle Wax, Inc.*, 869 F.Supp. 1304, 1311 (N.D.Ill.1994), *aff'd in part, vacated in part,* 77 F.3d 909 (7th Cir.1996). A control product is "a product that is ... non-infringing ... [and] which is similar to the products at issue." *ConAgra, Inc. v. Geo. A. Hormel & Co.*, 784 F.Supp. 700, 728 (D.Neb.1992), *aff'd,* 990 F.2d 368 (8th Cir.1993). The court finds that *Polo Players' Edition* is "a non-infringing product which is similar to the products at issue" and so its role in the survey was appropriate. The dominant portion of both parties' marks, as well as the title of the control magazine, is "Polo". (See Defendants' Exhibit # 1 (New POLO Magazine); Defendants' Exhibit # 3 (*Polo Players' Edition*); and Defendants' Exhibit # 143). That title is similar to the numerous PRL marks, many of which, as Westchester itself has noted, do not consist solely of the word polo, but instead, are composite marks, which contain the word "POLO" somewhere on the product. It follows that use of *Polo Players' Edition* in the McCullough survey was an appropriate control to screen out potential "noise", and that the survey is relevant on the issue of likelihood of confusion.

In addition to the survey evidence submitted, which the court finds persuasive for the reasons detailed, PRL also cited a number of incidents which, it maintains, show actual confusion among potential con-

---

**6.** In doing so, the court acknowledges the many complaints that Westchester made about the accuracy of the MMR survey process and tabulations. (*See* Plaintiffs' Proposed Findings of Fact # 169, and 11/17/98 A.M. Tr. 40–55; Docket Entry # 152). However, even with the inaccuracies cited, the court is still persuaded that the MMR Survey employed an appropriate methodology and the results are therefore persuasive. *See, Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F.Supp. 123 (S.D.N.Y.1993); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir.1980); *Reference Manual on Scientific Evidence* (Federal Judicial Center, 1997, p. 251).

sumers. Many of these instances are detailed in testimony from Westchester's own employees, or are documented in Westchester's own files. While Westchester contests the weight, and sometimes even the admissibility of these events, each is relevant to this "digit" of confusion. The events detailed below occurred after consumers had reviewed a copy of either the New Polo Magazine, or Westchester's materials promoting/advertising the new magazine, but before the July 1998 disclaimer was added:

> The magazine's Detroit account manager testified that, after being shown the magazine, two or three potential advertisers asked him: "[A]re you affiliated or are you associated in any way with Ralph Lauren"? (Thornburgh Depo. at 36:18–37:11.)

> A subscriber study by Mediamark Research Inc. ("MRI"), done on behalf of the New POLO Magazine, revealed two instances in which subscribers made unsolicited comments about a perceived affiliation between the magazine and Polo Ralph Lauren. (Defendants' Exhibit # 118 at 1, 8; Defendants' Exhibit # 119 at 1, 8; 11/18/98 P.M. Tr. at 92–95 (Tubridy)).

> A dissatisfied subscriber returned a gift subscription card with the notation that the New POLO Magazine's "introductory advertising was misleading" as it led him to believe that the magazine was "a Ralph Lauren magazine." (Defendants' Exhibit # 121).

> Stanley Silverstein, Vice–President and General Counsel of Warnaco, Inc. testified that his wife received a copy of the New POLO Magazine, the one with Claudia Schiffer on the cover, and remarked that she was "surprised that it took Ralph [Lauren] that long to do a magazine." This comment was prompted, presumably, as a result of the Neiman Marcus cardholder promotion. Mr. Silverstein reported that he was aware that it was not PRL's magazine because he was familiar with the media coverage

concerning this litigation. (Silverstein Depo. at 9:6–10:10.)

Ken Nolan, an accountant who has prepared tax returns for PRL in the past, testified that he and his wife received a copy of the September 1997 edition of the New POLO Magazine, the edition with Prince Charles on the cover, and that both he and his wife thought that it was published by PRL. (Nolan Depo. at 5:10–8:24.)

Lee Sporn testified that he had observed several instances of actual confusion. Mr. Sporn testified that in February 1998, while traveling from New York to Delaware, he observed two women at a magazine rack in Pennsylvania Station. One of these women "turn[ed] to the other and s[aid], oh, look, Prince Charles is on the cover of the new Ralph Lauren magazine." (11/16/98 P.M. Tr. at 53–54.)

In addition to those instances, each of which occurred after a review of an issue of the New POLO Magazine or its advertising material, PRL also presented evidence of other events in which consumers or potential advertisers associated the New POLO Magazine with PRL. Some of these are summarized below:

> James Lonergan, the current publisher of the New POLO Magazine, testified that "every person in sales and marketing", at the magazine, had reported instances in which people asked about or mentioned Polo Ralph Lauren in reaction to the New POLO Magazine. (Lonergan Depo. at 127:6–16.)

> Lisa Fields, the magazine's Northeast Advertising Sales Representative, testified that one out of two, of the "hundreds" of persons with whom she speaks about the New POLO Magazine, responds by inquiring whether it is affiliated with Polo Ralph Lauren. (Fields Depo. at 22:16–23:24; 156:20–157:8.)

> The magazine's former National Accounts Director, Rod Hunsaker, testified that on "about ten" occasions, people would ask him whether the New POLO

Magazine has "any connection with Polo Ralph Lauren or Ralph Lauren[.]" (Hunsaker Depo. at 214:4–215:8.)

Further, Mr. Hunsaker wrote a report to John Goodman, in which he repeated comments from potential advertisers showing that, for them, Westchester's magazine could be perceived as linked to PRL. (Defendants' Exhibit # 94). That report, which he styled "New York's Reception of POLO Magazine: The Good, The Bad, and The Ugly", is starkly revealing, as to the level of concern about the infringement issue, among the merchandisers from whom Mr. Hunsaker sought advertising. For instance, Mr. Hunsaker reported in his memo that "[m]y man at Giorgio Armani was impressed.... He hoped that the title would not be perceived as a negative by his superiors in Milan". He also reported, in the same memo, that "Brooks Brothers said our name is an insurmountable problem.... Any perceived connection with Ralph Lauren is a big negative." Defendants' Exhibit # 94; 11/1798 P.M. Tr. at 17 (Defendants' Exhibit # 94 at PO3431). On another occasion Mr. Hunsaker reported to Jim Lonergan that he had met with a potential advertiser, Howard Zenner of Hickey–Freeman, and that Mr. Zenner "insists that they could NEVER have anything to do with a company that sound[s] like it has an affiliation with Polo Ralph Lauren.... [He] was so adamant about the name problem that he would not even let me leave the magazine in his booth." (Defendants' Exhibit # 112 at PO9424). Lastly, Mr. Hunsaker informed Mr. Lonergan that Bob Hunter, Director of Sales for Tombolini, "[t]hinks 'polo' is an infringement on Ralph." (*Id.* at PO9426).

Although Westchester tries to argue that these do not represent, or foreshadow, confusion among magazine consumers or sportswear purchasers, that is not convincing. For one thing, there is support, beyond logic and common sense, for the contention that advertisers of a magazine, rather than its readers, may be more appropriately counted among its "consumers". *See, e.g., Inc. Pub. Corp. v. Manhattan Magazine, Inc.,* 616 F.Supp. 370, 397 (S.D.N.Y.1985), *aff'd* 788 F.2d 3 (2nd Cir. 1986). "The 'consumers' of magazines are advertisers; readers by subscription; and readers who purchase single copies at newsstands. The question therefore becomes whether such consumers, advertising in, subscribing to, or purchasing single copies of [defendant's product] would be "'misled, or simply confused'" or "'would probably assume' that [PRL] published [the product]." *Id.* at 377. It appears from the evidence that the only relevant group which has not registered some comment about the magazine's perceived affiliation with Ralph Lauren products is the membership of USPA. This is hardly surprising for two reasons. One, is the fact that this litigation is referenced repeatedly in the Westchester periodical, and second is the history of litigation, and the little love lost, between PRL, or its predecessors, and the USPA. (Defendants' Exhibit # 47; Defendants' Exhibit # 46). It is well established that at issue here is "the likely confusion of members of the relevant class of customers and potential customers. Those customers may be consumers, professional purchasers or wholesalers or retailers." 3 MCCARTHY, *supra,* § 23:5 at 23–14–15 (citing *Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.,* 482 F.Supp. 980 (S.D.N.Y.1980)); *Bishop v. Hanenburg,* 39 Wash.App. 734, 695 P.2d 607 (1985); (footnote omitted). "Not only is a supplier a member of the public, but if a supplier is confused by similar businesses with identical names, the consuming public is likely to be similarly confused." *Bishop,* 695 P.2d at 611. The confusion of retailers alone may constitute infringement. *See, e.g., Russ Berrie,* 482 F.Supp. at 990.

Lastly, Westchester has objected consistently to any reliance on this evidence, complaining that it is hearsay, sometimes from interested witnesses, (Lee Sporn, Stanley Silverstein, and Ken Nolan), by which PRL hopes to persuade the court to

make a finding of actual confusion. Those objections are without merit. In this circumstance, hearsay is no prohibition. Although the rules of evidence traditionally proscribe consideration of an out of court statement that is admitted for the truth of the matter asserted, the court concludes that the out of court statements at issue here are not offered to prove the matters stated, but only as probative of the declarant's apparent confusion as to the source, sponsorship, or affiliation of PRL to the magazine. *See* FED.R.EVID. 801. Those statements are admissible to prove the declarant's state of mind upon viewing or learning of the publication. *See* FED. R.EVID. 803(3); *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1160 n. 10 (5th Cir.1982). Further, in *Armco*, the court held that testimony about customer confusion from the claimant's own employees was permissible to show the state of mind of the declarant. *Id.*

Westchester also contends, and it is true, that the number of actual confusion "events" must be placed against the background of the number of opportunities for confusion, before an informed decision can be made as to the weight such evidence should receive. "If there is a very large volume of contacts or transactions which could give rise to actual confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight." 3 McCARTHY, *supra*, § 23:14 at 23–39. "Given significant volume of sales, isolated instances of actual confusion may be disregarded as de minimis." *Inc. Pub. Corp. v. Manhattan Magazine Inc.*, 616 F.Supp. 370, 386 (S.D.N.Y.1985), *aff'd*, 788 F.2d 3 (2d Cir.1986). Here, however, the court finds that each incident submitted for consideration, while of varying quality and character, is some evidence of the repeated nature of inquiries or comments, usually unsolicited, about the affiliation, if any, between PRL and the New POLO Magazine. It is well settled that "[t]here can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion." *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir.1971). Further, very little evidence of actual confusion will suffice, for " 'while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof.' " *See Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985), *reh. denied*, 761 F.2d 695 (5th. Cir. 1985) (quoting *World Carpets*, 438 F.2d at 489).

In crediting these out of court statements on the issue of the likelihood of confusion, this court finds that they do provide some evidence of actual confusion. Moreover, in borderline cases where evidence of actual confusion is not available, or is not overwhelming, a "gap" can be filled by a properly conducted survey of the relevant class of prospective customers. "While survey evidence is sometimes said to be evidence of 'actual' confusion, it is so only to the extent that the survey replicates the real world setting which can create an instance of actual confusion." 3 McCARTHY, *supra*, § 23:17 at 23–44. More importantly, the absence of evidence of actual confusion is less significant when the period in which the two marks have coexisted is relatively short. *See, e.g., Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336 (5th Cir.1984). Here, this lawsuit and the publicity attendant to it began immediately with Westchester's relaunch of the magazine, and since July 1998, Plaintiffs have been required to notify potential subscribers and advertisers, by way of a disclaimer, that there is no affiliation with PRL.

Finally, in deciding whether proof of actual confusion has been shown, the reasoning in *Elvis Presley Enterprises* is, again, instructive. In that situation, "initial interest confusion" was found to be a strong indicator of confusion. The Fifth Circuit held that it was sufficient to show

that customers had been confused, at first, when they decided to patronize the bar, and that a subsequent clarification did not defeat the issue of a likelihood of confusion. Even though the confusion was "dissipated" once the patrons were inside the bar, that did little to eliminate the harm to the plaintiff. On that matter, the court stated the following:

Actual confusion that is later dissipated by further inspection of the goods, services, or premises, as well as post-sale confusion, is relevant to a determination of a likelihood of confusion. *See* [3 McCarthy 1997, *supra*, §§ 23:6–7]. "Infringement can be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion." 3 *id.* § 23:6; *see also* [*Dr. Seuss Enters. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1405 (9th Cir.), *cert. dism'd*, 521 U.S. 1146, 118 S.Ct. 27, 138 L.Ed.2d 1057 (1997) ] (noting that no sale must be completed to show actual confusion); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987) (finding liability for initial-interest confusion). Initial interest confusion gives the junior user credibility during the early stages of a transaction.... *Id.*; [3 McCarthy *supra*, §§ 23:6].

*Elvis Presley Enterprises*, 141 F.3d at 204. Here, both unhappy initial subscribers and wary advertisers point to a perceived affiliation with Ralph Lauren, even if that perception was fleeting. That suffices as evidence of actual confusion which makes the weight afforded to the Mendelsohn survey less important.

This "digit", on whether actual confusion has occurred, favors PRL.

### (8) Degree of Care of Consumers

■ Although Westchester argues that its consumers are "sophisticated", and that magazine readers are "apt to inspect magazines" before a purchase, the court reasons that it is unlikely that consumers will study the masthead of a publication to confirm association, or disassociation, with another's products or goods. Further, whether the ultimate readers are "sophisticated" does little to allay the fear of confusion generated by the New POLO Magazine's current practice of mass distribution. (See July 1998 Memorandum Order, p. 35, Docket Entry # 38). Indeed, some responses to the MRI reader survey revealed that, after spending hours with the magazine, readers were still associating it with PRL. (Defendant's Exhibit # 118; Defendants' Exhibit # 119; # 121) (11/18/98 P.M. Tr. 92 – 94 (Tubridy)).

In *Mutual of Omaha Ins. Co. v. Novak*, the parties disputed whether certain t-shirt designs so resembled an insurance company's marks that it was likely to cause confusion among consumers as to the insurer's sponsorship, endorsement, or other affiliation with the design. The court, in that case, found that the casual approach to the purchase of such items made it unlikely that consumers would learn that there was no connection between the insurance company and the defendant's products and, that it was "improbable that consumers will engage in further investigation." 836 F.2d at 398. The district court found therefore that the degree of care that is likely to be exercised by t-shirt purchasers did nothing to reduce the likelihood of confusion between the products. In this instance, the court likewise finds that magazine purchasers, faced with a typical book stall array of choices, will take no steps to investigate the true source of a glossy "lifestyle" magazine. Indeed, the questionnaires submitted as part of Westchester's MRI survey evidence would appear to confirm this. (Defendants' Exhibits # 119–121).

This digit weighs in favor of PRL on its claim of infringement.

### Conclusion on Infringement Claim

■ Finally, the digits of confusion are "not an end in themselves, and all are not of equal significance. The factors serve only as guides on the analytical route to

the ultimate determination of whether confusion is likely to result." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.,* 78 F.3d at 1122; *see also Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.,* 725 F.2d at 345 n. 9. The touchstone of infringement is whether the complained of use creates a likelihood of confusion as to the "source, affiliation, or sponsorship" by the claimant. *Society of Financial Examiners v. National Ass'n of Certified Fraud Examiners, Inc.,* 41 F.3d 223, 227 (5th Cir.), *cert. denied,* 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). In addition, a court is not limited to considering only the standard digits of confusion and should consider other relevant factors in its analysis. *See Elvis Presley Enterprises, Inc.,* 141 F.3d. at 194. One such factor in this case is the undeniable trend in diverse marketing and merchandising by fashion designers, and other manufacturers. Marketability of well-known names is more apparent, more pervasive, and presumably, more valuable in today's consumer realm. If, as McCARTHY states, a trademark serves to answer the question, "Who are you?", it seems, from a preponderance of the evidence submitted, that when potential consumers are asked to view the Westchester publication, that answer has been "Polo Ralph Lauren". *See* 2 McCARTHY, *supra,* § 12:1 at 12–4.

From all of the factors set out above, and the digits of confusion considered, the court concludes that the majority of these weighs in favor of a finding of likelihood of confusion. The court finds, therefore, that PRL has met its burden to show that Westchester's use of Polo as the name for its new, wide distribution magazine highlighting **Adventure ● Elegance ● Sport** constitutes infringement of PRL's marks.

### 2. Dilution Claims Under Federal and State Law

PRL has claimed dilution of its mark under 15 U.S.C. § 1125(c)(3), the Federal Trademark Dilution Act ("FTDA", "the Act"), which became effective January 1996. This new legislation was meant to address those situations in which a junior user's mark, although not in direct competition with the senior user, may still engender harm. The FTDA was intended to provide uniformity in the law by permitting a dilution claim regardless of whether such relief was available in the state where the suit is brought, and to provide a claimant with nationwide injunctive relief. H.R.Rep. No. 104–374, at 2–3 (1995), reprinted in 1995 U.S.C.C.A.N. 1029, 1030. While the Act was passed in the hope of resolving problems which had arisen from the limited protection available under state anti-dilution statutes, there are some areas of uncertainty that remain, and some that have been created by its passage. Without revisiting the political and philosophical disputes that led to this federal legislation, it is enough to observe that it springs from an idea that originated with Professor Frank Schechter, in 1927. In brief, Professor Schechter theorized that the traditional reason for trademark protection, which is based on confusion, would not hold in the modern era of consumer marketing. He suggested that modern consumers may be unlikely to realize the actual source of a product, even though they are familiar with a given mark, and that the true value of a modern trademark lies in its "selling power", which is based, in part, on a mark's unique position in the marketplace. Frank I. Schechter, *The Rational Basis of Trademark Protection,* 40 Harv.L.Rev. 813, 831 (1927). On this basis, Professor Schechter argued that the law's primary concern should be the injury to a mark which results when it is used in connection with a non-competing product thereby diminishing the value of the original mark's selling power. He described such an injury as a "gradual whittling away or dispersion of the identity and hold upon the public mind of the mark or name" which results from the mark's use on non-competing goods. Id. at 825. Various expansions on Professor Schechter's central premise led to the current federal statute. Now that those theories have

been codified, however, it is left to the courts, with little guidance, to implement its contours.

Under the FTDA, a claimant is protected from "dilution of the distinctive quality" of a famous mark notwithstanding the presence or absence of likelihood of confusion or direct competition between the parties. 15 U.S.C. § 1125(c). Dilution under the federal act is defined as the "lessening of the capacity of a famous mark to identify and distinguish goods and services." 15 U.S.C. § 1127. Generally, that has been understood to encompass both the type of harm that is caused by blurring, as well as the type of harm caused by tarnishment. Further, a mark qualifies for protection under the Act only if it is famous. In determining whether a mark is both famous and distinctive 15 U.S.C. § 1125(c) details the following factors which the court may consider:

(A) The degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of the use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1). To date, most commentators and courts agree that the fame of a mark addressed in the Act appears to demand a standard higher than the typical state anti-dilution statutes which require that a mark be a distinctive one in order to warrant protection from dilution. *See* David S. Welkowitz, *Oh Deere, What's to Become of Dilution? (A Commentary on the New Federal Trademark Dilution Act)*, 4 UCLA Ent.L.Rev. 1, 4 (1996). In that regard, the following marks have been found to meet the "famous" requirement under the Act: Budweiser, for beer; Nailtiques, for fingernail care products; and Candyland, as the name of a children's game. *See, e.g., Anheuser–Busch, Inc. v. Andy's Sportswear Inc.*, 40 U.S.P.Q.2d 1542 (N.D.Cal.1996); *Nailtiques Cosmetic Corp. v. Salon Sciences Corp.*, 41 U.S.P.Q.2d 1995 (S.D.Fla. 1997); *Hasbro, Inc. v. Internet Entertainment Group, Ltd.*, 40 U.S.P.Q.2d 1479 (W.D.Wash.1996). On the other hand, the following marks have been found insufficiently famous to warrant protection: Petro for truck stop services, and StarMarket for a chain of supermarkets. *See, e.g., Petro Stopping Ctrs., L.P. v. James River Petroleum*, 130 F.3d 88 (4th Cir.1997); *Star Markets, Inc. v. Texaco, Inc.*, 950 F.Supp. 1030 (D.Haw.1996).

Before this court, PRL claims that Plaintiffs have violated its rights under both the new federal law and the existing state law. The received wisdom is that dilution claims under Texas law and federal law are governed by the same standard and litigants and commentators routinely cite cases that are supposed to support this truth. But on closer examination, and particularly with the advent of the FTDA, this is no longer a certainty. The Fifth Circuit has yet to address the significance, or contours, of the new federal Act. Further, there is a split of authority among the circuit courts that have wrestled with this legislation as to what its import is and how it should be applied. *See Ringling Bros.—Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*, 170 F.3d 449 (4th Cir.1999) (petition for cert filed June 14, 1999); *I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 49 (1st

Cir.1998). After an exhaustive review of the published decisions, this court has not found, and the parties have not cited, any Fifth Circuit opinions, nor even any cases decided in this circuit, which discuss the application of the new federal statute to a claim such as this one. Although the statutes of most states, including Texas, allow relief based on a likelihood of dilution standard, the federal statute arguably differs in the quantum of proof a plaintiff must show in order to prevail.

Even though the "causes dilution" language expressed in the Act suggests an actual harm standard, some writers contend that there is no measurable difference in the standard a claimant must meet. Those advocating this interpretation insist that, because dilution is defined by the Act as the " 'lessening of the capacity of a famous mark to identify and distinguish goods or services,' and because actual dilution is not necessary to adversely affect this capacity, the Act must encompass the likelihood of dilution standard." Patrick M. Bible, *Defining and Quantifying Dilution Under the Federal Trademark Dilution Act of 1995*, 70 U.Colo.L.Rev. 295, 307 (1999) (citing 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 24:90 (4th ed.1996)). It does seem, however, that "[u]nder the actual dilution standard, the defendant's mark must have been in the market long enough to have caused some measurable dilution," while under the likelihood of dilution standard, a court may be asked to determine whether a junior user's actions will cause dilution to the plaintiff's mark, in advance of the defendant's entrance on the market. Bible, *supra*, at 308 (citing 3 McCarthy, *supra*, § 24:94). The Fifth Circuit has not evaluated the standard of proof to be applied to a claim under the FTDA; that is, whether a plaintiff must prove that a de-

fendant's action has caused dilution, or whether proof of a mere likelihood of dilution will suffice to support a claim.

These differing standards are critical to the issues here as Westchester contends that its federal registration is a complete bar to the anti-dilution claim that PRL has made under Texas law. If that is true, then only the federal dilution claim remains and the court must determine the standard of proof required by that Act. Further complicating what might, otherwise, be a simpler inquiry, is the fact that the U.S. Court of Appeals for the Fourth Circuit has decided recently that proof of a likelihood of dilution is insufficient to allow a claimant to recover under the Act, and that proof of actual dilution is necessary before a plaintiff can succeed on a dilution claim under federal law. *Ringling Bros.— Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*, 170 F.3d 449 (4th Cir.1999) (petition for cert filed June 14, 1999). Moreover, even if, as PRL argues, it need meet only the likelihood of dilution standard, that itself is fraught with controversy. A number of federal courts have followed a balancing test, developed by Judge Robert Sweet, of the Second Circuit Court of Appeals, in the decision rendered in *Mead Data Cent., Inc. v. Toyota Motor Sales U.S.A., Inc.*, 875 F.2d 1026, 1035 (2d Cir.1989), to determine whether, in a given case, a likelihood of dilution exists.[7] Although generally acknowledged to be an influential standard, and one that has been followed more or less rigorously since that date, the "*Sweet* factors" are not without detractors. Indeed, one writer has remarked on the following inadequacies of this test in analyzing a dilution claim:

> Despite reliance on the test by many courts, the factors do not adequately

---

**7.** In that opinion, Judge Sweet listed the following factors as relevant to a likelihood of dilution analysis, when blurring is at issue:
1) similarity of the marks;
2) similarity of the products covered by the marks;
3) sophistication of consumers;
4) predatory intent;
5) renown of the senior mark;
6) renown of the junior mark.
*Mead*, 875 F.2d at 1035.

isolate the harm caused by dilution from the harm in a typical "likelihood of confusion" case and, to some extent, completely misapply the dilution concept. For example, it is clear from Professor Schechter's original article and the plain language of the Act that dilution occurs when a famous mark is used on dissimilar goods. The "similarity of the products" factor in Sweet's test, however, directly contradicts this manifest intention. Further, the "predatory intent" factor is misplaced under any analysis under the Act because the Act expressly states that consideration of this factor is only proper when the plaintiff seeks a remedy beyond injunctive relief. Moreover, in the blurring cases, harm occurs regardless of the existence of the defendant's predatory intent. Inclusion of this factor may only cause courts to blend "likelihood of confusion" analysis with dilution analysis, because a defendant who intentionally uses another's mark most likely is attempting to confuse the consumer and divert sales away from the well-established mark. Therefore, application of Sweet's likelihood of dilution analysis does not accurately reflect either Schechter's intentions or the intentions of Congress in enacting the Act, and often results in a misguided effort to isolate dilution.

Bible, *supra*, at 311–12 (footnotes omitted). *See I.P. Lund*, 163 F.3d at 49. It is easy to see that the subtle, but inherent, difficulties in applying the new federal legislation have considerable impact on an evaluation of PRL's claims.

**Dilution Under Texas Law**

"While the legislative history of the Dilution Act clearly states that the Act does not preempt existing state dilution statutes," one exception to this rule of nonpreemption, is set out at 43(c)(3) of the Act. Lynda J. Oswald, *Tarnishment and Blurring Under The Federal Trademark Dilution Act of 1995*, 36 AM .BUS.L.J. 255, 269–70 (1999). That section provides that federal registration of a trademark is a complete defense to state and common law dilution claims and it was included to encourage federal registration. *See* Federal Trademark Dilution Act of 1995: Hearings on H.R.1295 Before the Subcommittee on Courts and Intellectual Property, 104th Cong. (1995) (testimony of Mary Ann Alford, Vice President and Assistant General Counsel, Intellectual Property Reebok International, Ltd, and Executive Vice President, International Trademark Association); *see also* 3 McCARTHY, *supra*, § 20:90 at 24–144 & n. 26. Westchester relies upon this provision, and argues that PRL's claim, under the TEX.BUS. & COM.CODE § 16.29, is completely barred. The FTDA provides, in pertinent part, that:

> The ownership by a person of a valid registration ... on the principal register shall be a complete bar to an action against that person, with respect to that mark, that is brought by another person under the common law or a statute of a State and that seeks to prevent dilution of the distinctiveness of a mark, label, or form of advertisement.

15 U.S.C. § 1125(c)(3). Section 1125(c)(3) encourages the federal registration of trademarks, and furthers the purpose of the Lanham Act, by protecting registered marks from state law interference. *See* JEROME GILSON, 2 TRADEMARK PROTECTION AND PRACTICE § 5.12[1][c][v], at 5–267 (1974) (current through May 1999); 3 McCARTHY, *supra*, § 24–90, at 24–144 & n. 26 (citing House Report 104–374 (Nov. 30, 1995)). While section 1125(c)(3) provides an absolute defense to dilution claims based on state law, it has no impact on dilution claims that are based on federal law. *See* GILSON, *supra*, § 1.12[1][c][v], at 5–267; 3 McCARTHY, *supra*, § 24–90, at 24–144; *see also Viacom Inc. v. Ingram Enters., Inc.*, 141 F.3d 886, 891 n. 8 (8th Cir.1998).

Still, PRL hopes to recover under its Texas dilution claim, free from the bar set out in § 1125(c)(3), by arguing that the federal registration for the mark POLO, protects only Ami Shinitzky's "Old POLO

Magazine," not Westchester's "New POLO Magazine." Plaintiffs point out, however, that regardless of any other factor, and even if Westchester's magazine were not covered somehow by its registration, the federal dilution statute does not limit the effect of a registration to only those goods expressly covered. As to the latter contention, PRL has cited no law to the contrary.

To date, only three published opinions even mention section 1125(c)(3), and none of those contains any real analysis of this provision. *Jet. Inc. v. Sewage Aeration Systems*, 165 F.3d 419 (6th Cir.1999); *Viacom, Inc. v. Ingram Enterprises, Inc.*, 141 F.3d 886 (8th Cir.1998); *CIT Group, Inc. v. Citicorp*, 20 F.Supp.2d 775 (D.N.J.1998). In *Viacom, Inc. v. Ingram Enterprises, Inc.*, the Eighth Circuit did address the "complete bar" set out in the FTDA, in a slightly different context, but observed that the federal statute still allows a party to contest the "validity" of the registration. 141 F.3d at 890. ("Viacom's claim under the Missouri Anti–Dilution act is not foreclosed or superseded by the FTDA because Viacom may fail to prove its claim for injunctive relief under § 1125(c)(1), and Ingram may fail to prove that it is entitled to the § 1125(c)(3) defense against this state law claim.... In addition, we note that Congress in § 1125(c)(3) of the FTDA made federal trademark registration a defense to claims under state anti-dilution statutes, rather than preempting such statutes altogether.")

■ Here, the court agrees with Westchester that the purpose of the federal statute appears clear. If a party asserts a dilution claim against one who owns a federally registered mark, it must proceed under the federal dilution statute. Allowing state law dilution claims to proceed against owners of federally registered marks would interfere with federal law and discourage the federal registration of marks, contrary to the purpose of the Lanham Act. *See* H.R.Rep. No. 104–374 at 7 (1995), reprinted in 1995 U.S.C.C.A.N.

1029, 1034. Section 1125(c)(3) "provides a further incentive for the federal registration of marks and recognizes that to permit a state to regulate the use of federally registered marks is inconsistent with the intent of the Lanham Act 'to protect registered marks used in such commerce from interference by state, or territorial legislation' ").

Westchester's POLO mark is located on the principal register, and it appears that, under the plain language of the statute, and the limited authorities on this issue, Plaintiffs' preclusion argument is well taken. *See* 15 U.S.C. § 1125(c)(3). As there is no Fifth Circuit authority on point, to hold otherwise would ignore the plain language of the Act. For that reason, the court concludes, in sum, that the FTDA is a bar to PRL's claim under Tx.Bus. & Com.Code § 16.29.

Nonetheless, PRL's argument is an intriguing one: that, because the mark is being used in a manner inconsistent with the original application, the FTDA should not serve to preclude a state law remedy. PRL posits that the FTDA provision is irrelevant because, here, Plaintiffs are misusing their mark. However, as noted, no support for that position has been submitted, and after an extensive survey of the case law and treatises, the court has found no decision which addresses the grounds PRL asserts. More importantly, because of the court's findings on the issue of infringement, and the relief ordered on that claim, there seems little need to pursue this inquiry. In this context, it is worth noting that PRL has insisted, from the outset, that injunctive relief is the necessary remedy, and it has never requested money damages or an accounting of profits. PRL argues further that injunctive relief is required under the rubric of either the federal or the state anti-dilution statutes. In that regard, PRL maintains that a disclaimer, which Westchester urges the court to consider, would be an ineffective remedy for dilution and, in fact, would result in a dilution of its mark. *See, e.g.,*

*Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.,* 832 F.2d 1311, 1316 (2d Cir.1987); *E. & J. Gallo Winery v. Gallo Cattle Co.,* 12 U.S.P.Q.2d 1657, 1669 (E.D.Cal.1989), *aff'd as modified,* 967 F.2d 1280 (9th Cir.1992). Because the court has concluded, for the reasons stated, that permanent injunctive relief is required on the infringement action, it need not reach PRL's contention that a state claim is still available because Westchester is using the mark outside its registered purpose. As PRL's request for relief is the same under the Texas statute, that dispute is left for another day.

**Dilution Under Federal Law**

■ As noted, the FTDA amended the Lanham Act to codify the protection available to famous marks from unauthorized users attempting to trade upon the goodwill and established renown of such marks, thereby diminishing their distinctive quality. H.R.Rep. No. 104–374, at 3, reprinted in 1995 U.S.C.C.A.N. at 1030. To show dilution, under the federal law, a plaintiff must prove (1) sufficient similarity between the junior and senior marks to evoke an instinctive mental association of the two by a relevant universe of consumers which (2) has caused (3) actual economic harm to the famous mark's value by reducing its previous selling power as an advertising agent for its goods or services. Mere proof that customers would make a mental association between the marks, however, is insufficient to allow a plaintiff to prevail. *Star Markets, Inc. v. Texaco, Inc.,* 950 F.Supp. at 1037. How much more than that a claimant has to show is subject to dispute.

■ The crux of PRL's argument is that its mark is diluted by a blurring of identification between its goods and the one currently produced by Westchester. *Pebble Beach Co. v. Tour 18 I, Ltd.,* 942 F.Supp. at 1564. At the outset, Westchester argues that, in order to prevail under the FTDA, PRL must present evidence to show that actual economic harm has resulted from the dilution of its mark, and

that it has wholly failed to meet this burden. Plaintiffs are adamant that PRL's claim for dilution is pure speculation. Westchester argues that PRL has cited absolutely no evidence to show the effect of its use of the mark for a magazine. (PRL's Proposed Findings of Fact at 74 and Proposed Conclusions of Law at 26). According to Plaintiffs, the only evidence to which PRL points on this issue is Westchester's use of the mark alone. In support, Westchester emphasizes the Lanham Act's definition of dilution, which means "the lessening of the capacity of a famous mark to identify and distinguish goods...." 15 U.S.C. § 1127. Westchester contends that despite the fact that, in PRL's words, the New POLO Magazine has been in "extensive nationwide distribution" for over a year, PRL presented no evidence that Westchester's use has lessened the capacity of PRL's marks to identify and distinguish its goods. Westchester insists that this is fatal to PRL's claims, and points out that Defendants' own witness, Buffy Birrittella, admitted that PRL's "image has pretty much stayed consistent" over the past year. (11/16/98 P.M. Tr. 28). Further, Plaintiffs argue that, even though PRL commissioned three surveys on the issue of likelihood of confusion in this case, it failed to present any survey evidence in regard to a showing of dilution, by blurring, or otherwise. Plaintiffs characterize PRL's request to enjoin Westchester's use of the name Polo, as "sheer speculation about dilution", and so it should be rejected. *See Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1039–40 (2d Cir.1989) (Sweet, J., concurring).

Westchester is likewise adamant that the Fourth Circuit decision in *Ringling Bros.—Barnum & Bailey,* which requires a showing of actual harm from dilution, is the appropriate standard, and that PRL's proof fails entirely here. In response, PRL contends that the *Ringling Bros.— Barnum & Bailey* decision is an aberration, clearly against judicial trends, and

disavowed by McCARTHY and other notable authorities. PRL insists that, to date, the Fifth Circuit has relied upon the likelihood of dilution standard, and it cites *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070 (5th Cir.), *cert. denied*, 522 U.S. 915, 118 S.Ct. 299, 139 L.Ed.2d 231 (1997), and those cases following it as support for that argument.

It is true that a number of Fifth Circuit decisions, including *Exxon*, do evaluate dilution claims under *Sweet*-type factors, but those decisions merely reviewed findings under the Texas anti-dilution statute. It is, therefore, not safe to assume, as PRL apparently does, that the law in this circuit clearly mandates a likelihood of dilution standard, rather than one of actual harm caused by dilution. It is safe to assume, however, that the recent Fourth Circuit decision will generate much uncertainty. Notwithstanding the view of the FTDA's requirements in the *Ringling Bros.* opinion, Professor McCarthy has written that the federal Act "does not require proof of an actual lessening of strength of the famous mark: only that there is a lessening of the capacity of the ability of the mark to be strong as a commercial symbol and identifier." *See* 3 McCARTHY, § 24:94 at 24–160 (emphasis omitted); *see also* Courtland L. Reichman, *State and Federal Trademark Dilution*, FRANCHISE L.J. 111, 132 (1998) (concluding that the federal Act "appears to require actual dilution", but supporting the view that a claimant need only show a likelihood of dilution because that standard is consistent with the definition's use of the word 'capacity'). Capacity indicates an ability by the junior user to dilute, not actual dilution in the marketplace. There is no need to show actual harm. It has been observed, as well, that in a trademark dilution case, " '[d]ilution is itself an injury which [cannot] be recompensed by money damages." *Deere & Co. v. MTD Products, Inc.*, 860 F.Supp. 113, 122 (S.D.N.Y.), *aff'd*, 41 F.3d 39 (2d Cir. 1994) (quoting *American Express Co. v. Vibra Approved Lab. Corp.*, No. 87–CV–8840, 1989 WL 39679, *10 (S.D.N.Y. April 19, 1989). Further, given these competing standards it has been suggested that, in any event,

> to strike an ideal balance, courts should apply a modified likelihood of dilution standard in cases where the junior user's mark has yet to be introduced into a market and survey evidence of actual dilution is unavailable, and apply an actual dilution standard in cases where the junior user's mark has coexisted in the market with the original mark and actual dilution can be shown conclusively without reliance on an inherently uncertain and questionable balancing test.

Bible, *supra*, at 313.

Although the Fourth Circuit's decision in *Ringling Bros.* is not binding on this court, it is instructive. The Fourth Circuit determined that a likelihood of dilution is not the appropriate standard in a situation involving a blurring of marks for two reasons. First, and most importantly, the court interpreted the FTDA as providing a remedy only for actual, consummated dilution. Second, it interpreted the Act as one protecting solely the selling power of a mark and not its distinctiveness. It is clear, however, that despite the fact that the court in *Ringling Bros.* opined that actual harm may be proven through a variety of methods, it recognized that such a standard is a strict one. The court, in fact, stated that "[p]roof will be difficult, because actual, consummated dilutive harm and its cause are difficult concepts." 173 F.3d at 464. Even so, the Fourth Circuit concluded that this is what Congress intended because the economic harm that may result from a mere replication of a junior mark "is by no means certain." *Id.* at 459–60.

In reviewing the published decisions which discuss the FTDA, the leading authorities, and those opinions referencing the Texas law, it is unclear whether this circuit will require a finding of actual harm as a necessary element of a federal dilution

claim. Decisions in this circuit which have addressed claims of dilution by blurring have so far avoided an analysis of the new Act. *See Elvis Presley Enterprises,* 141 F.3d at 193 (5th Cir.1998); *Pebble Beach,* 155 F.3d at 541; *Exxon Corp.,* 109 F.3d 1070. It is important to note, as well, that several courts outside the Fourth Circuit have followed the standard of proof announced in *Ringling Bros.,* (*See Playboy Enterprises, Inc. v. Netscape Communications,* 55 F.Supp.2d 1070 (C.D.Cal. 1999); *American Cyanamid Co. v. Nutraceutical Corp.,* 54 F.Supp.2d 379 (D.N.J.1999)), while other courts seem to accept that dilution which harms a senior user's mark can be proven in the absence of proof of actual harm. (*The Nexxus Products Co., v. CVS New York, Inc.,* 188 F.R.D. 11 (D.Mass. 1999))).

As there is no authority which sets the governing standard for relief, in this circuit, under the new Act, and because PRL's requested relief is the same as that ordered in the infringement action, the court is reluctant to enter this uncharted water. In those Fifth Circuit cases relied upon by PRL, each one addressed findings under the Texas statute only, where likelihood of dilution is clearly the burden that a claimant must meet. Those opinions not only fail to address the FTDA, but pointedly avoided doing so. Notably, in each of those cases, trial courts found injunctive relief justified (or not) on an analysis of the infringement action alone. While affirming, in the main, any injunctive relief findings, the Fifth Circuit relied on those grounds and declined to address issues implicated by the Federal Anti–Dilution Act. *See Elvis Presley Enterprises,* 141 F.3d at 193; *Pebble Beach Co.,* 155 F.3d at 541; *Exxon Corp.,* 109 F.3d 1070. This court feels no more inclined to do so in this instance. Given the relief ordered on the infringement action, which is the same measure of relief which PRL is seeking under both the state and federal dilution statutes, there seems little need to add another matter to the appellate freight

these parties will bear. However, with the exception of the litigants, there is no one more keenly aware of the time that has elapsed while these issues have been pending. In the hope, therefore, of avoiding any further expense and delay to the parties, the court makes alternative findings on the federal dilution claim in the event that the permanent injunction, ordered as a remedy for infringement, is set aside.

To determine whether PRL has met the burden, under either standard, to show dilution, it must first show that its marks are famous. Further, in a dilution analysis, a plaintiff must show more "in the form of marketplace fame and recognition" in order to establish that its mark is strong. 3 McCarthy, *supra,* § 24.109 at 24–198. In that regard, a plaintiff's long and extensive use of a mark, coupled with a national reputation and extensive advertising and promotional efforts may suffice to establish the strong and distinct nature of a mark and so entitle it to protection under the standards set out in a typical anti-dilution statute. *See Pebble Beach,* 942 F.Supp. at 1564. Although Westchester contends that PRL has not shown that its trademarks were famous, or distinctive in 1975, when the original *POLO Magazine* was launched, that argument is without merit. (July 1998 Memorandum Order, p. 35–36). PRL is not complaining of infringing activity in regard to the publication of the Old POLO Magazine, or even *Polo Players Edition,* but instead, it complains about the New POLO Magazine, the one that was "re-launched" in October 1997. As detailed earlier, PRL has shown that its marks were famous and distinctive on that date. (Defendants' Exhibits # 35A; # 36; # 37A–I; # 142; # 140).

As of July 1998, Westchester had already distributed, without charge, more than 800,000 copies of the New POLO Magazine, and it has produced six (6) additional issues since that time. If, as Plaintiffs hope, that circulation increases with each edition, the court finds a likelihood,

indeed a probability that such distribution will result in a dilution of the POLO Trademarks. (*See* July 1998 Memorandum Order, p. 36; Docket Entry # 73). It is also important to note that, in addition to mere use of the mark, Westchester is discounting advertising rates and conducting wholesale promotions in order to gain wider distribution and a higher market profile. (Defendants' Exhibits # 122 – # 126) ("Keep in mind, that in addition to great event exposure opportunities, Polo Magazine itself will reach exactly the audience Ferragamo would like to reach.") (Defendants' Exhibit # 122, letter from Lisa Fields to Denise DeLuca, Director of Public Relations, Ferragamo) ("We reached 225,000 very affluent, worldly readers all over the U.S., and would remind you of a *Town & Country, W, Departures*, in case you haven't seen the magazine.... Our regular rate is $31,900, but because [Tootsie's] is such a regular, they only pay $10,000, so you would only pay $5,000." (Defendants' Exhibit # 126, letter from Lisa Fields to "Francesca", dated July 9, 1998). Further, travelers on American Airlines apparently can claim a mileage award tied to free distribution of the New POLO Magazine. (Defendants' Exhibit # 129). ("The new 1999 display advertising rates reflect our new circulation and low out-of-pocket cost to reach 250,000 Polo Magazine readers.") (Defendants' Exhibit # 135).

 Accordingly, in regard to PRL's claim under the FTDA, if proof of actual dilution is required, the court agrees with Westchester that Defendants' claim fails. Under the standard articulated in *Ringling Bros.*, there has been no showing of actual harm. If, on the other hand, this circuit follows those courts and authorities in reasoning that the standard for recovery under the FTDA is the likelihood of dilution, the court is convinced that, from the evidence produced, PRL has met that burden of proof. Defendants' marks were clearly famous and distinctive well before Westchester, or arguably even Fleet Street, began its use. (*See* Final Findings # 5, # 6, # 7, # 10, # 11). On those factors set out in § 1125(c)(1)(A–H), the court finds the evidence sufficient to prove PRL's marks "famous and distinctive" by a preponderance. (*See* Final Findings # 5, # 6, # 7, # 10, # 11, # 12, # 16, # 17, # 19). The court also concludes, from all of the evidence, that the marketing and distribution methods used by Westchester since October 1997, have a propensity to bring PRL to mind as "a particular product, service, or source of either" and so those acts are likely to result in a dilution of PRL's POLO Trademarks. *Pebble Beach*, 942 F.Supp. at 1567 (citing *Jordache Enters., Inc. v. Levi Strauss & Co.*, 841 F.Supp. 506, 522 (S.D.N.Y.1993). (See Final Findings # 90, # 30). Even applying the *Sweet* factors to these claims, the weight of that analysis is in PRL's favor as well. The court finds that the similarity of the marks; the comparative renown of PRL's mark to Westchester's mark; the sophistication of consumers; and Plaintiffs' predatory intent in creating its new merchandise, all weigh in favor of PRL's claim for relief. *See Mead Data*, 875 F.2d at 1035; Final Findings # 5–7, # 10–12, # 17, # 19). The court finds further that the new distribution methods, aggressive solicitation, and advertising techniques will result in a likelihood of dilution to those marks by blurring; that is by "lessen[ing] the capacity of [PRL's] famous mark to carry out its role as a trademark—namely, to identify and distinguish." *I.P. Lund*, 163 F.3d at 48, (*citing* 3 MCCARTHY § 24:93). To remedy this injury, PRL is entitled to injunctive relief. Put simply, the court finds that, given the remedy ordered on the infringement claim, there may be no need to address the dilution allegations. In an abundance of caution, however, it has done so, alternatively, only to assist in the final resolution of these matters should that injunction ruling be set aside.

### Westchester's Defenses

In reviewing whether permanent injunctive relief is appropriate, the court must

address Westchester's defenses to the claims of infringement, dilution, and unfair competition. One significant aspect of this inquiry is Westchester's incontestable trademark for a magazine, under the name "POLO", devoted to "equestrian sports and lifestyles".

It is beyond dispute that John Goodman, Westchester's owner, has a long and well documented affiliation with that sport. Fleet Street's publication, which was sold to Westchester, is the official magazine of the USPA, and enrollment in that group entitles its members to a free subscription. As discussed earlier, Westchester contends that PRL is trying, through this litigation, to control all use of the name "polo" and to extend its own mark to cover "lifestyles". Westchester argues that PRL should not be allowed, through this litigation, to "usurp certain long standing connotations of the word 'polo', especially from a party such as Westchester that is legitimately trying to use them." It argues that there is no infringement issue because, while PRL has a high name recognition in the fashion industry, its mark for "POLO" clothing and home furnishings is in no way threatened by the disputed magazine. (Docket Entry # 37, pp. 11–14).

**Incontestability**

In responding to PRL's claims before this court, Westchester is most adamant that, because it has an incontestable registration for its mark, its use of "Polo" as the name for a magazine may not be challenged. Section 33(b) of the Lanham Act provides that the evidentiary effect of an incontestable registration "shall relate to the exclusive right to use the mark on or in connection with the goods or services specified in the affidavit filed under the provisions of Section 15." 15 U.S.C. § 1115(b). A mark becomes "incontestable" through five years' continuous use following federal registration and compliance with statutory formalities. *See* 15 U.S.C. § 1065. Once a mark has achieved incontestable status, "it is conclusively presumed either that the mark is non-descriptive, or if descriptive, has acquired a secondary meaning." 2 McCarthy, *supra*, § 15:35 at 15–53. Westchester, relying on § 33(b) of the Lanham Act, 15 U.S.C. § 1115(b), contends that its exclusive right to use the mark is subject only to the eight defenses enumerated in that provision of the statute.[8] Westchester argues that, because PRL has made no attempt to cancel its registration, its incontestable mark is a complete bar to any infringement action. PRL raises a number of matters in response. First, it notes that under 15 U.S.C. § 1065, a senior user, Ralph Lauren in this instance, may question the use of a mark even though it has become incontestable. PRL argues next that "incontestability" is limited to those goods or services which are listed in the application and for which the mark has been in use for five continuous years. PRL insists that Westchester has developed a new product and so any rights that may have attached to the Fleet Street mark do not extend to its current usage. Finally, PRL contends that, under § 1115(b)(3), Westchester is using the mark in a way which misrepresents the source of the goods.

Surprisingly few decisions have been published on this precise issue. For that

---

8. Under 15 U.S.C. § 1115(b) an alleged infringer may argue the following: (1) that the registration was obtained fraudulently; (2) that the mark has been abandoned; (3) that the mark is used to misrepresent the source of the goods in connection with which it is used; (4) that the allegedly infringing mark is used, otherwise than as a mark, as the alleged infringer's individual name in her own business, or the term is descriptive of and used fairly and in good faith to describe the alleged infringer's goods or their geographic origin; (5) that the allegedly infringing mark was adopted without knowledge of the registrant's prior use and has been used continuously for a certain period of time; (6) that the allegedly infringing mark was registered and used prior to the infringed mark's registration; (7) that the mark is being used to violate the anti-trust laws; and (8) that the infringement is subject to equitable defenses, such as laches, estoppel, and acquiescence.

reason, the court turns, again, to McCarthy on Trademarks as a guide through this labyrinth. In commenting on incontestability as a defense, McCarthy characterizes it as a "swiss cheese rule". 5 McCarthy, § 32:147 at 32–176. Labeling the defense one that is "misdescriptive" and "misleading", McCarthy notes that exceptions abound to the "incontestable" status given a mark, while observing that there is still "doubt as to the exact scope of which challenges are foreclosed and which are not by the status of 'incontestability'." *Id.* Although, § 33(b) details eight explicit exceptions to incontestability, according to McCarthy, that section also "incorporates the exceptions of § 15 by reference, and § 15 in turn incorporates § 14(c) and (e) by reference, and § 14(c) in turn incorporates the exceptions of § 2(a), (b), and (c) and § 4." *Id.* In all, McCarthy tallied some twenty-two exceptions to "incontestability." *Id.* Finally, even if one of those eight absolute exceptions, detailed in the Act, is proven, it "do[es] nothing more than destroy the conclusive evidentiary status of the registration." 5 McCarthy, *supra*, § 32:153 at 32–182. The evidentiary weight of a registration then descends from conclusive to "prima facie", and a party may lodge any legal or equitable issue or defect which could have been raised had the mark not been registered. (*Id.* at 32–183). Indeed, decisions in this circuit have held that an incontestable status does not even bar a claimant from arguing that the mark is a weak one, noting that "[i]ncontestable status does not make a weak mark strong". *Oreck Corp. v. U.S. Floor Systems, Inc.,* 803 F.2d 166, 170 (5th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).

As mentioned, PRL contends that § 1065 provides that "incontestability does not apply in defense of a claim brought by a senior user like PRL that has acquired common law rights prior to the date of registration", and so the Fleet Street registration cannot be deemed "incontestable" as to its prior existing rights. (Docket Entry # 147, Defendants' Pre-trial Brief, p. 33). PRL maintains that, without regard to the enumerated defenses in § 33(b), it is free to challenge Westchester's use of the incontestable mark under the prior use exception because its mark was in nationwide use before the Fleet Street registration issued. (PRL's Proposed Conclusions of Law at 29 – 31). PRL points out that the Lanham Act provides that a mark is incontestable only in the following circumstances:

> [E]xcept to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of registration under this chapter of such registered mark. . . .

15 U.S.C. § 1065.

Relying on the plain meaning of this provision, PRL argues that it acquired common law trademark rights, which continue today, before the 1992 date on which Fleet Street obtained its registration. Westchester claims, however, that PRL cannot invoke the "prior use defense" unless it can establish that its use of the mark is "geographically" remote from Plaintiffs' use of the Fleet Street mark. The gist of Westchester's argument is traced to a line of Supreme Court decisions that date from early in this century, and is generally referred to as the *"Tea Rose–Rectanus* defense". *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916) (*Tea Rose* ); *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918). PRL, acknowledging that legal precept, argues nonetheless that such a defense is no help to Westchester because the "plain meaning" of the prior use exception "is that if a party has acquired common-law trademark rights continuing since before the publication of the federal registration, then to that extent the registration will not be incontestable." The court agrees that

Westchester's argument is inapplicable here. *See 815 Tonawanda Street Corp. v. Fay's Drug Co.*, 842 F.2d 643, 646 (2d Cir.1988) (citing *Wrist–Rocket Mfg. Co., Inc. v. Saunders Archery Co.*, 578 F.2d 727, 731 (8th Cir.1978)). The defensive issue implicated in the *Tea Rose–Rectanus* reasoning is one which requires that the party asserting the "prior use" must be geographically remote from the alleged infringer. While that proposition is true, it is not pertinent, as that logic applies in those instances in which a junior user is defending a claim against a senior user. Here, those positions are reversed; it is the senior user, PRL, which has had its marks in nationwide use since 1967, and who seeks to enjoin the junior user, Westchester. *See,* McCARTHY, *supra,* at § 26:4 at 26–9 ("the net result of the *Tea Rose* and *Rectanus* decisions is that ... the national senior user of a mark cannot oust a geographically remote good faith user who has used the mark first in a remote trade area"). More importantly, PRL points out that it does not rely on the *Tea Rose–Rectanus* defense, or its statutory counterpart, but instead, on the prior use defense that is embodied in Section 15 of the Lanham Act. (*See* Docket Entry # 187, # 26, p. 14).

It appears that some authority supports the view that prior use, under 15 U.S.C. § 1065, may be invoked by a senior user who has acquired common law rights on a nationwide basis. In *Cuban Cigar Brands N.V. v. Upmann Intern., Inc.*, 457 F.Supp. 1090 (S.D.N.Y.1978), *aff'd,* 607 F.2d 995 (2nd Cir.1979), the senior user's nationwide practices were found to defeat any consideration of incontestability. *See also, 815 Tonawanda Street Corp. v. Fay's Drug Co.*, 842 F.2d at 646. *See also* McCARTHY § 26:56, at 26–91. The court is persuaded that PRL has shown that it obtained common law rights in the Polo Trademarks, throughout the United States, prior to Fleet Street's registration of the mark in 1992, and that, since that time it has used the mark continuously in all fifty states. (11/16/98 A.M. Tr. 59–60; 61–64; Defen-dants' Exhibit # 37, and 11/17/98 A.M. Tr. at 140). Accordingly, PRL has established a "prior use" sufficient to counter Westchester's assertion that its mark is incontestable.

PRL argues, in the alternative, that the registration which Westchester acquired from Fleet Street covers only "the magazine as it was published for over 20 years" by Ami Shinitzky, and that Westchester's magazine is not protected by the registration because it "focuses primarily on fashion, adventure and elegance" (see Docket Entry # 187, PRL's Proposed Conclusions of Law at 30–32). PRL argues that an incontestable status is limited to only those services in connection with a registered mark which has been in continuous use for five consecutive years. PRL claims that the new magazine does not meet this requirement and so Westchester's right to use the mark must be limited to those goods for which it was originally obtained and attached. *See Moore Business Forms, Inc. v. Rite Aid Corp.*, 21 U.S.P.Q.2d 2024 (W.D.N.Y.1991).

In that regard, PRL maintains that the magazine, currently published by Westchester, is a different product from the one produced by Ami Shinitzky. It follows that, because the Fleet Street mark is no longer being used in the manner for which it was obtained, any presumption which may otherwise attach to an incontestable registration, disappears with regard to goods not listed expressly in the PTO application. Westchester is adamant, however, that it owns a mark, registered in 1992, and incontestable as of April 1998, for "magazines devoted to equestrian sports and lifestyles." Westchester responds that its predecessor used the mark "POLO" for its equestrian sport and life style magazine in good faith for more than 22 years, and that in those years the mark was registered and built goodwill. Westchester characterizes, as "ludicrous", PRL's charge that it is now publishing a different product. Westchester argues

that, because PRL has never registered the mark for a magazine, it would be grossly inequitable to permit it to claim, belatedly, that use of an incontestable mark "infringes" its rights when it is applied to such different products. *See, e.g., Dunfey Hotels Corp. v. Meridien Hotels Investments Group, Inc.,* 504 F.Supp. 371, 382 (S.D.N.Y.1980). Plaintiffs contend further that this exception must be applied narrowly, or "it completely swallows up" the benefit of incontestability.

Plaintiffs are most insistent that PRL ignores the undisputed fact that the affidavit it filed with the POLO registration covers a "magazine on the subject of equestrian sports and life styles," without any conditions or limitations. Since Westchester's magazine is such a periodical, its registration conclusively establishes its right to use the mark POLO on, or in connection with, that product. On this point, Westchester has submitted dictionary definitions of the word, "lifestyle", in support of its claimed adherence to the original application. Westchester insists that "lifestyle", as used in its 1992 application before the PTO, means "a way or style of living". (Oxford English Dictionary, Supp. Oxford University Press 1987; Docket Entry # 119, Motion for Summary Judgment by Westchester Media Co., et al.). But, as one writer cautions, although "judicial eagerness to resort to dictionaries for simplistic solutions to complex trademark cases is understandable", it is of questionable utility. 1 *Gilson, supra,* § 2.02[2], at 2–38.

... One difficulty with dictionaries in trademark litigation is that they may not reflect word meaning among those persons who purchase the particular prod-

ucts involved.... Another difficulty is that dictionaries may not conclusively establish that members of the relevant public actually do understand the claimed meaning, and courts have disagreed on this point.... There is also the problem of the degree to which a dictionary is legally authoritative. A large publishing company typically maintains a staff which reads all types of printed matter in search of new words or new meanings of old words. After a sufficient volume of such matter is collected, lexicographical judgment is exercised and, if warranted, a dictionary definition based on such usage is prepared and included. A court accepting a dictionary entry at face value is in effect adopting the lexicographical judgment as its own, even though such a judgment might be based on printed matter which, if offered in evidence, would not be controlling." *Gilson, supra,* § 2.02[2], at 2–35 – 2–36. (internal citations omitted).

Indeed, use of the word, "lifestyle", in any connotation is apparently the subject of some debate among lexicographers.[9]

Westchester points out that, in making its application to the PTO, it supplied copies of the magazine, from March and May 1989, so that the PTO examining attorney was conversant with the product for which the registration issued. The March 1989 edition of the magazine, submitted to the PTO, depicts three polo players on the cover. (Defendants' Exhibit # 1, Plaintiffs' Exhibit # 160). The featured stories were titled "The Polo Excellence Awards. The Argentine Open". That edition was described further as, a "Special Issue: The World of Polo". (Plaintiffs' Exhibit # 58).

---

**9.** The "usage note" appended to the definition in the 1992 American Heritage Dictionary observed that,

When *lifestyle* began to gain currency a generation ago, a number of critics objected to it as voguish and superficial, perhaps because it appeared to elevate habits of consumption, dress, and recreation to a primary basis of social classification. Nonetheless, the word has proved durable and useful, if only because such categories do in fact figure importantly in the schemes that Americans commonly invoke in explaining social values and social behavior whether appropriately or not.... As such, the word has won the occasionally grudging acceptance of the Usage Panel. *American Heritage Dictionary of English Usage,* 1040 (3rd Ed.1992).

986

It is interesting that, one of the first, full-page ads in that magazine is for a Polo Ralph Lauren product, men's cologne. The ad is a color reproduction of the cologne bottle which has an image of polo players, engaged in a game, superimposed on it. There are a total of eight (8) articles in that issue, each one about the sport or a tournament venue ("Abierto", an article about the Argentine Open; "Love at First Ride Off", an article about novelist Rita Mae Brown, a recent fan of the game; "Around the World in Eighty Plays", describing a "voyage 'round the polo world"; "The Game of Kings", a two-page spread, with photographs, of celebrities and actors, either playing polo or attending matches; "On Any Sunday", an article purporting to look "backstage" at a polo match ("Those who think of polo as an elitist sport, a sort of croquet on horseback providing diversion for the hoity-toity, should take a stroll 'backstage' during a break in the action"); "The Polo Look", an article about polo fashion "through the ages" which is accompanied by candid photographs of participants and spectators at tournaments; "The 1989 Polo Excellence Awards", touted as the magazine's "tribute to the sport's best and brightest"; and the last feature, "Picnic a la Polo", an article on "tailgating" as an honored tradition in polo circles, which includes recipes for the menu items featured). The magazine contains 124 pages, including all ads, articles, and photographs. In that edition, only eleven (11) advertisements were unrelated to polo equipment or realty. Of those 11, one was for the Ralph Lauren cologne, as noted, and another was for a car dealer offering trailers suitable for hauling horses. Another of these 11 advertisements was for watches, made by Rolex, presumably the sponsor of "The Rolex Gold Cup". Finally, one of these ads was for an art gallery, featuring an Indian polo scene on silk.

The May 1989 edition of *Polo Magazine*, also submitted to the PTO with the application, had a horse and a player reproduced on the cover. (Defendants' Exhibit # 1, Plaintiffs' Exhibit # 160). The fea-

ture articles are "A Shopper's Guide to Polo Lessons" and "A Southern Renaissance". "Digging for Gold, the Rolex Gold Cup" was an article about the tournament referenced on the cover. That issue contains four articles, one about South Carolina as a polo venue, one about Atlanta as a polo venue, one about two young competitors in the Rolex Gold Cup, and one about learning how to play the sport. ("Nothing Could Be Finer"; "A Peach of a Place for Polo"; "The Midas Touch"; "Off to a Good Start"). That issue includes 64 pages, total, of print, photos, and advertisements. In that edition, only five (5) advertisements were for products unrelated to the sport or its equipment. Of these, one was for cosmetic surgery, one was for a watch, which featured a polo player on the face, one was for an automotive center, which was promoting trailers for hauling horses, one was for a brokerage firm, and the last was a liquor advertisement. The back cover of the magazine was a full-page ad for Cadillac automobiles. In one, full-page clothing ad, a clothier, Rule 18 Polo and Equestrian Sportswear, described itself as "Real, Not Ralph". Most of the pages in both of these editions were printed in black and white, and almost every page held a picture of a polo player, polo equipment, saddlery, or livestock. Although there was copy, arguably, devoted to fashion and travel, the fashions featured were all related to the game or its spectators, and did not allude to evening wear, wedding attire, or those designer fashions and runway shows now highlighted in the New POLO Magazine. None of the travel articles were devoted to locations other than polo fields or cities with active polo clubs.

Further, in weighing PRL's argument, the court is aware that a description of a magazine's editorial content is available in a trade publication called "Standard Rates & Data Service" ("SRD" or "SRDS"). " 'SRD' has magazines grouped in various categories and prints a publisher's editorial profile which is drafted and submitted by the magazine. That profile is intended

to state what the magazine is about and advertisers and ad agencies use 'SRD' as an important reference." *Inc. Publishing Corp.*, 616 F.Supp. at 372. PRL has shown evidence that, during this litigation, the Fleet Street Publishing magazine was listed in the SRDS category of periodicals devoted to "Horses, Riding, & Breeding" (Defendants' Exhibit # 12A). Other publications listed in the same category are *The Horse Trader, Hunter & Sport Horse, Mid–Atlantic Thoroughbred, Paint Horse Journal, Practical Horseman,* and *Quarterhorse News.* Fleet Street's self-description in that category lasted, apparently, through the June 1998 edition of SRDS. *Polo Players Edition* was then identified in the category of magazines devoted to "Horses, Riding & Breeding". (Defendants' Exhibit # 12B). In fact, in the September 1998 SRDS, *Polo Players Edition* is the only Westchester publication listed. SRDS does offer categories for magazines that write about "affluence", "media/personalities", "popular culture", "general editorial", and "entertaining and performing arts". (Defendants' Exhibit # 12 A–C). In fact, *Town & Country, Travel & Leisure* and *Condé Nast's Traveler* are listed among those publications devoted to travel or general editorial content. (*Id.*) The *Robb Report,* said to be a likely competitor of Westchester's New POLO Magazine, is listed in the category of magazines devoted to "affluence." (Defendants' Exhibit # 12, Defendants' Exhibit # 107). The court considers this SRDS listing, a self-descriptive roster, as some indication of Westchester's new focus. It is obvious that, prior to Westchester's acquisition, the editorial staff of the magazine, then directed by its Fleet Street owners, considered itself more akin to *Practical Horseman,* than to *Town and Country.*

▉ PRL is correct in noting that courts have held, repeatedly, that the presumptions which attach to incontestable registrations do not follow any goods or services which are not listed expressly in the application. *Moore Business Forms*

*Inc. v. Rite Aid Corp.,* 21 U.S .P.Q.2d 2024 (W.D.N.Y.1991), *aff'd* 983 F.2d 1048 (2nd Cir.1992). Indeed, as noted by the Eighth Circuit in *PepsiCo, Inc. v. Grapette Co.,* 416 F.2d 285 (8th Cir.1969):

Where a transferred trademark is to be used on a new and different product, any goodwill which the mark itself might represent cannot legally be assigned. The trademark owner does not have the right to a particular word, but to the use of the word as a symbol of the particular goods. To hold otherwise, would be to condone public deceit.

*PepsiCo,* at 289. *See also Cuban Cigar,* 457 F.Supp. at 1100 n. 42, n. 43 (*Citing Casual Corner Assoc. v. Casual Stores of Nevada, Inc.,* 493 F.2d 709 (9th Cir.1974); *Burger King of Florida, Inc. v. Hoots,* 403 F.2d 904 (7th Cir.1968). Courts interpreting this provision have required the goods or services in the registration to be identical, not merely similar or related to, the goods or services in question. *See Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607 (2nd Cir.1960), *cert. denied,* 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960); *In Re Loew's Theatres, Inc.,* 769 F.2d 764 (Fed.Cir.1985); *In Re Merrill Lynch, Pierce, Fenner and Smith, Inc. .,* 828 F.2d 1567, 1568 (Fed.Cir.1987).

Westchester argues, however, that the cases relied on by PRL are inapposite because each one involved circumstances in which the disputed mark was being used on goods or services not covered by the incontestable registration, whereas, here, its incontestable registration covers the very product on which it uses the mark, an "equestrian sports and life styles magazine". In view of the strong policies which encourage registration, Plaintiffs warn that courts should be careful to limit the application of the Section 1065 exception to clear cases of infringement. Certainly, while federal registration is to be encouraged, nonregistration does not impact the existing state or federal common law rights in a mark. It is use, not registration, which creates the underlying exclu-

sive rights to a mark. *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812 (1st Cir.1987). 3 McCarthy, *supra*, § 19.3, at 19–11. (Underlying common law rights in a trademark are not created by registration, but are created by use and the consequent acquisition of common law rights. It is sometimes erroneously deduced from this that under the Lanham Act, registration of a trademark grants only procedural advantages and not enlarge the registrant's substantive rights, for ownership rests on use, not registration). Moreover, the proof is clear that the Fleet Street registration issued for goods or services under § 2(f), a concession by Fleet Street that the mark was not inherently distinctive. *See Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir.1994) (*citing Yamaha Intern. Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1577 (Fed.Cir.1988)).

Here, the court finds that the New POLO Magazine is a different product from the magazine described in Westchester's trademark registration. While the registration covers a magazine "on the subject of equestrian sports and lifestyles", that is a magazine much like the one produced by Ami Shinitzky, and which continues today as *Polo Players' Edition*. The new magazine has a reduced emphasis on the sport of polo, and it focuses instead on fashion, adventure and elegance, often through the use of images highly reminiscent of PRL's own advertisements. From all of the evidence submitted, and for the reasons detailed previously, the court concludes that when Westchester acquired the trademark from Fleet Street Publishing, it was for a magazine different from the one it is publishing today under the name "POLO". For that reason, the court concludes that Westchester's incontestability defense fails and an infringement action can succeed even though the registration became incontestable in April 1998.

Finally, PRL argues that Westchester is "misrepresenting the source" of its product under 15 U.S.C. § 1115(b)(5).

That argument is unavailing. It appears, from the few decisions on point, that a mere showing of a likelihood of confusion is not sufficient to preclude use of an incontestable mark under this exception. *McDonnell Douglas Corp. v. National Data Corp.*, 228 U.S.P.Q. 45, 47 (T.T.A.B. 1985) (construing identical "misrepresentation of source" language in 15 U.S.C. § 1064(3)). The court agrees with Westchester that the entire premise of PRL's theory on the alleged misrepresentation of source is that "Westchester purposefully misrepresented the source of the New POLO Magazine with the hope of confusing consumers into believing the magazine was somehow related to PRL." That argument fails as each of the cases cited by PRL holds that this exception applies only in those instances in which the defendant deliberately and blatantly passed off its goods as those of another. *Cuban Cigar Brands N.V. v. Upmann Intern., Inc.*, 457 F.Supp. at 1101 (defendant "blatantly misused" its mark by simulating plaintiff's mark and packaging, thereby "encouraging the public to recognize its products as those of plaintiff"). PRL's allegations fail to state a claim for "misrepresent[ing] the source of goods", under 15 U.S.C. § 1115(b)(3), and there is no evidence in the record to support such a claim, under the governing authorities.

### First Amendment

Consistently, Westchester has argued that there are strong first amendment considerations that should defeat PRL's request for injunctive relief. While the court recognizes Westchester's first amendment contention, it does not agree that full injunctive relief threatens those rights. It is true that when a first amendment issue is at stake, the Lanham Act must be construed narrowly, no matter how strong the mark, and even in light of the presence of a likelihood of confusion. Undoubtedly, Westchester's argument has some appeal given the nature of the marks at issue and the history of John Goodman's association

with the sport. But, it is equally well settled that the protection afforded by the first amendment does not give one license to "infringe on the rights" of others. *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d at 402. "The crucial focus of inquiry on the issue of likelihood of confusion is the effect of defendant's mark on prospective purchasers." *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1134 (2nd Cir.1979). In that regard, although Westchester expresses considerable alarm that the court would undertake a review of the magazines in order to determine whether there is a likelihood of confusion as to source, it seems clear that "[a]ny confusion as to source by a consumer depends upon an examination of the entire magazine." *See Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc.*, 687 F.2d 563, 567 (2nd Cir.1982).

In arguing that no relief is available here, much less full injunctive relief, Westchester insists that first amendment considerations override all others. One prong of Plaintiffs' argument is that, all else being equal, laches alone should preclude full relief when the first amendment has been implicated. This argument, however, presumes that Plaintiffs have prevailed in their contention that Ralph Lauren was aware of, but "slept on", his rights. For the reasons outlined later in this memorandum, the court has concluded that the magazine which Westchester has produced, from October 1997 on, is a different product from the one that Ami Shinitzky shepherded, and so Plaintiffs' laches argument is unavailing. It follows that the line of cases upon which Westchester relies for support of this proposition is not relevant and needs no further discussion.

 The next prong of Westchester's argument evokes the specter of governmental regulation of the "speech content of Westchester's magazine, which is not permissible under the first amendment." (*See* Docket Entry # 188, p. 4). Westchester insists that, if injunctive relief is granted, it effectively places this court

on "the editorial board of the magazine" and would result in an unconstitutional prior restraint of Westchester's free speech rights. Westchester's arguments as to the intrusive nature of the relief requested in this matter gives the court some pause in evaluating PRL's claims. But, while an order to cease publication, under a particular name, is a rare circumstance, it is by no means singular. *See W.G.B.H. Educational Foundation, Inc. v. Penthouse Intern., Ltd.*, 453 F.Supp. 1347 (S.D.N.Y.1978), *aff'd*, 598 F.2d 610 (2nd Cir.1979); *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217 (2nd Cir.1987); *American Ass'n. for Advancement of Science v. Hearst Corp.*, 498 F.Supp. 244 (D.D.C.1980). Even at that, courts must tread carefully in view of such arguments, although it is commercial speech at issue. The threshold inquiry in a matter which concerns commercial speech is whether the speech is found to be a lawful activity and not misleading. If so, the court must then determine whether the governmental interest asserted is a substantial one. If it is, the court must consider whether the regulation at issue will advance that governmental interest, and finally, whether a more extensive restriction than necessary has been requested to achieve that purpose. *See Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Clearly, one may be prohibited from forms of "communication more likely to deceive the public than to inform it." *Id.* 447 U.S. at 563, 100 S.Ct. at 2350. (*Ibanez v. Florida Dept. of Business & Professional Regulation, Bd. of Accountancy*, 512 U.S. 136, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994; *Inc. Pub. Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370 (S.D.N.Y.1985), *aff'd* 788 F.2d 3 (2nd Cir.1986). "As more and more courts considered the question, it has become clear that enforcement of trademark rights are not affected by the extension of First Amendment guarantees to advertising an expression, and that the First Amendment is not a defense to an

action for trademark infringement or of a Section 43(a) violation where the defendant's mark is likely to cause confusion .... [f]reedom of speech is not absolute; it is balanced against competing governmental interests and policies, and with respect to certain types of speech, it yields." 2 *Gilson, supra*, § 5.09[5] at 5–173–74. The court is confident that, even though full injunctive relief is granted, Plaintiffs retain the ability to publish a magazine about the equestrian sport of polo and the "lifestyles" attendant to that sport. It also has the right, without restriction, and without any first amendment consideration, at all, to publish a magazine about any "lifestyle", fashion, elegance, and travel, under some other name. It is well settled that "[t]he first amendment is not a license to trammel on legally recognized rights in intellectual property." *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir.1979).

A further aspect to Westchester's argument is the contention that any injunctive order issued here would be impermissibly vague and impossible to monitor. Westchester maintains that such an injunction would not only be "unworkable" and, therefore, void, under Federal Rule of Civil Procedure 65(d), but also unnecessary, because a disclaimer order is available as a lesser remedy, and so a broad injunction should not issue. In so arguing, Westchester characterizes, in the following manner, its perception of PRL's requested injunctive order:

> as one "prohibiting use of the mark 'POLO' " to identify 'the New Polo Magazine', (but not the 'Old Polo Magazine' or a 'magazine on the subject of equestrian sports and lifestyles')" .... (Docket Entry # 188, p. 5).

Certainly the specificity of an order is critical to its enforcement and Westchester's argument, as articulated, has surface appeal. But, as one court has recognized, the property rights of a trademark owner do not have to "yield to the exercise of first amendment rights" where a defendant has alternative avenues of communication available. *Reddy Communications, Inc. v. Environmental Action Foundation, Inc.*, 199 U.S.P.Q. 630, 634 (D.D.C. 1977). Here, Westchester has available to it already a periodical, currently published under the name *Polo Players Edition*, and which, according to its own description, serves the polo-playing community. The activity proscribed by this court is the publication of a lifestyle magazine directed to a wider audience; that is, one comparable to the targeted readership of *Town & Country, Cigar Aficianado, The Robb Report, Luxe*, and the others described as Plaintiffs' recent competitors. (Defendants' Exhibit # 107). Obviously, Westchester is free to publish that sort of periodical under any name it chooses, other than POLO. Because use of that name on the magazine that Westchester is publishing has been found to cause confusion, and thereby mislead consumers as to an affiliation or sponsorship by the Ralph Lauren entities, that infringing activity must cease.

More recently, Westchester has cited language in a Fifth Circuit opinion which suggests that an injunction may not issue in the face of a first amendment objection, unless there is a "particularly compelling" reason to do so which outweighs a defendant's interest in choosing an appropriate title for its own work. *See Sugar Busters L.L.C. v. Brennan*, 177 F.3d 258 (5th Cir. 1999). Westchester argues that the circumstances here are "even more compelling" than those before the Fifth Circuit, and that the *Sugar Busters* decision is a "clear recognition that the first amendment, in the context of titles, requires a greatly 'heightened likelihood of confusion' ". (*See* Docket Entry # 209, letter from Tom Godbold, May 26, 1999). On invitation of the court, PRL has responded to this argument. PRL raises two considerations to counter this new contention. First, PRL insists that the extent, if any, to which the *Sugar Busters'* footnote is applicable is slight. PRL notes that in

*Sugar Busters*, the Fifth Circuit was addressing competing book titles, in contrast to the disputed name of a periodical. PRL has cited many cases which address the propriety of a trademark designation on periodicals, or a series of books, as opposed to one for the title of a single volume. While it is true that such a distinction exists in the law, it does not, as Westchester points out, dispose entirely of the issue presented here. Indeed, the cases from other circuits, that were referenced in *Sugar Busters*, did not address book titles exclusively.

A case from the Second Circuit, which is referred to in *Sugar Busters'*, states clearly that, in deference to significant first amendment interests, the law does permit an author relative freedom to choose a title for his own work. In *Twin Peaks Productions, Inc. v. Publications Intern., Ltd.*, 996 F.2d 1366 (2nd Cir.1993), the Second Circuit weighed a dispute about a book title derived from the name of a continuing television series and the screenplay on which it was based. The *Twin Peaks* court held "that literary titles do not violate the Lanham Act 'unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.'" *Id.* at 1379 (*quoting Rogers v. Grimaldi*, 875 F.2d 994, 998 (2nd Cir. 1989). In *Rogers*, the Second Circuit had decided previously that, in situations in which there is a "hybrid commercial-artistic function", a Lanham Act claim is subject to a "stringent balancing test". *See Twin Peaks*, at 1379, n. 4. *See also No Fear, Inc. v. Imagine Films, Inc.*, 930 F.Supp. 1381, 1383 (C.D.Cal.1995) (endorsing the *Rogers* "balancing" approach [as] generally applicable to Lanham Act claims against work of artistic expression. . . . This approach takes into account the ultimate test in trademark law, namely, the likelihood of confusion as to the source of the goods in question"), *citing Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group*, 886 F.2d 490, 495 (2nd Cir.1989).

Courts in the Second Circuit, have stressed, however, that, in making this determination, the first point of reference is the familiar digits of confusion. If, as *Twin Peaks* holds, a plaintiff's showing on the likelihood of confusion factors must be "particularly compelling" to overcome "the constitutional protection afforded expressive activity", then it appears that PRL is correct in questioning its relevance to this litigation. That inquiry triggers an assessment of PRL's next contention, which is that this litigation centers on Westchester's attempt to use "Polo" in its trademark sense, not as an aspect of "artistic expression". (*See Twin Peaks*, at 1379, and letter from Carey Ramos, June 4, 1999, Docket Entry # 211). It is beyond dispute that Westchester has argued, all along, that it has a right, pursuant to its incontestable registration, to use its mark, "Polo", to identify it as the source of the goods so labeled. The court has accepted that argument and has analyzed the issues accordingly. The threshold of that analysis is whether the contested mark is being used in a way that misleads consumers as to any association or affiliation with PRL. The central question again, and the most crucial one, is whether such use of the mark correctly identifies the proper source of the magazine.

Accepting, for these purposes, without necessarily deciding, that *Sugar Busters* has "raised the bar", in this circuit, in a trademark analysis, and requires that "particularly compelling" circumstances exist before an injunction can issue in view of a first amendment objection, the court still finds such relief appropriate here. For the reasons discussed earlier, the court has found that the New Polo Magazine, with its expanded distributorship, recent high-profile presence in the retail market, its advertising, its layouts, and its altered content which features matters beyond the equestrian sport of polo, does create a likelihood of confusion with PRL. This likelihood of confusion has been cor-

roborated by both the MMR survey and anecdotal evidence of actual confusion. Further, the evidence is clear that Westchester's principals were well aware of the PRL marks before deciding to re-vamp the magazine, and the credibility findings dictate the conclusion that Plaintiffs intended to trade on PRL's established good will and reputation. In view of PRL's showing on the likelihood of confusion, and considering all of those matters, including Plaintiffs' intent in launching two magazines rather than one, together with the wholesale alteration of Westchester's advertising and marketing strategy, the court concludes that injunctive relief is appropriate, and does not imperil any first amendment right. *See Anheuser–Busch, Inc. v. Balducci Publications*, 28 F.3d 769 (8th Cir. 1994), *cert. denied*, 513 U.S. 1112, 115 S.Ct. 903, 115 S.Ct. 903, 130 L.Ed.2d 787 (1995); *Silverman v. CBS, Inc.*, 870 F.2d 40, 49 (2d Cir.), *cert. denied*, 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989). Because the court has also determined that a disclaimer is not an appropriate, available remedy in this instance, full injunctive relief is required, even in light of Plaintiffs' first amendment claim. Such relief will effect no prior restraint on Plaintiffs' ability to publish its magazine and will not give rise to a first amendment impediment. *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir.), *cert. dism'd*, 521 U.S. 1146, 118 S.Ct. 27, 138 L.Ed.2d 1057 ((1997).

### Laches

■ Westchester argues that this is not an appropriate case in which to enjoin use of an incontestable mark even had PRL proven continuous prior use under § 1065. Plaintiffs hope to persuade the court that the New POLO Magazine is a mere continuation of the Old POLO Magazine, published under its trademark registration which covers "equestrian sports and lifestyle". Accordingly, it argues that PRL's knowledge and support of Ami Shinitzky's magazine, through Ralph Lauren's 1975 interview, and subsequent advertisements, defeats PRL's infringement and dilution claims. Plaintiffs are adamant that PRL "slept on its rights" because it never lodged an objection to use of the name "POLO", for a magazine, until a "cease and desist" letter was sent in September of 1997. Plaintiffs rely on the Fifth Circuit's ruling in *Elvis Presley Enterprises* in support of its argument that PRL should be barred by the equitable doctrine of laches from contesting the use of *POLO* as the name for a "lifestyles magazine". From all of the facts developed, this contention presents a much closer question than either of Westchester's other defensive issues. To succeed on the defense of laches, Plaintiffs must establish that the following circumstances are present: "(1) an unreasonable delay by one having legal or equitable rights in asserting them; and (2) a good faith change of position by another to his detriment because of that delay ." *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d at 1082 (*citing Rogers v. Ricane Enterprises. Inc.*, 772 S.W.2d 76, 80 (Tex.1989)). *See also Conan Properties, Inc. v. Conan's Pizza, Inc.*, 752 F.2d at 153; *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d at 1161; *Environmental Defense Fund, Inc. v. Alexander*, 614 F.2d 474, 478 (5th Cir.), *cert. denied*, 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980). Prejudice can also occur if it would be seen as inequitable to allow a plaintiff's claim to be enforced in light of some change in the defendant's position. "Specifically, prejudice ensues when a 'defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed'." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2nd Cir.1996) (*quoting Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 808 n. 17 (8th Cir.1979). In this regard, Westchester is vehement in its assertions that it has expended millions of dollars in proceeding with the publication, and new distribution methods, since it purchased the trademark rights from Fleet Street and Ami Shinitzky. PRL, on the other hand, responds that Westchester was on

notice since June 1997, at the earliest, or on September 26, 1997, at the latest, when Mr. LoCicero sent the cease and desist letter. Further, PRL points to misleading actions by Westchester which were meant to imply that Ralph Lauren was assisting and supporting the new publication.

 Westchester's witnesses testified that during the years preceding its purchase of *POLO* Magazine, potential advertisers frequently asked Fleet Street employees whether there was a connection between the magazine and PRL/Ralph Lauren. (*Zoe Prokos Dep. 9:10 – 12:16, 40:17 – 41:8* ) (potential advertisers would often ask if there was a connection between *POLO Magazine* and PRL; when asked how often, she responded: "I would have to say it happened thousands but I don't know, I couldn't even guess. It was a constant, everyday occurrence"); *Marilyn Bartel Dep. 8:2 – 8:20, 15:3 – 15:23* (asked "several times a month" whether *POLO Magazine* and PRL were affiliated); *Elizabeth Carey Dep. 17:5 – 23:21* (potential advertisers would occasionally ask if there was a connection between the magazine and PRL). However, Westchester has not shown any evidence that PRL was aware of these continuing inquiries.

Further, the trial evidence shows that PRL was not put on full notice of Westchester's plans to revamp Ami Shinitzky's *POLO* Magazine into the current mass distribution fashion and lifestyle product, and so Westchester did not rely to its detriment on any actions by PRL in the spring and summer of 1997. Westchester contends, and it is true, that its staff met and corresponded with PRL representatives shortly after the purchase and before the relaunch of *POLO Magazine.* The court finds, however, that PRL first raised a concern about the use of the name "Polo" for a magazine devoted to "adventure, elegance and sport", at a June 23, 1997, meeting with then-publisher Reid Slaughter. (11/18/98 A.M. Tr. 97– 106; Plaintiffs' Exhibit # 6A, # 12A). That meeting was between PRL representative, Elizabeth ("Liz") Morris, and Mr. Slaughter, who hoped to sell advertising space in the magazine to the Ralph Lauren companies. At the outset of the meeting, Ms. Morris expressed concern about Westchester's authorization to use the name "POLO" for the magazine that Reid Slaughter was "pitching". According to portions of Mr. Slaughter's testimony, he then explained that the magazine had been published for years and that Westchester had purchased the trademark from Fleet Street Publishing. It is reported that one of Ms. Morris' assistants was present at the meeting, and stated that she was aware of Ami Shinitzky's magazine, *POLO.* (11/18/98 A.M. Tr. 97– 106). Mr. Slaughter testified that he believed that he had answered Liz Morris' questions about use of the name "POLO", and that Ms. Morris never raised the issue again. (11/18/98 P.M. Tr. 57).

At her deposition, Ms. Morris testified that, during their meeting, Mr. Slaughter told her about the re-launch, the Neiman Marcus promotion, and the magazine's proposed distribution. She asked questions about, among other things, the magazine's content. In response to those inquiries, Mr. Slaughter left her with a media kit. (*Elizabeth Morris Dep. 53:14 – 53:19, 54:24 – 58:5; 59:23 – 60:14, 62:4 – 63:16* ). Ms. Morris stated the media kit contained an "outline of what the magazine was meant to be, its circulation, its content, how they were first going to distribute it, how they were going to follow-up". (*Id. 49:12 – 50:18* ). At the end of the meeting, Ms. Morris told Reid Slaughter that she would take the request to advertise in the magazine under consideration, that she wanted to "show it to Ralph", and was going to raise Westchester's offer that night at a meeting of PRL's senior executives. (*id. 63:17 – 63:24* ) *11/18/98 a.m. 100:6 – 100:25* ). Ms. Morris and Mr. Slaughter scheduled another meeting for early August 1997. Westchester contends that, in the interim, and at her request, after she and Reid Slaughter were unable to schedule a second meeting, it sent addi-

tional information to Ms. Morris, in the form of updated layouts of the magazine. (11/18/98 A.M. 102– 104 (Slaughter); 11/18/98 P.M. 54 – 55 (Slaughter); Plaintiffs' Exhibit # 44).

On direct examination, Mr. Slaughter testified that when he presented Ms. Morris with a sales pitch on the New POLO Magazine including "actual layouts of stories", she had responded quite positively. (11/18/98 A.M. Tr. at 99.) The court finds that testimony disingenuous. From all of the evidence presented, the court concludes that, at the meeting, Ms. Morris expressed concern about the use of the title "Polo." In fact, Mr. Slaughter's first description of this meeting omitted, entirely, the fact that Ms. Morris raised concern about the name of the magazine when the meeting began. (Declaration of Reid Slaughter, filed in support of Westchester's response to PRL's motion for preliminary injunction; 11/18/98 P.M. Tr. at 37.) In essence, Mr. Slaughter testified that he "reassured" Ms. Morris by relying on descriptions of the Old POLO Magazine, as well as on Ralph Lauren's personal knowledge of the Ami Shinitzky magazine. (11/18/98 P.M. Tr. at 37–38.) Indeed, Mr. Slaughter confirmed that, throughout the meeting with Ms. Morris, he stressed that his magazine was not a new one, because a new periodical would have been more difficult to sell to prospective advertisers. (11/18/98 P.M. at 35–36.) Further, after Mr. Slaughter's "reassurances," he claimed that he showed Ms. Morris materials on the magazine including two "mock-up" covers. However, the covers which were shown to Ms. Morris were never actually used on the New POLO Magazine. In fact, one of the covers shown to Liz Morris was a photo of a horse, even though a horse has never been displayed on any cover of the New POLO Magazine until the February 1999 issue. (11/18/98 P.M. Tr. at 50; 55; Defendants' Exhibit # 1). Mr. Slaughter also testified, at first, that he had shown Ms. Morris "actual layouts, which was about 20 different 11 by 17 pages of actual layouts of stories."

(11/18/98 A.M. Tr. at 99.) Mr. Slaughter later recanted, clarifying that he had really given Ms. Morris only the two mock covers, the advertising rate and deadline information, and one page from a fledgling media kit. It is significant to this dispute to note that the media kit given to Ms. Morris did not include a "mission statement" describing the New POLO Magazine. (11/18/98 P.M. Tr. at 50–52, 55.) Further, the more detailed, actual layouts of the magazine were not delivered to Polo Ralph Lauren until nearly two months later, on August 12, 1997, little more than six weeks before PRL sent Westchester its letter objecting to the New POLO Magazine. (Plaintiffs' Exhibit # 45; 11/18/98 P.M. Tr. 56; Defendants' Exhibit # 48.) Finally, while Mr. Slaughter swore that he received "support" and many "positive signs" from Polo Ralph Lauren after this June 23 meeting, under cross-examination he confirmed that, despite repeated attempts by Westchester, neither Mr. Slaughter nor his assistant, Victoria Martin, ever again met with anyone from Polo Ralph Lauren. (11/18/98 P.M. Tr. 40–42.)

Westchester also argues that it relied "specifically" on Defendants' "support" for its re-launched magazine, as expressed through an invitation from PRL's advertising agency, Carlson & Partners, to participate in "Magazine Week." Westchester points out, accurately, that in September 1997, PRL's advertising agency invited it to attend "Magazine Week", an opportunity for a select number of magazine "finalists" to appeal to PRL with advertising deals. (11/18/98 A.M. 104–106; Plaintiffs' Exhibit # 12A). This invitation was confirmed in a fax sent to Westchester on September 24, 1997. (Plaintiffs' Exhibit # 12A). But, again, all of the circumstances surrounding the invitation are more telling than the fact of the invitation itself. The trial evidence revealed that PRL's agency extended this invitation only after misleading representations were made to Ralph Lauren's staff. The record shows that, after Victoria Martin failed to

obtain any follow-up appointment with PRL, she wrote Ms. Morris a letter stating that a "well known celebrity and good friend of Mr. Lauren" had presented the New POLO Magazine to him and she suggested that he had reacted "positively" to the new magazine. It is apparent from all of the evidence that these statements were not true. (Plaintiffs' Exhibit # 47; 11/18/98 P.M. Tr. at 42–46 (Slaughter)). Internal notes from PRL's files, and Ms. Morris' deposition testimony, are convincing evidence that the invitation was prompted by Ms. Martin's misleading statements regarding the "celebrity friend", and Mr. Lauren's purported reaction to the "re-launch". (Plaintiffs' Exhibit # 47; Morris Depo. at 71–72, 83–85.) The invitation to attend "Magazine Week" was later rescinded when PRL realized that it concerned the New POLO Magazine. (11/18/98 A.M. Tr. at 49 (Slaughter).) On September 26, 1997, PRL sent a letter objecting to Westchester's relaunch of POLO Magazine. (11/18/98 A.M. 106 – 107; Plaintiffs' Exhibit # 50, # 183). Indeed, given this court's finding that Westchester intended to benefit from the success and goodwill that PRL has built up over the years, a reasonable inference may be drawn that Westchester purposefully misled PRL in its early solicitations for advertisements.

A much closer question than the Liz Morris meeting is presented by Westchester's evidence of an article which appeared in Ad Week Magazine in 1989. Plaintiffs rely on this to support the claim that PRL's suit is equitably barred by laches or acquiescence. Almost ten years ago, Ad Week described the content of Fleet Street's POLO Magazine as follows:

> Started in 1974 as a journal for players, the monthly magazine recently repositioned itself.... "We had to become more lifestyle oriented," explains founding editor Ami Shinitzky, "because polo is really a way of living, like in those sumptuous Ralph Lauren ads."

\* \* \* \* \* \*

> Still, the new Polo bears a striking resemblance to one of Lauren's ads. It's loaded with pictures of upscale people having a good time at country clubs. Shinitzky hopes to attract advertisers that want to reach just that crowd. So far, he's had some success, getting Rolls Royce, Rolex and, yes, Ralph Lauren to sign on.

(Plaintiff's Exhibits # 25).

Buffy Birrittella, Ralph Lauren's assistant and a ranking PRL executive, admitted that she had reviewed that Ad Week article at the time that it was published, but that she and Mr. Lauren did nothing to object to the Fleet Street magazine. (11/16/98 P.M. Tr. 27– 28). It is true, as Westchester asserts, that nowhere is there any evidence that PRL registered a complaint to Fleet Street, or to Ami Shinitzky, about the proposed "lifestyle content" of his POLO Magazine. Ms. Birrittella testified that she was not concerned with this article, or with POLO Magazine's content in 1989, and that PRL continued to place advertising in the Fleet Street magazine even after that article was published. In fact, Ms. Birrittella referred specifically to the cologne ad which appeared in the March 1989 edition. Westchester maintains that these advertisements defeat PRL's request, at this late date, for injunctive relief. (11/16/98 P.M. Tr. 27– 28).

When confronted with this evidence, PRL has responded that "... aspirations didn't bother us. Reality bothered us." (01/28/99 Tr. 95). In truth, the court, having had the opportunity to hear and observe Ami Shinitzky, is convinced that, no matter how charming, sophisticated, urbane, and sincere he may have been in wishing to launch a national "lifestyle" magazine, his chances for success in such a venture were negligible. It is one thing to direct a publication which follows the sport of polo, and its participants, when the audience and distribution method is a relatively small and captive roster of USPA members. Indeed, the advertising rates and

the costs of the Fleet Street publication underscore this. It is quite a different matter to succeed in the competitive publishing market when the intended audience is much larger and more diverse; an audience, for instance, similar to the universe of Neiman Marcus cardholders.

■ An additional, but a crucial, inquiry in determining whether there has been an unreasonable delay involves an examination of why any delay has occurred. One pertinent justification is discussed in Professor McCarthy's treatise: "The senior user has no obligation to sue until 'the likelihood of confusion looms large' and certainly '[o]ne cannot be guilty of laches until his right ripens into one entitled to protection. For only then can his torpor be deemed inexcusable'." 5 McCARTHY, supra, § 31:19 at 31–43, quoting Johanna Farms, Inc. v. Citrus Bowl, Inc., 468 F.Supp. 866 (E.D.N.Y.1978)). As McCARTHY explains further, "[w]hile a slow, steady increase in the level of business attributable to the normal growth of any business may not always be sufficient to excuse a prior delay, any . . . expansion into new . . . territories should be sufficient to excuse a prior delay." 5 McCARTHY, supra, § 31:19 at 31–43– 44). It is also true that, "[t]he owner of a mark is not required to police every conceivably related use thereby needlessly reducing noncompeting commercial activity and encouraging litigation in order to protect a definable area of primary importance." Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc., 486 F.Supp. at 422–23. In that regard, it is notable that, when Reid Slaughter stepped down as publisher of the New Polo Magazine to return to Cowboys and Indians, his replacement was James Lonergan, whose educational background and prior experience in magazines had been in marketing and advertising, not in writing, photography, or even sports,

much less equestrian sports. The court notes as well, an appearance by the New POLO Magazine's former editorial and design director, Steve Connatser, on Good Morning America, on October 21, 1997. Mr. Connatser was interviewed after the lawsuit had been filed, and after the notorious "Hunsaker letter" had been mailed. In that interview, Mr. Connatser confirmed that the magazine hoped to go from a circulation of 6,000 to 250,000 circulation, conceding that it was "very ambitious and we think we can reach it." (Defendants' Exhibits 45A) [9]

Here, Plaintiffs also point out that Ralph Lauren was himself the subject of a feature article in a 1975 edition of POLO Magazine, and that the company advertised repeatedly in that magazine during the years that followed. For this reason, Plaintiffs suggest that, while the eight-month delay in Elvis Presley may have been insufficient to bar injunctive relief, "the 20–year history of non-controversial publication of Fleet Street's magazine" should suffice to defeat PRL's claims here. But this argument is without merit. From all of the facts and circumstances presented, the court cannot agree that any arguable period of delay began in 1975. Instead, the applicable period of delay, if any, was triggered by the re-launch of the publication in the Fall of 1997. Indeed, even Plaintiffs suggest an alternative date as the one on which any laches analysis should hinge. Plaintiffs point to June 23, 1997, the date on which the meeting took place between representatives of the marketing department of the New POLO Magazine and Elizabeth Morris of PRL. If that meeting date is deemed the most logical "trigger", the court concludes that PRL began documenting its objections just three months later, with the cease and desist letter to Westchester. The court

---

**9.** In the course of the interview, the anchor person also remarked, "Let's face it, his company is Polo Ralph Lauren, your magazine is Polo, and while I'm not a design artist, it looks to me that even the logos are rather similar. . . . I know there's litigation. You're not going to want to comment specifically on all of this, but you know, there might be people who could be confused, you might admit, yes?" (Defendants' Exhibit # 45A).

finds, from the present record, that there was no inexcusable delay from the time that PRL realized the new focus of POLO Magazine, to the time that it raised written objections. The court finds that PRL did not delay unreasonably in moving to enjoin Westchester's use of the name for the "re-launch", nor did it acquiesce in such a use for the New POLO Magazine. *American Auto. Assn., Inc. v. AAA Ins. Agency, Inc.*, 618 F.Supp. 787, 796 (W.D.Tex.1985) (*citing Citibank, N.A. v. Citibanc Group*, 724 F.2d 1540, 1546–47 (11th Cir.1984)). As detailed earlier, this court finds that the magazine published by Westchester is an entirely new product and different from the Old POLO Magazine in most aspects. Because the court finds that the activity at issue began with the "re-launch" of the New POLO magazine in 1997, it finds further that PRL neither delayed unreasonably in moving to enjoin that publication, nor acquiesced in Westchester's infringing use.

In addition, the cases cited by Westchester do not provide support for denying injunctive relief on the grounds of "delay." In *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir.1985), the plaintiff waited nine months to seek a preliminary injunction and knew of the defendant's infringing activity for more than four years prior to filing suit. In *GTE Corp. v. Williams*, 731 F.2d 676 (10th Cir.1984), the plaintiff knew about the defendant's infringing activity for three years before seeking relief. Westchester has also relied on *Kellogg Co. v. Exxon Corp.*, No. 96–3070 G/A, slip op., 1998 WL 1051061 (W.D.Tenn. Aug. 31, 1998), as support for its defenses of laches and acquiescence. But the Kellogg court found, specifically, that "the connection between the parties' products and marketing channels for the sale of their products is too attenuated to support Kellogg's claim of progressive encroachment," *Kellogg Co.*, Slip.op. at 27. The court pointed out that Exxon's use of the contested tiger mark was only in connection with convenience stores located at gasoline stations, while Kellogg's cereal products are in mass dis-

tribution. *Id.* Unlike *Kellogg*, the marketing channels at issue in this case are similar, and the court finds that Westchester's magazine is one within the "natural zone of expansion" for PRL. PRL's extensive presence in national fashion and lifestyle magazines, and the context in which the New POLO Magazine presents the "POLO" mark distinguish these facts from the ones addressed in *Kellogg*. The New POLO Magazine presents the "POLO" mark on a product that is directed towards "upscale" consumers and advertisers who are not connected in any way with the sport of polo. In contrast, the Exxon tiger mark continued to be used, as it had for many years, in connection with convenience stores located on the premises of Exxon gasoline stations. Kellogg, on the other hand, continued to produce cereal products and made no showing that its zone of natural expansion included gasoline station services.

Finally, many courts have held that laches may not, even if otherwise successful, necessarily, bar injunctive relief. *Conan*, 752 F.2d at 152 (citations omitted); *American Rice, Inc. v. Arkansas Rice Growers Co-op. Assn.*, 532 F.Supp. 1376 (S.D.Tex.1982), *aff'd*, 701 F.2d 408 (5th Cir.1983). In *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455 (4th Cir.) *cert. denied*, 519 U.S. 976, 117 S.Ct. 412, 136 L.Ed.2d 325 (1996), a permanent injunction was found justified even though the defendant claimed laches and acquiescence should preclude such relief. The court found that the public interest in avoiding confusion and mistake dictates that laches is not to be "rigidly applied" when a strong showing of likelihood of confusion has been made. After examining the effect of any unreasonable delay on plaintiff's infringement claims, the court, in *Sara Lee*, determined that "actual confusion trumps the defenses of laches and acquiescence." *Id.* at 461. *See* 5 McCarthy, *supra*, § 31:41 at 31–76–77. *See also, Resorts of Pinehurst, Inc. v. Pinehurst National Corp.*, 148 F.3d 417, 423 (4th Cir.) *cert. dism.*, 525 U.S.

1051, 119 S.Ct., 614, 142 L.Ed.2d 554 (1998). Although, the Fifth Circuit Court of Appeals once commented, in a footnote, that "there is no doubt that laches may defeat claims for injunctive relief as well as claims for an accounting", that proposition is anything but certain in this circuit.[10] *Armco, Inc. v. Armco Burglar Alarm Co.,* 693 F.2d at 1160 n. 14, (*citing Roto–Rooter Corp. v. O'Neal,* 513 F.2d 44, 46 (5th Cir. 1975), and *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037 (2nd Cir.1980)). Three years later, in *Conan Properties, Inc. v. Conans Pizza, Inc.,* 752 F.2d at 152, the Fifth Circuit remarked that "[a] finding of laches alone ordinarily will not bar the plaintiff's request for injunctive relief, although it typically will foreclose a demand for an accounting for damages." The *Conan* court also cited decisions from the Supreme Court, as well as from the Seventh and Second Circuits on this point. The *Conan* court pointed out that delay, which implies consent, amounts to nothing more than a revocable license and that license is revoked once the plaintiff does lodge an objection to the infringing action. *See Menendez v. Holt,* 128 U.S. 514, 524, 9 S.Ct. 143, 32 L.Ed. 526 (1888). The court cautioned, however, that, in those situations in which a defendant can be seen to actually rely upon the plaintiff's affirmative actions, the fiction of "implied consent" is not applicable and an injunction is not appropriate. *Id.* (*citing Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037 (2nd Cir.1980)). As PRL has not asked for money damages in this case, delay alone, even if present, will not preclude recovery. *See World Gym Licensing, Ltd. vs. Fitness World, Inc.,* 47 F.Supp.2d 614 (D.Md. 1999).

■■■ Westchester also contends that PRL's relief is barred by the equitable doctrine of acquiescence. "Laches is commonly defined as an inexcusable delay that

results in prejudice to the defendant", "while acquiescence involves the plaintiff's implicit or explicit assurances to the defendant which induces reliance by the defendant." *Conan,* 752 F.2d at 153 (*citing to Matter of Bohart,* 743 F.2d 313, 315 (5th Cir.1984), and *Dwinell–Wright Co. v. White House Milk Co.,* 132 F.2d 822, 825 (2nd Cir.1943)). Of course, as affirmative defenses, Westchester must prove how it has been prejudiced by either an unreasonable delay or an assurance, implicit or explicit, on PRL's part. *See Bohart,* 743 F.2d at 326 n. 13. In *Elvis Presley Enterprises,* 141 F.3d 188, the Fifth Circuit remarked that "[a]ny acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of the plaintiff's objection to such acts. Noninfringing use of a mark is not relevant to a defense of laches." *Id.* at 205 (*citing Conan Properties,* 752 F.2d at 151–52, and to *Mead Johnson & Co. v. Baby's Formula Serv., Inc.,* 402 F.2d 19, 22 (5th Cir.1968)). Moreover, in describing activities during the eight-month period of purported detrimental delay in the *Elvis* case, the Fifth Circuit observed that "no undue prejudice has been shown as a result of the delay in this case ... [c]hanging the name of the bar would not have destroyed the investment of capital in the nightclub." *Elvis Presley Enterprises,* 141 F.3d at 205–06.

Here, Westchester acquired the registration from Fleet Street in May of 1997, and immediately began a wholesale change in the magazine's organizational structure, editorial thrust, and targeted audience. PRL knew, or should have known, of this new direction in June 1997 when the meeting between Ms. Morris and Mr. Slaughter took place. Even at that, the court is convinced that Ms. Morris was given misleading information about the extent of the new venture by Reid Slaughter's failure to provide accurate cover mock ups and a complete media kit. When PRL was fully

---

10. In *Armco,* the court of appeals found that a six year lapse from the time the defendant "knew or should have known" of defendant's infringement until the litigation began was critical because it was during that six-year period that defendant's business grew substantially. 693 F.2d at 1162.

informed about the new venture, it promptly sent a cease and desist letter. The court finds that the time that elapsed, from June to September 1997, does not constitute undue delay in this instance. Acknowledging Westchester's argument that PRL was on notice of the magazine's intentions and goals from the Shinitzky era dating to 1975, the court emphasizes that in revamping the product, the Westchester magazine encroached in areas that Ami Shinitzky's product never did. In *Mead Johnson & Co. v. Baby's Formula Service, Inc.*, a finding that laches barred injunctive relief was set aside in circumstances similar to the ones here. In that case, the plaintiff took no action against a defendant who had been openly using a name similar to its own product, since 1959, and did not lodge a protest until 1966, when it learned of significant changes in defendant's design and marketing practices. In setting aside the original order, the court found that the trial court had erred in considering the years of non-infringing use as relevant in determining that laches had been shown, or as an indication that plaintiff had acquiesced in the illegal conduct. *Id.* at 22. The Fifth Circuit remarked that, from the time that the plaintiff actually learned of the infringing use, only four months had elapsed, and that during that four months, investigation and the preparation of suit took place which could not "legally constitute laches". *Id.*

Further, as shown earlier, before its acquisition by Westchester, *Polo Magazine* described itself as belonging in the SRDS category of publications dedicated to horses and horse breeding. That is surely some evidence that, in that era, it considered itself a "horsey" periodical rather than a lifestyle magazine. The court finds that the "re-launch" of POLO Magazine created a new publication with a different look, a different content, and a decidedly different target audience. Again, it is important to note that PRL has shown evidence that, in response to the question "Who are you?", a measurable percentage of those surveyed respond "Ralph Lauren", after viewing a copy of the New Polo Magazine. Although Westchester argues that similar associations with Ralph Lauren were pervasive during the Fleet Street years, no evidence has been produced, or even suggested, that PRL was aware of that association by Fleet Street advertisers. The court finds that when PRL became aware of the emphasis on matters other than the sport of polo, it lodged its objections within a reasonable time. The cease and desist letter was sent in September of 1997, shortly after it was alerted to the "re-launch", and neither laches nor acquiescence will serve as a bar to injunctive relief.

### Injury to PRL's Mark

"The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *See Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987). On this record, the court still finds the question of harm to PRL, as a result of the infringement of its mark a close one, with no real analogies in the published cases. PRL argues that because consumers are likely to be confused about an affiliation between it and the magazine, it will suffer irreparable harm if permanent injunctive relief is not granted. PRL contends that the inherent damage to its reputation which will result from its inability to control the use of its own mark, given the likelihood of confusion with this magazine, requires such far reaching and permanent relief. PRL has expressed two primary areas of concern. One is a perceived consumer impression that the New POLO Magazine, through its advertising content, is endorsing competitors' products. Certainly that is a serious matter given the time and money PRL has devoted to carving its own niche in the fashion/accessory/home furnishings market. Second, because of its inability to control the manner in which the mark is used,

PRL reports that since October 1997, Westchester has printed material which reflects poorly on the PRL image.

■ This circuit has recognized that the damage incurred by the loss of control over one's mark cannot always be quantified. *Allied Marketing Group, Inc. v. CDL Marketing, Inc.,* 878 F.2d 806, 810 n. 1 (5th Cir.1989) (affirming a finding of irreparable harm, based on damage to plaintiff's goodwill caused by consumer confusion, and stating: "We have recognized that a finding of irreparable harm is appropriate even where economic rights are involved when the nature of those rights makes 'establishment of the dollar value of the loss ... especially difficult or speculative.'") (*quoting Mississippi Power & Light Co. v. United Gas Pipe Line,* 760 F.2d 618, 630 n. 12 (5th Cir.1985)). In *American Rice, Inc. v. The Arkansas Rice Growers Co-op. Ass'n.,* 532 F.Supp. at 1389, the court concluded that "[b]ecause plaintiff may not control the quality of defendant's goods, [plaintiff] has lost and faces future losses of its own reputation and goodwill. This loss of control, in spite of defendant's claim that its [product's] quality equals plaintiff's, constitutes immediate, irreparable harm." (*citing Chips 'N Twigs, Inc. v. Chip–Chip, Ltd.,* 414 F.Supp. 1003, 1018 (E.D.Pa.1976)). "Good will and reputation are protected under the Lanham Act, and there is a likelihood that Plaintiff's will prevail in its claim that Defendants' conduct is damaging thereto. Irreparable injury may result if Defendants' abuse of Plaintiff's name and good will is not enjoined." *Better Business Bureau of Metropolitan Houston, Inc. v. Medical Directors, Inc.,* 509 F.Supp. 811, 814 (S.D.Tex.1981), *aff'd,* 681 F.2d 397 (5th Cir.1982). Similarly, other courts have stressed that

> [t]he trademark laws are designed not only to prevent consumer confusion, but also to protect "the synonymous right of a trademark owner to control his product's reputation". *James Burrough,*

*Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 274 (7th Cir.1976).

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2nd Cir.1979).

Although Westchester contends that PRL's evidence has wholly failed to show any real injury, on this record, the court cannot agree. Even a cursory glance through the magazines submitted for the court's review, confirms that the advertising emphasis in the New POLO Magazine is quite different from that in the issues that pre-date October 1997, and so PRL's concern about perceived endorsements of rival goods is appreciable. (*See* Defendants' Exhibit # 1, Plaintiffs' Exhibit # 160, October 1997, January/February 1998, March/April 1998, May/June 1998, July/August 1998, November/December 1998, April 1999, August 1999 issues of New POLO Magazine). The court finds that those advertisements, and, more importantly, some of the articles, repeatedly encourage readers to buy wares that are produced by PRL's competitors. (July 1998 Memorandum Order, p. 40). In addition to the advertisements, many of the fashion features prominently advertise clothes, perfume, and other products made by designers that compete directly with PRL. Further, some of the advertising and photographic displays create images at odds with those which PRL has promoted for 30 years. The court notes a decided difference in the approach to merchandising that is present in some of the articles and the photography used in the fashion features printed in the New Polo Magazine. (Defendants' Exhibit # 41, Defendants' Exhibit # 1, June 1999 issue, p. 66–67). It is likewise clear that, not only has PRL objected to some of the matters contained in the New Polo Magazine, but readers have objected as well. (Tr. 11/16/98 A.M. at 46, 72–73 (Birrittella); 11/16/98 P.M. at 11 (Birrittella); 42 (Sporn)). (Defendants' Exhibit # 1, October 1998 issue, p. 12).

The court concludes that, on the whole, PRL will not have the ability to control its own reputation and goodwill if the New Polo Magazine is allowed to continue under that name. That inability suffices for a finding of irreparable harm, especially because PRL's economic injuries are difficult to establish. Having found that there is a likelihood of confusion, through an erroneous association of PRL to the New POLO Magazine, the court finds that such confusion will engender harm to consumers as well as to Defendants. *Allied Marketing Group v. CDL Marketing, Inc.*, 878 F.2d 806 (5th Cir.1989); *Better Business Bureau of Metropolitan Houston, Inc. v. Medical Directors, Inc.*, 509 F.Supp. 811 (S.D.Tex.1981), *aff'd*, 681 F.2d 397 (5th Cir.1982). Further, the injury to PRL's reputation and goodwill which has ensued, will continue, if injunctive relief is not granted, and the injury caused by the loss of control over its own mark cannot be compensated by money damages. As Westchester has trumpeted the fact that it has circulated and distributed the magazine extensively since its debut, in the hope of acquiring a new audience for the equestrian sport, that injury can only be increased accordingly. James Lonergan, the current publisher, testified at his deposition that, as of the fall of 1998, over one million copies of the New Polo Magazine have been distributed. The magazine is now available on newsstands, in bookstores, hotel rooms and airports nationwide. This is a decidedly different circulation mechanism from the one used by the Ami Shinitzky trade journal.

In *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 854 n. 14, 102 S.Ct. 2182, 2188 n. 14, 72 L.Ed.2d 606 (1982), it was observed that trademark infringement not only "inhibits competition" but also "deprives consumers of their ability to distinguish among the goods of competing manufacturers" (*see also Qualitex Co. v. Jacobson Products. Co., Inc.*, 514 U.S. 159, 163–164, 115 S.Ct. 1300, 1303, 131 L.Ed.2d 248 (1995) (trademark law protects both trademark owners and con- sumers and " 'reduce[s] the customer's costs of shopping and making purchasing decisions', for it quickly and easily assures a potential customer that this item, 'the item with this mark', is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past.") (*quoting* 1 McCarthy § 2.01[2], p. 2–3 (3d ed.1994)). In a trademark infringement case, where there is a showing that "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question' ", the court may find irreparable injury. *Tough Traveler Ltd. v. Outbound Products*, 60 F.3d 964, 967 (2nd Cir.1995) (*citing Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 66 (2nd Cir.1985); *see also Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 708 (2nd Cir.1982); *Nabisco, Inc. v. Pepperidge Farm Brands, Inc.*, 50 F.Supp.2d 188 (S.D.N.Y.1999)).

Finally, in contending that PRL has made no showing of actual harm, Westchester points to the deposition testimony given by Ralph Lauren, in which he stated that he had no "objection" to the contents of the November/December 1998 edition of the magazine. (Defendants' Exhibit # 1; Plaintiff's Exhibit # 160). PRL responds that the issue under discussion, the one with player Adolfo Cambiaso on the cover, and others of recent vintage, appear to have been produced with "the trial schedule and issues clearly in mind". PRL insists that these recent editions include a greater number of articles and photographs related to the sport of polo, and fewer on the unrelated fashion and lifestyle pieces which were prominent in earlier Westchester issues. PRL points out that, for the first time since the Westchester production began, the January/February 1999 magazine features a horse on the cover. (*See* Defendants' Exhibit # 1, Plaintiffs' Exhibit # 160, January/February 1999). PRL declares these "an attempt on the part of Westchester to adjust the record at trial" and that, as such, it is

**1002**

further evidence of Plaintiff's bad intent, rather than proof that it has suffered no harm. (PRL's Proposed Findings of Fact at 52). In evaluating the Ralph Lauren deposition testimony, it should be noted that, while reviewing a copy of the November/December 1998 POLO magazine, Mr. Lauren elaborated on his "no objection" statement as follows:

> If I saw this magazine alone, I saw this guy on the cover, unless I read it, I would think it is a fashion magazine and I would think that it looks like a Polo model, okay? In coming to read it and looking at it, what's also interesting is seeing "Evening Wear Sensual Side" which doesn't connect to anything else that you have showed me right now. So having a model, a modelly look, and "Evening Wear Sensual Side" would catch my eye as saying, is that Polo. Okay. I'm looking at the Evening Wear Sensual Side. Inside the magazine, I'm not really, I don't object too much to the magazine inside. I object to the cover.

Deposition of Ralph Lauren, pp. 78–79.

Later in the deposition, Mr. Lauren remarked that his objections are "no secret", and that,

> This magazine is moving ... in terms of what the image was, okay, from the cover to your brochure that you proposed.
>
> . . .
>
> So evidently, as you are going along, you are very aware of the case, your company is very aware of the case. I object to the way this looks, I object to this cover based on what you have already established. You establish things over a period of years. I didn't establish my business in one moment. I didn't establish the ties by saying this is Polo tie in one day. It took 32 years for people to get to know what I stand for. This magazine is trying to establish an image. Its image that was established when it came out was a fashion magazine using the name Polo, and using evening wear on

the cover of this, it looks like a fashion magazine.

Lauren Deposition pp. 80–81.

Although Westchester argues that this "admission" by Ralph Lauren is "devastating" to PRL's claims, the court concludes that these comments may be interpreted differently. As PRL has stressed, Mr. Lauren was reviewing an edition of the magazine which was published while this litigation was pending, and which places a greater emphasis on the sport of polo in the editorial content than some of the others published earlier in Westchester's ownership. That is certainly a reasonable interpretation of the cited testimony. Further, his extended remarks in reaction to the magazine sum up, pretty well, the essence of PRL's infringement claim. Finally, the fact that Lauren expressed "no objection" to the sports content in that issue of the magazine, serves only to underscore that Westchester's first amendment argument is misplaced. From Ralph Lauren's testimony, it is reasonable to conclude that the PRL objection is to the name "Polo" which has been attached to a magazine devoted to "**Adventure ● Elegance ● Sport**". It is not to the editorial content, per se, that the infringement allegation is lodged, but to the totality of the revamped product, going by the name of "Polo", and which dates from October 1997. To that product, consumers have been shown likely to answer "Ralph Lauren", in response to the ultimate trademark inquiry, "Who are you"?

The court finds further that Westchester's reliance on *National Football League Properties v. Playoff Corp.*, 808 F.Supp. 1288 (N.D.Tex.1992), is without merit. In that case, the evidence was clear that the defendant had taken care to distance itself from the plaintiff's mark and had disclaimed any association with it. In contrast, the court finds that, here, in the New POLO Magazine, Westchester appears to be targeting PRL's customer base. Having found that there is a likelihood of confusion, by an erroneous associa-

tion of PRL to the New POLO Magazine, the court finds that that confusion will engender harm to Defendants and consumers. *Allied Marketing Group v. CDL Marketing, Inc.,* 878 F.2d 806 (5th Cir. 1989); *Better Business Bureau of Metropolitan Houston, Inc. v. Medical Directors, Inc.,* 509 F.Supp. 811 (S.D.Tex. 1981), *aff'd,* 681 F.2d 397 (5th Cir.1982). This is especially so because PRL's economic injuries will be difficult to establish. *See American Rice, Inc. v. Arkansas Rice Growers Cooperative Assn.,* 532 F.Supp. at 1389. The court finds that loss of control to PRL's reputation and good will, in this context, and the injury to PRL's good will and reputation will continue if injunctive relief is not granted.

**Balance of Harm**

 Westchester maintains that it "purchased POLO Magazine out of a desire to expand the appeal of the magazine, the sport of polo, the 'world of polo', and the lifestyle of polo's participants". (July 1998 Memorandum Order, p. 41). It argues that the word "polo and the sport of polo have always evoked images of elegance and the 'high life'" and so "[t]here should be nothing shocking, devious, or more importantly, unlawful, in the notion that Westchester would honestly desire to put those images at the forefront and present them to a broader audience—not at the expense of the sport, but in conjunction with it." (July 1998 Memorandum Order, p. 41). Westchester argues that an injunction would "devastate" its attempts to relaunch the magazine and would make its investment to date, worthless. In making these statements, Plaintiffs insist that the "balance of harm" is clearly in its favor as it has expended time and money pursuing those stated goals, and its expenditures would be futile if PRL succeeds. The court appreciates Westchester's assertion that the injunctive relief requested would cause disruption to its operation and the loss of resources expended, so far, on the new venture. (July 1998 Memorandum Order, p. 41). In support of its rea-

soning, Westchester relies on *National Football League Properties v. Playoff Corp.,* 808 F.Supp. 1288 (N.D.Tex.1992), contending that where the harm to the non-movant is "equal or greater" than the harm to the complainant, no injunction should issue.

In truth though, Westchester proceeded with publication of the magazine even in light of the cease and desist letter, and with full knowledge of PRL's objections. Westchester cannot now complain of a "devastating" economic injury given the circumstances which preceded this litigation. On June 23, 1997, before the first issue of the new magazine appeared, a PRL executive expressed concern over the use of the title "POLO". On September 26, 1997, counsel for PRL notified Westchester, in writing, of its objections to the new magazine title. (Defendants' Exhibit # 48). Westchester cannot now rest on its decision to ignore that notice and transform its own actions into a justification to continue infringing conduct. *Opticians Ass'n. of America v. Independent Opticians of America,* 920 F.2d 187, 197 (3d Cir.1990) (same); *Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d 852, 859 (7th Cir.1982) (defendant "cannot now complain that having to mend its ways will be too expensive").

Westchester also complains that the harm engendered by an order to change its name after "22 years of publication is staggering" and irreparable. But, while Westchester maintains that it will suffer severely if it has to change the name of the magazine, it is difficult to credit that argument. The court concludes that Westchester had made no showing to establish that it will be truly harmed if it is ordered to publish the disputed magazine under a different name. It has been pointed out that the Old POLO Magazine changed its name after 17 months of publication, from "POLO News" to "POLO", and that it changed the appearance of its name/logo three times in the first five years of operation (May/June 1995 issue of the Old

POLO Magazine at 120). Finally, after more than 20 years, it is clear that Westchester changed the name again, this time to *Polo Players' Edition.* The court concludes, from the testimony of the trial witnesses, that Westchester's claimed "identity and goodwill built up over two decades of publication" is limited to the Old POLO Magazine's distribution to a small group of polo enthusiasts, essentially the 3,500 USPA members who received it free as a benefit of their membership. (11/18/98 A.M. Tr. at 73, 76; 11/19/98 A.M. Tr. at 83; Defendants' Exhibit # 59). Moreover, the 22 years of "identity and goodwill", established by Fleet Street's reputation with the USPA roster and its longstanding advertisers, continues today in connection with *Polo Players' Edition.* (11/18/98 A.M., Tr. at 23). Further, if as Westchester contends, an injunction is an inappropriate remedy because such an order would be hopelessly vague and repugnant to first amendment principles, then one cannot but wonder why there is a vehicle, already in distribution, which embraces the purported editorial goal of promoting the sport? *Polo Players' Edition,* under Peter Rizzo's guidance, seems to address all of Westchester's trademark rights, as set out in the incontestable registration. The court is convinced from all of the evidence, that the periodical that is meant to serve the polo playing community is now published under the name *Polo Players Edition,* and the conclusion is inescapable that the New POLO Magazine is not really directed toward enthusiasts of the game, but instead is directed toward a broad spectrum of consumers of a new lifestyle magazine.

Finally, the court cannot help observing that it seems incongruous for Westchester to argue, on the one hand, that Ralph Lauren cannot be allowed to "corner the market on affluence" because it is widely known that polo players and aficionados are well-heeled. On the other hand, Plaintiffs proclaim an egalitarian goal to bring more interest and, presumably, more players and spectators to the game. Because polo is undeniably a sport which requires considerable expenditures for ponies, travel, and equipment, one wonders how great an increase to its present audience, beyond the captive readership of the USPA membership, that Westchester can truly hope to acquire? Based on its own marketing survey, and the economic reality of participation in the sport, can Westchester/Goodman really hope to draw vast numbers of new players and spectators to a sport which requires an investment of six trained ponies, at a minimum, per player, with the concurrent costs for stabling, training, travel and upkeep?[11] Indeed, on February 14, 1999, the *New York Times* published an obituary on polo great, and Texas native, Cecil Smith.[12] The obituary remarked that "Smith's era" was "the American zenith of polo, a game invented by Asiatic nomads and brought to the United States in 1872 by Englishmen riding American horses. Mostly because of the high cost of horses—$12,000 to $15,000 for ordinary polo ponies and $25,000 to $40,000 for the best—only three thousand players are registered with the United States Polo Association." From the evidence at trial it appears that the membership has remained relatively static since that era. (11/18/98 Tr. p. 73, 76; 83; Plaintiffs' Exhibit # 9).

If, as noted in both the *New York Times* obituary and the New POLO Magazine article, Cecil Smith played when the game was at "its zenith", how is it that a high

11. The basics of the game as summarized, from descriptions given by Cecil Smith and others:

> It is played with four players to a team on a grass field 300 yards long and 160 yards wide. A game lasts six chukkers, or periods, of seven and a half minutes each, and each player needs a new horse every chukker.

Frank Litsky, "Cecil Smith, Considered the Best Polo Player Ever, Dies at 94", N.Y. Times, February 14, 1999, at 49.

12. *Id.*

dollar infusion into a trade journal aimed at players, can ever hope to attract a large number of new enthusiasts? (Defendants' Exhibit # 1; Plaintiffs' Exhibit # 160; July/August 1998, POLO Magazine). Smith's obituaries seem to highlight the inherent conflict in Westchester's argument. The game demands great financial resources to fund players and equipment, and so, naturally, it has been the hobby of the affluent. It follows then that the appeal of a magazine devoted to that group is relatively limited. Juxtaposed with that truism is the fact that, if lowly Texan Cecil Smith penetrated that economic barrier in the 1930s, and played at the "zenith" of the game, the conclusion is unavoidable that perhaps the game's appeal is as great as it is ever going to be. (Plaintiffs' Exhibit # 160, June 1999, p. 107). One may even conclude from Cecil Smith's role in the history of the sport that the game is not necessarily married to opulence and elegance, as Westchester so often argues.[13]

On another note, Westchester argues, implicitly, that due to the presence of the disclaimer, or for other reasons, PRL has not shown any occurrence of actual confusion, anecdotal or otherwise, since this court's preliminary injunction order. However, it has not escaped the court's notice, primarily because of Westchester's efforts in calling attention to it, that this litigation has received widespread notoriety. (Defendants' Exhibit # 46—A–F; June 24, 1998 letter from Mr. John Boundas, with attachments A–I). In fact, it would be difficult to find a more litigation-conscious party than Westchester has shown itself to be throughout the course of these proceedings. Even the magazine's subscribers/readers have expressed dismay about the inordinate attention paid to the trademark dispute between PRL and

John Goodman's enterprise. (Defendants' Exhibit# 1, April 1999, Letters, p. 10, letter from John P. Schreitmueller). Besides lending credence to the adage that it is never advisable to argue with those who buy ink by the barrel, this also points to circumstances which explain, to a certain extent, the absence of instances of actual confusion since July 1998. The court remarks upon this because, in this circuit, the weight that is given to a finding of actual confusion is relevant, not only on the likelihood of confusion factors, but also on the balancing of harms in fashioning relief. *Union Nat. Bank of Texas, Laredo, Tex. v. Union Nat. Bank of Tex., Austin, Tex.,* 909 F.2d 839 (5th Cir.1990).

The court is satisfied that PRL's objection is to the use of "Polo" in a misleading manner, a manner which is prohibited under the Lanham Act. The relief that PRL requests is a change to the title of the magazine. That relief is not without legal precedent as Westchester suggests. *See W.G.B.H. Educational Foundation, Inc. v. Penthouse Intern., Ltd.,* 453 F.Supp. 1347 (S.D.N.Y.1978), *aff'd,* 598 F.2d 610 (2nd Cir.1979); *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217 (2nd Cir.1987); *American Assn. for Advancement of Science v. Hearst Corp.,* 498 F.Supp. 244 (D.D.C.1980). In addition, the court is confident that Westchester does have available an outlet that it may use to publish, without any restrictions at all, a magazine devoted to the equestrian sport and that is aimed at its true enthusiasts. That vehicle is currently published under the title *Polo Players Edition.* The court finds that the injunctive relief ordered here does not prevent Westchester from exercising its rights, free of any prior restraint, or other first amendment implication. *See Dr. Seuss*

---

**13.** The humorist Will Rogers, also quoted in Smith's obituary, described one of Smith's tournament successes in the 1930's as follows:

Well, the hillbillies beat the dudes and took the polo championship of the world right out of the drawing room and into the bunk-

house. And she won't go East in years. . . . Poor old society. They got nothing exclusive left. The movie folks outmarried and outdivorced 'em, the common folks took their cocktails, 'near' society took to bridge. Now polo has gone to the buckwheat belt. *Id.*

*Enterprises, L.P. v. Penguin Books, USA, Inc.,* 109 F.3d 1394 (9th Cir.), *cert. dism.,* 521 U.S. 1146, 118 S.Ct. 27, 138 L.Ed.2d 1057 (1997).

The conclusion is inescapable that Westchester went forward with its new publication, assuming the attendant economic risk, with full knowledge of PRL's objections, and its actions since were in light of this court's findings on the preliminary injunction matter. Because PRL has established that irreparable harm will ensue to its mark, as well as to consumers, as a result of the New POLO Magazine, and because Westchester has failed to show that any real damage to its stated business goals will result from a name change, the balance of potential harms favors the grant of an injunction.

**The Public Interest**

■ Westchester argues that the public's interest would be poorly served if it is forced to change the name of its magazine. Relying upon the longtime "connotation" of the word "Polo", and its first amendment argument, Plaintiffs contend, again, that this factor weighs in favor of no injunction because the public is disserved if its interests are limited. However, the benchmark of a trademark infringement action, under the Lanham Act, is whether the public would be misled. The Act is meant to insure that, once established, a trademark can be used as a symbol to "identify and distinguish" the goods or services of its owner. 15 U.S.C. § 1127. In that regard, it seems unjustified to allow a product, which has been shown to confuse consumers, to remain on the market. Indeed, trademark rights need not " 'yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist.' " *Mutual of Omaha,* 836 F.2d, at 402 (*quoting Lloyd Corp. v. Tanner,* 407 U.S. 551, 567, 92 S.Ct. 2219, 2228, 33 L.Ed.2d 131 (1972)). Here, Westchester has available, today, a periodical that it can publish and that is directed to equestrian sports enthusiasts. If it chooses to persist in the publi-

cation of a different magazine, one that is directed to a different audience, with different thematic, editorial, and advertising emphasis, it must select a different name. Further, from all of the evidence presented, the court concludes that the infringing conduct which has taken place, following the acquisition of the marks from Fleet Street, has been intentional.

It is likewise difficult to credit Westchester's insistence that no infringement has been shown, and so no relief is necessary, given the continued inquiries to Westchester's own staff about an affiliation or association with Ralph Lauren. The court is aware that some of that information did not come to light until repeated requests for discovery had been made. In fact, some very relevant documents were produced immediately before trial, or were not produced until the trial had almost ended. In addition, when Westchester was required to place a prominent disclaimer on the cover of the New Polo Magazine, its first response was to request an amendment to the language. When that request was denied, on July 9, 1998, Westchester attempted to change the meaning of the advisory rather than implementing it as ordered. Instead of proceeding with the ordered disclaimer, Westchester crafted a statement which combined a comment on its lack of association with PRL with its hostility toward the Ralph Lauren entities. That was rectified after a complaint by PRL. The court agrees with PRL that, rather than effecting the goal of distancing itself from Defendants, Westchester attempted to use the disclaimer to tout its own product. Subsequently, Westchester placed the disclaimer in a location which, rather than being prominent, is easily obstructed when the magazine is placed in a typical bookstore stall. Further, Westchester continued to send promotional materials and ads which did not contain the disclaimer at all. That conduct, which PRL has characterized as "defiant", persuades the court that, for whatever reason, Westchester has tak-

en actions, either deliberately or negligently, which have effectively avoided the consequences of the interim order. Finally, in the July 1999 issue of the magazine, the disclaimer was so inconspicuous that its size and placement had to be cured by use of stickers.

Whether through purposeful or inadvertent acts, Westchester has not faithfully complied with legal orders and procedures. In balancing how the public is best served, the court is not convinced that such conduct should be overlooked. From all of the circumstances attendant to Plaintiffs' truculent discovery practices and inconsistent use of the disclaimer, the court concludes that Westchester has displayed questionable willingness to "distance itself" from PRL. The conclusion is unavoidable, therefore, that the public interest is better served by granting full relief to PRL. Again, in so finding, the court is confident that an order to Westchester to change the name of its new publication offends neither the first amendment nor acts as a disservice to the public interest, given the specific circumstances of this case.

**Disclaimer**

■ In fashioning relief in this matter, the court is well aware of PRL's repeated request that adverse factual inferences should be drawn on the issue of intent because of Westchester's actions in delaying the transfer of, and even destroying, certain discovery documents. Indeed, much heat has been generated over PRL's complaint that many discoverable documents, helpful to its claims, had been waylaid or destroyed by Westchester throughout the discovery period preceding the trial. PRL has urged the court to find, from those circumstances, that Westchester's actions were in bad faith and so the weight of the digits of confusion is clearly in its favor. The centerpiece of PRL's complaint about Westchester's discovery practices is a letter sent by Rod Hunsaker to prospective advertisers which stated, in part, that the New POLO Magazine is "not about the sport [of Polo], but rather about an adventurous approach to living life." (Defendants' Exhibit # 90). Mr. Hunsaker testified, in his deposition, that he had sent the letter to "hundreds" of potential advertisers, and copies of form letters were not retained. (*See* Rod Hunsaker Dep., 274). PRL has shown little to contradict this assertion. In that regard, Westchester is correct when it points out that, in this circuit, an "adverse factual inference" may be drawn only if there is a clear showing that the complained of actions were taken in bad faith. "Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case." *Vick v. Texas Employment Com'n*, 514 F.2d 734, 737 (5th Cir.1975); *Caparotta v. Entergy*, 168 F.3d 754 (5th Cir.1999).

From the record before this court, no such clear finding is justified. The court accepts, from all of the evidence produced, that Mr. Hunsaker, following his discharge from Westchester, deleted memoranda from his computer as a routine matter and not in a sinister attempt to obscure the facts. But the conclusion that no clear finding of bad faith is possible does not end the matter. This court has expressed its concern, on numerous occasions, about the prejudice and cost to PRL which resulted from the late tender of relevant documents, not only during trial, but even as the trial was ending. These documents were responsive to appropriate requests made well in advance of trial. There is no dispute that one of the items of evidence upon which PRL relies so strongly, the Hunsaker letter, was culled from PRL's own files, and was never tendered by Westchester during the course of discovery or the litigation. This is an extremely troubling omission. No less troubling is the very late disclosure of Rod Hunsaker's memo to John Goodman on his efforts to promote the magazine to advertisers wary about the "Polo" name. ("The Good, The Bad, and The Ugly", Defendants' Exhibit # 94). The fact that so many relevant documents which dealt directly with the

issue of intent and consumer confusion were filed late, or allowed to be destroyed, is a grave matter. Although the court cannot, on this record, derive an adverse inference that Westchester acquired the Fleet Street registration in bad faith, the court does take its discovery behavior into account in contemplating the contours of appropriate relief.

Due to the actions outlined above, PRL has expressed reservations about whether any relief, short of a permanent injunction, could ever insure its rights. The court shares this concern. The conclusion is inescapable that Westchester's attitude toward the discovery process and court proceedings has been rather cavalier. Coupled with these discovery lapses is the curious response by Westchester, and its principals, to the preliminary order on the disclaimer. Although in the usual circumstance, a disclaimer may be an effective remedy, and one that is recommended when a first amendment issue is present, it is not available here. First, Westchester never asked for such relief, never presented any clear evidence on the effectiveness of such relief, and under the prevailing law has waived its right to make such a demand at this time.

> "It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues in evidence to be presented at trial." The claims, issues, and evidence are narrowed by the pretrial order, thereby narrowing the trial to expedite the proceeding. Once the pretrial order is entered, it controls the course and scope of the proceedings under Federal Rule of Civil Procedure 16(e), and if a claim or issue is omitted from the order, it is waived, even if it appeared in the complaint.

*Elvis Presley Enterprises, Inc.*, 141 F.3d at 206 (citations omitted). For the reasons detailed elsewhere in this memorandum, the court finds further that, even if it were to entertain Westchester's evidence of the matter on disclaimer, that is, admit Dr.

Ridgeway's report, but discount those portions which incorporate "question # 4 from Mr. McCullough's survey", a disclaimer would be an ineffective remedy. Through its discovery conduct and inconsistent compliance with this court's orders, Westchester has shown itself to be lax in response to court orders and the rules of procedure.

**Relief**

█ It has been observed that "[t]rademark infringement is a peculiarly complex area of the law. Its hallmarks are doctrinal confusion, conflicting results, and judicial prolixity." *HMH Pub. Co., Inc. v. Brincat,* 504 F.2d 713, 716 (9th Cir.1974). This case is undoubtedly proof of that. But, the overall objective of the law is to protect consumers from being misled as to the quality or source of goods or services; to prevent impairment to the value of the mark; and to strive to achieve those first two goals in a manner consistent with free and fair competition. *Id.* at 716. In crediting each of those goals, this court had to decide fact intensive disputes on competing business goals which, of course, direct the outcome of the required legal conclusions. In making these findings of fact the court has made credibility decisions, after having had the opportunity to observe the witnesses, and to assess their testimony in the light of all of the circumstances and documents presented. With particular regard to the multi-digit test necessary to determine whether a likelihood of confusion is present, credibility findings are critical on the issue of Westchester's intent, as well as on the defenses of laches and acquiescence.

Given the conclusion that a likelihood of consumer confusion results from Westchester's new publication, PRL is entitled to a finding in its favor on the claim of trademark infringement. Unfortunately, the options for relief are limited. PRL is not seeking money damages, but instead an order that Plaintiffs be permanently enjoined from publishing its lifestyle magazine, one devoted to elegance and adven-

ture, under the name "Polo". In deciding whether to order an injunction, it is important to remember that " '[i]n fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable.' " *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d at 550, (*quoting Taco Cabana*, 932 F.2d at 1126). While arguing that no infringement has occurred, Westchester asks the court to impose a less drastic remedy, if any. Westchester now argues that a disclaimer is just such an alternative in this situation. But as discussed earlier, that alternative is not possible for two reasons. One, despite repeated invitations, Westchester never asked the court to consider a disclaimer as a lesser remedy. PRL is quite right in pointing out that in no pre-trial pleadings, including the joint pre-trial order, did Plaintiffs ever ask the court to consider disclaimer as an alternative measure of relief. While the court may, in any event, entertain such a request to avoid manifest injustice, it declines to do so here.

Further, in pursuit of this alternative relief, Westchester has asked the court to accept the survey findings by Defendants' designated expert witness, Bruno Ridgeway, on the effect of a disclaimer. (*See* Docket Entry # 155). Mr. Ridgeway's reported conclusions have been admitted, over objection, and a full record on that matter has been preserved. But, for the court to accept Plaintiffs' contention on the efficacy of a disclaimer, it would have to disregard certain portions of Mr. Ridgeway's report, those findings that resulted from the tabulations set out in Mr. McCullough's survey responses to "question # 4" (Docket Entry # 151). This process, cumbersome to say the least, and uncertain at best, is rejected. Plaintiffs' proposition is fraught with great potential for speculation about just what the remainder of the Ridgeway report actually proves. Having repeatedly turned aside opportunities to present evidence on the disclaimer matter, Plaintiffs' attempts at this stage are not

persuasive. Most importantly, even if otherwise convincing, the Ridgeway survey results do nothing to dispel the court's deep concern about future adherence to a disclaimer order.

The second reason that a disclaimer, even if otherwise appropriate, as the least drastic remedy is unavailable, stems from this court's experience with its prior orders. In the court's estimation, Westchester not only attempted to evade the clear import of the existing disclaimer order, but it has tolerated repeated lapses, and even the *de facto* absence, of the disclaimer from a recent edition of the magazine. While the court is quite comfortable in accepting Westchester's assertion that the typeset error was inadvertent, and quickly remedied, it does not have equal comfort that another disclaimer order will meet with better compliance.

As a final matter, Westchester has been insistent that PRL's requested relief would be vague and overbroad because an order granting an injunction could not meet the specificity requirements set out in Federal Rule of Civil Procedure 65(d). The purpose of Rule 65(d) "is avoidance of injunctions which do not set out fairly for the benefit of the enjoined party what conduct is forbidden." *Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 129 (5th Cir.1973). "But the rule does not require the impossible. There is a limit to what words can convey. The more specific the order, the more opportunities for evasion ('loopholes') .... [T]he court may prefer brief imprecise standards to prolix imprecise standards." *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1431–32 (7th Cir.1985) (affirming injunction restraining defendant from producing "colorable imitation" of logo), *cert. denied*, 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986). It is well settled that

> [a]n infringer, enjoined from using an infringing mark ordinarily must stay a "safe distance from the margin line" and not crowd the plaintiff's trademark with

a similar usage. This duty should not be undercut by a court redesigning or modifying the infringing mark just beyond the point where legal liability ends. Courts are ill-suited to determine how much an infringing mark needs to be altered before it becomes non-infringing or whether an explanatory phrase would have any impact at all on the public. Explanatory phrases, while required by the courts in certain instances, have been held to increase confusion instead of to diminish it.... Indeed, it should not be the responsibility of the courts to redesign an infringing trademark because of First Amendment considerations, any more than they should re-write obscene matter or re-draft libelous utterances in applying the least restrictive remedy concept of Constitutional law.

2 *Gilson supra*, § 5.09[5] at 5–181– 182.

Westchester's contention that full injunctive relief is not authorized under the law is without merit. Numerous courts have enjoined the use of a name on a magazine when the facts and law so demand. *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217 (2nd Cir.1987); *Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc.*, 687 F.2d 563 (2nd Cir.1982); *American Ass'n. for Advancement of Science v. Hearst Corp.*, 498 F.Supp. 244 (D.D.C.1980); *WGBH Educational Foundation, Inc. v. Penthouse Intern., Ltd.*, 453 F.Supp. 1347 (S.D.N.Y. 1978), *aff'd*, 598 F.2d 610 (2nd Cir.1979). Moreover, in arguing against injunctive relief, Westchester ignores the reality that its New POLO Magazine is a commercial product, advertised and sold for profit, not only with reference to its articles, but also its design, packaging, distribution, readership, circulation, advertisers, and promotional materials. (PRL's Proposed Findings ¶ 73.) The injunctive relief granted affects only the misleading title and impacts in no way the content of Westchester's latest publication.

In fashioning this injunctive relief, the court hopes to make clear that any implication that PRL is claiming, or is entitled to, relief because it has exclusive rights in the word "polo" in any form, or in connection with any service or product, is not well founded. That contention is rejected. The relief granted here is based on the specifics of this case, including Westchester's actions following its purchase of the Fleet Street registration. *See Conan Properties, Inc.*, 752 F.2d at 154. "When fashioning an injunction ... the court must give careful consideration to the possibility that a defendant found to have either infringed the plaintiff's mark or unfairly competed with the plaintiff will modify his behavior ever so slightly and attempt to skirt the line of permissible conduct. Courts have responded to this problem by issuing broad injunctions that prohibit conduct that clearly infringes the plaintiff's mark as well as conduct that ordinarily would not justify any relief." *Conan Properties Inc.*, 752 F.2d at 153, (*citing Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695 (5th Cir.1981), *cert. denied*, 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982)). Because PRL has made its required showing under Rule 65 of the Federal Rules of Civil Procedure, and based on this court's equitable power to fashion any remedy necessary and appropriate to do justice in a particular case, the court finds that injunctive relief is required. *See Wenner v. Texas Lottery Com'n.*, 123 F.3d 321, 325 (5th Cir.1997), *cert. denied*, 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998) (*citing Hecht v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944)). Balancing Plaintiffs' concerns, Defendants' rights, and its proof, with the public interest, the court finds that, under Rule 65, PRL is entitled to full injunctive relief in this matter. The scope of that relief is detailed in a separate order which accompanies this memorandum.

**Request for Attorneys Fees**

PRL has combined its request for injunctive relief with one that its attorneys fees be awarded in this matter, pursuant to 15 U.S.C. § 1117(a). However, the prevailing party in a trademark action must demonstrate that the case is an exceptional one, under the Lanham Act, before such an award is appropriate. Some cases even suggest that such evidence must be proved by a clear and convincing standard. *See CJC Holdings, Inc. v. Wright & Lato, Inc.,* 979 F.2d 60 (5th Cir.1992). In this circuit, "exceptional" trademark infringement actions are ones which have been found to be "malicious", "willful", or even bordering on the fraudulent. *See Texas Pig Stands, Inc. v. Hard Rock Cafe Intern., Inc.,* 951 F.2d 684, 697 (5th Cir.1992). When considering a request for attorney's fees, the court must also balance whether the alleged infringer has presented what it, in good faith, contends is a legitimate bar to the action.

The issues presented in this case do not persuade the court that it is an exceptional one, under the Lanham Act, for which attorney's fees ought to be awarded. These are hard fought and complex issues, some of them matters of first impression in this circuit, and the court declines to award attorney's fees in view of the claims and defenses involved. However, due to the actions that Westchester took in the discovery proceedings pending trial in this matter, the court will award the fees and costs PRL expended in pursuit of all of the documents from Mr. Hunsaker and Mr. Thornburgh. A detailing of those fees may be submitted immediately.

IT IS SO ORDERED.

The Clerk of Court shall file this order and provide a true copy to all counsel of record.